# EXHIBIT 1

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF ALABAMA

3         CIVIL ACTION NUMBER

4         2:15-CV-01006-MHH

5

6  ROBERT BIRCHFIELD COLLIER, JR.,

7         PLAINTIFF,

8  VS.

9  HARLAND CLARKE CORPORATION,

10        DEFENDANT.

11

12

13

14

15

16

17

18

19

20         VOLUME ONE

21  DEPOSITION OF ROBERT BIRCHFIELD COLLIER, JR.

22       MONDAY, MAY 15, 2017

23       JOB NUMBER 212645

**Page 2**

1      S T I P U L A T I O N

2      IT IS STIPULATED AND AGREED by and between

3  the parties through their respective counsel,

4  that the deposition of ROBERT BIRCHFIELD COLLIER,

5  JR. may be taken before Donna Winters,

6  Commissioner and Notary Public, State of Alabama

7  at Large, at the law offices of Burr, Forman,

8  Wells Fargo Tower, 420 North 20th Street,

9  Birmingham, Alabama 35203, on the 15th day of

10  May, 2017 commencing at 9:25 a.m.

11  DEPOSITION OF ROBERT BIRCHFIELD COLLIER, JR.

12

13

14

15

16

17

18

19

20

21

22

23

**Page 3**

1      IT IS FURTHER STIPULATED AND AGREED that

2  the signature to and the reading of the

3  deposition by the witness is reserved, the

4  deposition to have the same force and effect as

5  if full compliance had been had with all laws and

6  rules of Court relating to the taking of

7  depositions.

8      IT IS FURTHER STIPULATED AND AGREED that it

9  shall not be necessary for any objections to be

10  made by counsel as to any questions, except as to

11  form or leading questions, and that counsel for

12  the parties may make objections and assign

13  grounds at the time of the trial, or at the time

14  said deposition is offered in evidence or prior

15  thereto.

16      IT IS FURTHER STIPULATED AND AGREED that

17  notice of filing of this deposition by the

18  Commissioner is waived.

19      In accordance with Rule 5(d) of Alabama

20  Rules of Civil Procedure, as amended, effective

21  May 15, 1988, I, Donna Winters, am hereby

22  delivering to Amy Jordan Wilkes, Esquire, the

23  original transcript of the oral testimony taken

**Page 4**

1  on the 15th day of May, 2017, along with

2  exhibits.

3    Please be advised that this is the same and

4  not retained by the Court Reporter, nor filed

5  with the Court.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 5

1    E X H I B I T S
2    EXHIBIT PG DESCRIPTION
3    DX-1 13 Re-Notice of Deposition of Robert Collier
4    DX-2 14 Plaintiff's Answers to Defendant's First
5    Interrogatories
6    DX-3 16 Robert Collier CV
7    DX-4 21 E-mails re: Strategic Account Executive
8    DX-5 25 RICI Inquiry
9    DX-6 26 7-13-2004 Offer letter
10   DX-7 29 2004 Clarke American employment
11   application
12   DX-8 30 Director Sales II - MICR Job Description
13   DX-9 41 EEA Goals - Confidential
14   DX-10 47 Revenue Channel February 2014
15   DX-11 50 Reveneu Channel December 2014
16   DX-12 53 2011 Professional Annual Appraisal
17   DX-13 55 2012 HCHC Annual Appraisal
18   DX-14 59 2013 HCHC Annual Performance Appraisal
19   DX-15 60 2011 Incentive compensation
20   DX-16 63 2012 Incentive compensation
21   DX-17 63 2013 Incentive compensation
22   DX-18 64 2014 Sales Incentive Plan Document
23   DX-19 65 Commercial Print Special Incentive

Page 6

1    DX-20 70 2014 Incentive compensation
2    DX-21 72 7-27-04 Handbook Acknowledgement
3    DX-22 74 Employee Handbook Revised January 2012
4    DX-23 76 8-1-2010 Human Resources Policy and
5    Procedure re: EEO
6    DX-24 79 6-1-2010 Human Resources Policy and
7    Procedure re: Reasonable Accommodation Policy
8    DX-25 83 8-1-2010 Human Resources Policy and
9    Procedure re: Harassment Prevention Policy
10   DX-26 88 1-7-2014 Benefits Summary Sheet
11   DX-27 89 Reductions in Force - Things You Need to
12   Know
13   DX-28 91 1-9-2015 e-mail re: STD & LTD
14   DX-29 92 January 2015 e-mails and UNUM paperwork
15   DX-30 94 January 2015 e-mails re: Termination
16   Package
17   DX-31 94 January 2015 e-mails re: Update
18   DX-32 99 February 2015 e-mails re: Receipt of
19   Information
20   DX-33 101 1-28-2015 e-mail re: Update
21   DX-34 102 2-6-2015 e-mail re: Update
22   DX-35 103 2-9-2015 Termination Form
23   DX-36 104 2-9-2015 Letter

Page 7

1    DX-37 105 Important Notice Regarding Your COBRA
2    Continuation Coverage
3    DX-38 108 2-4-2015 e-mails re: So long
4    DX-39 119 7-30-15 Medical record, Dr. Jane
5    Pearson
6    DX-40 122 2-2-16 Medical record, Dr. Jane Pearson
7    DX-41 123 3-31-16 Medical record, Dr. Jane
8    Pearson
9    DX-42 132 5-15-14 Fitness-For-Duty Certification
10   DX-43 133 11-7-13 Medical record, Andrews Sports
11   Medicine
12   DX-44 134 Birmingham Internal Medicine
13   Associates, PC Progress Note
14   DX-45 135 5-15-14 Medical record, Andrews Sports
15   Medicine
16   DX-46 137 7-22-14 Medical record, Andrews Sports
17   Medicine
18   DX-47 137 10-21-14 Medical record, Andrews Sports
19   Medicine
20   DX-48 138 1-20-15 Medical record, Andrews Sports
21   Medicine
22   DX-49 141 4-23-15 Medical record, Andrews Sports
23   Medicine

Page 8

1    DX-50 142 5-13-2015 Letter from Andrews to UNUM
2    DX-51 144 Authorization to Disclose Information
3    to The Social Security Administration (SSA)
4    DX-52 147 Disability Determination Explanation
5    DX-53 148 Authorization to Disclose Information
6    to The Social Security Administration (SSA)
7    DX-54 152 Disability Determination Explanation
8    DX-55 153 Social Security Notice
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 9

1        I N D E X
2   EXAMINATION BY: PAGE NUMBER
3   Ms. Wilkes            10 - 166
4
5        A P P E A R A N C E S :
6      HAYNES & HAYNES, by Ms. Alicia K. Haynes,
7   1600 Woodmere Drive, Birmingham, Alabama 35226,
8   appearing for the Plaintiff.
9      BURR, FORMAN, by Ms. Amy Jordan Wilkes, 3400
10  Wells Fargo Tower, 420 20th Street North,
11  Birmingham, Alabama 35203, appearing for the
12  Defendant.
13     ALSO PRESENT:  Susie Collier; Brad Wilder.
14
15     I, Donna Winters, a Court Reporter of
16  Birmingham, Alabama, acting as Commissioner, and
17  a Notary Public for the State of Alabama at
18  Large, certify that on this date, as provided by
19  Rule 30 of the Alabama Rules of Civil Procedure,
20  and the foregoing stipulation of counsel, there
21  came before me, ROBERT BIRCHFIELD COLLIER, JR.,
22  witness in the above cause, for oral examination,
23  whereupon the following proceedings were had:

Page 10

1      ROBERT BIRCHFIELD COLLIER, JR.,
2   having been first duly sworn, was examined
3   and testified as follows:
4      COURT REPORTER:  Usual stipulations?
5      MS. HAYNES:  We want to read and sign,
6   please.  And as I conveyed to you in the
7   elevator, his voice is really low, so if we're
8   having problems, just let us know.  Of course, I
9   know you will.
10
11  EXAMINATION BY MS. WILKES:
12  Q.   Good morning, Mr. Collier.  We met a few
13  minutes ago.  My name is Amy Jordan Wilkes, and
14  I'm an attorney for Harland Clarke.  I'm here
15  today to ask you some questions about the lawsuit
16  that you have filed against my client and the
17  claims that you make in that lawsuit.  Have you
18  ever given a deposition before?
19  A.   No.
20  Q.   Have you ever testified under oath?
21  A.   No.
22  Q.   I just want to go over a couple ground
23  rules.  I understand you're having some issues

Page 11

1   with your voice today, but can I get you to
2   answer with a "yes" or a "no" instead of "uh-huh"
3   or "huh-uh" or a head nod?
4   A.   Yes.
5   Q.   That's just so our court reporter can
6   accurately take down your answer.  If you start
7   shaking your head, I'll tap the table or remind
8   you.  I'm not fussing at you.  I just want to
9   make sure that she gets your testimony down
10  correctly, okay?
11  A.   Okay.
12  Q.   I understand that you have some medical
13  conditions that we're going to talk about later;
14  but if at any point you need to take a break,
15  will you let me know?
16  A.   Yes.
17  Q.   And if I've asked a question, all I'm going
18  to ask is that you answer the question before we
19  take a break, okay?
20  A.   Yes.
21  Q.   Are you on any medication today that would
22  impair your ability to answer my questions fully
23  and truthfully?

Page 12

1   A.   No.
2   Q.   If you don't understand a question that I
3   ask, can I get you to ask me to clarify, and I'll
4   do my best to rephrase it in a way that makes
5   sense?
6   A.   Yes.
7   Q.   And can I get you to agree to let me finish
8   asking my question before you answer, and I will
9   do my best to let you answer before I ask you
10  another question, okay?
11  A.   Yes.
12  Q.   What is your full name?
13  A.   Robert Birchfield Collier, Jr.
14  Q.   Have you ever been known by any other name?
15  A.   No.
16     MS. WILKES:  Alicia, to save time, I don't
17  know if you want me to send you a formal
18  discovery request, but the background, date of
19  birth, social security number, driver's license,
20  telephone numbers?
21     MS. HAYNES:  Just at a break tell me what
22  you need.  I'm sure relatives.
23     MS. WILKES:  Yes.  Those, I can do with the

Page 13

1 interrogatory.  But just the general date of
2 birth, social security number, driver's license
3 number, telephone numbers, current address.  Some
4 of those, I may have already asked.
5 Q.   To save your voice, that's information I
6 can get from your attorney.
7      MS. WILKES:  If you want, I can just send
8 you a list after the deposition.  It's the basic,
9 you know, marriages, children, where you go to
10 church.  I'll send you a list of these, if we can
11 just agree that you'll get that information to
12 me.
13     MS. HAYNES:  That's fine.
14 Q.   Did you ever keep a diary, a written diary
15 or journal?
16 A.   No.
17 Q.   What about a handwritten calendar?
18 A.   No.
19 Q.   Have you ever filed for bankruptcy?
20 A.   No.
21     (Whereupon, Defendant's Exhibit Number 1
22 was marked for identification, a copy of which is
23 attached to the original of the transcript.)

Page 14

1 Q.   I'm going to show you Defendant's Exhibit
2 1.  It's a document that you may not have seen
3 before.  It is the notice of your deposition that
4 I sent to your attorney.  Are you here today
5 pursuant to that notice?
6 A.   Yes.
7      (Whereupon, Defendant's Exhibit Number 2
8 was marked for identification, a copy of which is
9 attached to the original of the transcript.)
10 Q.   I'll show you Defendant's Exhibit 2.  These
11 are some answers to interrogatories that I
12 received from your attorney.  If you would for
13 me, turn to page 16.  Is that your signature at
14 the top of the page?
15 A.   Yes.  Yes, it is.
16 Q.   So you understood that you were providing
17 information in these interrogatories under oath?
18 A.   Yes.
19 Q.   If you'll look for me on page 7, you're
20 already there.  Number 3, I asked you to identify
21 every person who you filed any administrative
22 charge, complaint, judicial claim, or lawsuit,
23 and a bunch of other things.  In your answer, you

Page 15

1 mentioned an EEOC Charge that you filed in
2 connection with this case, and your unemployment
3 benefits claim, then you say you have not been a
4 party to any other lawsuit.  Is that still
5 correct?
6 A.   I'm not sure what you're saying.
7 Q.   Is your answer still correct?  Since you've
8 answered this interrogatory, have you filed any
9 other EEOC charges or lawsuits or claim?
10 A.   No.  No.
11 Q.   Turn to number 4, the next interrogatory.
12 It asked you to identify your relatives that live
13 within the Northern District of Alabama.  You've
14 got your wife and son and daughter and
15 daughter-in-law listed.  Do you have any other
16 relatives that live in Alabama who are over the
17 age of 19 that aren't listed?
18 A.   I have a great-aunt.
19 Q.   Does she live here in Alabama?
20 A.   Yes.
21 Q.   Where does she live?
22 A.   She lives in, I guess that would be over
23 by -- hold on a minute.  I guess it would be

Page 16

1 Hoover.
2 Q.   Hoover?  What is her name?
3 A.   Her name is Carol Collier.
4 Q.   How old is she?
5 A.   She is probably 83, 84.
6 Q.   Do you have any other relatives over the
7 age of 19 that live in Alabama?
8 A.   No, not that I know of.
9 Q.   Have you ever sought workers' compensation
10 benefits?
11 A.   No.
12     (Whereupon, Defendant's Exhibit Number 3
13 was marked for identification, a copy of which is
14 attached to the original of the transcript.)
15 Q.   I'll show you Defendant's Exhibit 3.  This
16 is what appears to be a resume for you that your
17 attorney has produced to me in this lawsuit.
18     MS. HAYNES:  Was it only one page?
19     MS. WILKES:  I think so.
20 Q.   Mr. Collier, do you believe there should be
21 another page to your resume?
22 A.   I don't recall.
23 Q.   You don't recall, okay.  Well, let me ask

Page 17

1 you this.  Other than The University of Alabama,
2 do you have any other education beyond high
3 school?
4 A.   I've got just training classes.
5 Q.   Did you take those training classes with --
6 A.   Harland Clarke, yes.
7 Q.   In your work history, you have a number of,
8 I guess, positions listed.  Are there any places
9 that you worked before Harland Clarke that are
10 not listed?
11 A.   I worked for Wagner Shoes.
12 Q.   Wagner Shoes, okay.  When was that?
13 A.   That was probably '76 to '82.
14 Q.   Was that here in Birmingham?
15 A.   Tuscaloosa and Birmingham.
16 Q.   Was that while you were in school?
17 A.   I went to school afterwards.
18 Q.   What did you do there?
19 A.   I was the manager.
20 Q.   Let me ask you this.  When you worked for
21 Interchecks, I see here it says you were
22 responsible for the development of the six-person
23 check products sales team.  Check products, do

Page 18

1 you mean solely personal checks, or does that
2 encompass more broadly the type of bank forms
3 that you later sold for Harland Clarke?
4 A.   Both, mainly commercial checks.
5 Q.   Commercial checks, okay.
6 A.   Interchecks was bought by Harland.
7 Q.   Interchecks was bought by Harland, okay.
8 A.   Yes.
9 Q.   In any of these previous positions, it
10 looks like most of which refer to Clarke American
11 or Harland Clarke, is that the same company, just
12 different names because of sales?
13     MS. HAYNES:  Object to form.
14 A.   Clarke American and Harland merged.
15 Q.   Merged, okay.  And all of these
16 positions -- well, I guess in any of these
17 positions, did you have any job responsibilities
18 related to commercial printing?
19 A.   Yes.
20 Q.   And which positions?
21 A.   The last one.
22 Q.   Sales director of forms?
23 A.   Yes.

Page 19

1 Q.   Is that the only one where you had some
2 responsibility related to commercial print?
3 A.   Yes.
4 Q.   At some point did you leave Harland Clarke?
5 A.   I did.
6 Q.   Who did you work for when you left Harland
7 Clarke?
8 A.   Main Street Checks.
9 A.   Main Street Checks.  And when was that?
10 A.   That was 2003.
11 Q.   Were they a competitor of Harland Clarke?
12 A.   They were.
13 Q.   What did you do for Main Street Checks?
14 A.   National sales manager.
15 Q.   National sales manager?
16 A.   Yes.
17 Q.   Was that selling forms products?
18 A.   It was checks products.
19 Q.   Did you have any responsibility for
20 commercial print at Main Street Checks?
21 A.   No.
22 Q.   Why did you leave Harland Clarke to go to
23 Main Street Checks?

Page 20

1 A.   Get home to Birmingham.  We had some aging
2 family members to take care of, and I had an
3 opportunity to move back to Birmingham with
4 Harland Clarke.
5 Q.   Where was Main Street Checks located?
6 A.   Here.
7 Q.   Oh, Main Street Checks was located here?
8 A.   Yes.
9 Q.   So you took the position with Main Street
10 Checks to move back to Birmingham, is that your
11 testimony?
12 A.   Yes.  Yes.
13 Q.   I don't see Main Street Checks listed on
14 your resume.  Are there any other places that you
15 worked besides what is listed as Main Street
16 Checks?
17 A.   No, ma'am.
18 Q.   Did you ever complain about any type of
19 discrimination or harassment while you worked at
20 Main Street Checks?
21 A.   No.
22 Q.   Did you ever take any type of medical leave
23 when you worked for Main Street Checks?

Page 21

1 A.  No.

2 Q.  Go back to Number 2 for me, your

3 interrogatory responses.  And I am on page 11,

4 looking at number 9.  I asked you to identify all

5 the places where you applied for employment after

6 you left your position with Harland Clarke.  If

7 you'll look at your answer, you've got a number

8 of companies listed.  RXBenefits; Hewlett

9 Davidson Powell, LLC; Willis Group; BP Payroll;

10 Metro Companies; Publix; BlueCross BlueShield of

11 Alabama; and Regions Bank.  Are there any other

12 companies where you sought work that are not

13 listed?

14 A.  Roly Poly.

15 Q.  Roly Poly, okay.

16     (Whereupon, Defendant's Exhibit Number 4

17 was marked for identification, a copy of which is

18 attached to the original of the transcript.)

19 Q.  I think this might help you.  I'll show you

20 Defendant's Exhibit 4.  It's a multi-page exhibit

21 of some e-mails that your attorney produced to

22 me, as well as a chart.  Let's go to the chart

23 first.  There are some numbers.  I think you're

Page 22

1 already there, the last page.  It's the chart

2 that is numbered HH 227.  This chart has, appears

3 to be the companies where you sought work; is

4 that correct?

5 A.  Correct.

6 Q.  And the positions that you sought; is that

7 correct?

8 A.  That's correct.

9 Q.  And the column that says Notification, is

10 that the date that you were notified that you did

11 not receive the position?

12 A.  Yes.

13 Q.  The positions that you did not receive, did

14 any of those companies tell you why they did not

15 offer you the position?

16 A.  Yes.

17 Q.  Is that the e-mails that are Bates-stamped

18 HH 223, 224, 225, and 226?

19 A.  Yes, ma'am.

20 Q.  Do you have any other information about why

21 you did not receive those positions, other than

22 what is contained in e-mails 223 through 226?

23 A.  No.

Page 23

1 Q.  No?

2 A.  No.

3 Q.  Looking back at the last page, the chart,

4 it shows that you applied at a number of

5 companies; Metro Companies, Publix, BlueCross

6 BlueShield of Alabama, Regions Bank.  Did you

7 ever hear back from any of those, as to whether

8 or not they were going to offer you a position?

9 A.  Just Metro.

10 Q.  Just Metro Companies?  And they declined to

11 hire you?

12 A.  Yes.

13 Q.  And when was that?

14 A.  It was -- I'm not certain.

15 Q.  Was it in 2015?

16 A.  '16.

17 Q.  2016?

18 A.  Yes.

19 Q.  You applied in 2015, but they didn't get

20 back to you until 2016?

21 A.  I'm sorry, it was 2015.

22 Q.  Was it within a few months of when you

23 applied?

Page 24

1 A.  Yes.

2 Q.  Was it within a few weeks of when you

3 applied?

4 A.  No.  It was probably two months after.

5 Q.  So you never heard back from Publix,

6 BlueCross BlueShield of Alabama, or Regions Bank;

7 is that correct?

8 A.  I filed online, online applications.  I

9 never heard anything back.

10 Q.  When did you apply for the position at Roly

11 Poly?

12 A.  Two months ago.

13 Q.  What position did you apply for?

14 A.  Anything.

15 Q.  Anything.  Were you offered a position with

16 Roly Poly?

17 A.  No.

18 Q.  Did they tell you why?

19 A.  Can't drive.

20 Q.  Can't drive.  Anything else?

21 A.  No.

22 Q.  Other than what we've discussed, is there

23 anywhere you have sought work since your

Page 25

1 employment with Harland Clarke ended?
2 A.   Harland Clarke.
3 Q.   Is there anything else, other than what
4 we've discussed?
5 A.   No.
6 Q.   Did you apply for unemployment compensation
7 benefits after your employment with Harland
8 Clarke ended?
9 A.   Yes.
10      (Whereupon, Defendant's Exhibit Number 5
11 was marked for identification, a copy of which is
12 attached to the original of the transcript.)
13 Q.   Let me show you what I've marked as
14 Defendant's Exhibit 5.  Do you recall filling out
15 Defendant's Exhibit 5 when you applied for
16 unemployment compensation benefits?
17 A.   I don't recall.
18 Q.   I'm sorry.  Did you say you don't recall?
19 A.   I don't recall doing it.
20 Q.   Do you recall providing some information to
21 the Department of Labor in connection with your
22 application for unemployment compensation
23 benefits?

Page 26

1 A.   Yes.
2 Q.   If you flip with me to the page that has
3 ADOL 18 at the bottom in little numbers, about
4 halfway down the list of questions there, it
5 says, "What was the final incident that caused
6 your discharge," and it says "Job elimination"?
7 A.   Yes.
8 Q.   Is that information you provided to the
9 Alabama Department of Labor?
10 A.   I'm sure it was.  That's what I was told.
11 That's what Moyer told me, my job was being
12 eliminated.
13 Q.   That's what Steven Moyer told you?
14 A.   Yes.
15 Q.   And we'll get to that.  So I understand,
16 from looking at your resume, that you started
17 with Clarke American in 1990; is that correct?
18 A.   It should be '82.
19 Q.   Because you were with Interchecks which was
20 later acquired by Harland Clarke or Clarke
21 American; is that correct?
22 A.   Yes, Harland Clarke.
23 Q.   So I'm going to jump ahead to when you came

Page 27

1 back in 2004.
2 A.   Okay.
3      (Whereupon, Defendant's Exhibit Number 6
4 was marked for identification, a copy of which is
5 attached to the original of the transcript.)
6 Q.   I'll show you what I've marked as
7 Defendant's Exhibit 6.  Do you recognize
8 Defendant's Exhibit 6?
9 A.   I do.
10 Q.   Is this the offer letter that you received
11 when you returned to work at Harland Clarke after
12 working for Main Street Checks?
13 A.   Yes.
14 Q.   It's dated July 13, 2004, correct?
15 A.   Yes.
16 Q.   And that's your signature on the second
17 page where you accepted the position?
18 A.   Yes.
19 Q.   And that was on July 16, 2004, correct?
20 A.   Yes.
21 Q.   In the first paragraph, it says that you
22 were offered the position of Director of
23 Partnership Development III - MICR Express?

Page 28

1 A.   Correct.
2 Q.   Is that the position you were in when your
3 employment ended?
4 A.   It was probably called something different,
5 but it was the same job description.
6 Q.   The last bullet point, where it's talking
7 about your compensation package, do you see the
8 last bullet point where it says, "Extensive
9 travel is a requirement of this position.  You
10 will be based out of the Jeffersonville facility
11 but allowed to home office in Alabama as
12 necessary"?
13 A.   Yes.
14 Q.   Where is Jeffersonville?
15 A.   Indiana.  In Louisville basically, right
16 across the river from Louisville.
17 Q.   You understood at the time you took the
18 position, that it would require extensive travel?
19 A.   Yes.
20 Q.   Do you see underneath that where it says,
21 "This letter shall not constitute or be evidence
22 of any agreement or understanding expressed or
23 implied on the part of Clarke American to employ

Page 29

1  you for any definite period of time, nor shall it
2  alter your status as an at-will employee of
3  Clarke American"?  Did you understand, when you
4  took the position, that you were an at-will
5  employee?
6  A.   Say it again.
7  Q.   Did you understand, at the time you took
8  the position with Clarke American, later Harland
9  Clarke, that you were an at-will employee?
10     MS. HAYNES:  Object to the form.
11  Q.   Did you understand that Harland Clarke --
12  A.   Employed at-will.
13  Q.   -- that Harland Clarke could terminate you
14  at any time for any reason, with or without prior
15  notice?
16  A.   Yes.
17     (Whereupon, Defendant's Exhibit Number 7
18  was marked for identification, a copy of which is
19  attached to the original of the transcript.)
20  Q.   I'll show you Defendant's Exhibit 7.  Do
21  you recognize Defendant's Exhibit 7?
22  A.   Yes.
23  Q.   Is that the employment application that you

Page 30

1  completed when you came back to work for Clarke
2  American in 2004?
3  A.   Yes.
4  Q.   And if you go to page 7 for me, that's the
5  last page, that's your signature?
6  A.   Yes.
7  Q.   I'm looking in the second paragraph of the
8  application verification.  Did you understand
9  that your job application was on a contract of
10  employment for any specific time?
11  A.   Yes.
12  Q.   Again, that you could be terminated by the
13  company at any time?
14  A.   Yes.
15     (Whereupon, Defendant's Exhibit Number 8
16  was marked for identification, a copy of which is
17  attached to the original of the transcript.)
18  Q.   I'll show you Defendant's Exhibit 8.  Have
19  you ever seen Defendant's Exhibit 8 before?
20  A.   Yes.
21  Q.   Is it a job description for your position
22  at the time that your employment ended?
23  A.   I'm not certain.  I don't see a date on

Page 31

1  here.
2  Q.   Well, is this a job description for the
3  Director of Sales II - MICR position?
4  A.   It appears so.
5  Q.   Is that the position that you held when
6  your employment with Harland Clarke ended?
7  A.   Yes.
8  Q.   Take a minute and read through this
9  description.  And my question is, is it an
10  accurate summary of your job duties and
11  requirements in the Director of Sales II - MICR
12  position?
13     MS. HAYNES:  Are you saying on the first
14  page, the summary, or the key duties?
15     MS. WILKES:  I mean the entire description.
16  Q.   Is it an accurate description of your
17  position, your job duties?
18  A.   In the position summary, it says Director
19  Partner Development.
20  Q.   So you're saying that was not your title?
21  A.   Under Job Title, it says Director Sales II.
22  Q.   Well, let's look back at your offer letter.
23  Let's look back at Defendant's Exhibit 6.  It

Page 32

1  says, "I am pleased to extend this offer of
2  employment to you for the position of Director of
3  Partnership Development II - MICR Express."  Did
4  I understand your testimony a few minutes ago
5  correctly when you said that was the position but
6  the name changed?
7  A.   Yes.
8  Q.   And you said you had seen Defendant's
9  Exhibit 8 before.  Do you believe that it is a
10  job description for your position?
11  A.   Can I look through it?
12  Q.   Sure.  Take your time.
13  A.   I remember seeing this paper, but I'm not
14  sure it's the correct one or not.
15  Q.   Is there anything in the job description
16  that is inaccurate, as far as your job duties and
17  responsibilities and requirements?
18  A.   It doesn't talk about specific products we
19  sold.
20  Q.   So other than specifically identifying the
21  types of products you sold, is there anything
22  else that is inaccurate?
23  A.   I don't see anything.

**Robert Birchfield Collier, Jr.**

Page 33

1  Q.    And other than the fact that you can't
2  remember if that was your job description, do you
3  have any reason to dispute that that was the job
4  description?
5  A.    No.
6  Q.    Your director of sales position, that was
7  in the Forms Division; is that correct?
8  A.    Yes.
9  Q.    And when you were talking earlier about the
10 specific products that you sold, the Forms
11 Division sold what I call bank forms.  What type
12 of forms did you sell?
13     MS. HAYNES:  Object to the form.  You can
14 answer.
15 A.    We sold cash tickets, general ledger
16 tickets, anything the bank uses to transact
17 business.
18 Q.    So the Forms Division was responsible for
19 selling deposit slips and teller receipts,
20 ledgers, things like that; is that correct?
21     MS. HAYNES:  Object to the form.
22 A.    Yes.  And then also commercial print, about
23 six months before I was terminated.

Page 34

1  Q.    The commercial print started about six
2  months before your position was eliminated?
3  A.    Yes.
4  Q.    Prior to that, it had just been forms; is
5  that correct?
6  A.    Yes.
7  Q.    Is MICR a specific type of bank form, the
8  MICR forms?
9  A.    The MICR is the magnetic ink on the bottom
10 of the form.
11 Q.    So MICR, those were specific types of forms
12 you sold that had the numbers on the bottom?
13 A.    Magnetic Ink Character Recognition is what
14 MICR stands for.  Magnetic Ink Character
15 Recognition.
16 Q.    What types of commercial print services was
17 the Forms Division providing in the six months
18 prior to your position elimination?
19 A.    Brochures.
20 Q.    Did you say brochures?
21 A.    Brochures.
22 Q.    Promotional materials?
23 A.    Promotional materials.

Page 35

1  Q.    And prior to that six months, you had never
2  had any experience in commercial print; is that
3  correct?
4      MS. HAYNES:  Object to the form.
5  A.    No.
6  Q.    That's not correct?  Or I think your answer
7  didn't match my question.  Is your answer that
8  no, prior to that six months, you did not have
9  any experience with commercial print?
10 A.    Personally?
11 Q.    Yes.
12 A.    No.
13 Q.    No, you didn't have that experience?
14 A.    No.
15 Q.    On the second page of the job description,
16 it's the page that's got the number 581 at the
17 bottom --
18     MS. HAYNES:  Which Exhibit, 8?
19     MS. WILKES:  I think so, yes.
20     MS. HAYNES:  This one?
21     MS. WILKES:  Yes.
22 Q.    I'm looking at the top of the page where it
23 says Key Duties and Responsibilities, and the

Page 36

1  first thing listed says, "Coordinates and directs
2  all sales activities for assigned sales region."
3  Is that what you did?
4  A.    Yes.
5  Q.    And you had a number of account executives
6  that worked underneath you?
7  A.    Five.
8  Q.    Five.  So you were responsible for
9  coordinating and directing those five account
10 executives' activities; is that correct?
11 A.    Yes.
12 Q.    And were those five sales, I guess they
13 were called account executives, is that what they
14 were called?
15 A.    Account executives and senior account
16 executives.
17 Q.    Okay, account executives and senior account
18 executives.  So you had three account executives
19 and two senior account executives; is that
20 correct?
21 A.    Yes.
22 Q.    And who were the account executives?
23 A.    Randy Newton, Tracy Harley, Jeff Foley.

**Robert Birchfield Collier, Jr.**                    10 (37 - 40)

Page 37

1  Q.   Who were the senior account executives?
2  A.   Tom Jones, Maria --
3  Q.   You don't remember her last name?
4  A.   I'm trying to think of her last name.
5  Q.   What's the difference between an account
6  executive and a senior account executive?
7  A.   Experience and success.  It's a promotion.
8  Q.   So the account executives and the senior
9  account executives, did they have specific
10 customer accounts that they were assigned?
11 A.   Yes.
12 Q.   And they managed those accounts?
13 A.   Yes.  And relationships.
14 Q.   Managed the relationships?
15 A.   And they were responsible for selling new
16 business also.  Maria Robinson.  Robinson was her
17 last name.
18 Q.   Robinson, Maria Robinson.  For the record,
19 I'm not trying to testify for you.  I'm trying to
20 repeat what you say to help you and help the
21 court reporter.
22 A.   That's fine.
23 Q.   So the customers that the account

Page 38

1  executives and senior account executives were
2  selling forms, products, and later commercial
3  print to, those were financial institutions?
4  A.   Well, we sold third-party also.
5  Q.   Third-party.  Who was the third-party?
6  A.   Like Donnelly, Standard Register.  They
7  sold products, and we sold them the products that
8  they didn't produce.
9  Q.   Then they sold them to financial
10 institutions?
11 A.   Yes.
12 Q.   Were you assigned any customer accounts to
13 directly manage?
14 A.   No.
15 Q.   Was it part of your job duties to make sure
16 the account executives and senior account
17 executives maintained contact with the customers?
18 A.   Yes.
19 Q.   And you encouraged them to develop close
20 relationships with existing customers?
21 A.   Yes.
22 Q.   And also develop relationships with new
23 customers, right?

Page 39

1  A.   Right.  Yes.
2  Q.   How often did you directly interact with
3  the customers?
4  A.   Daily.
5  Q.   What was the nature of your interaction
6  with the customers?
7  A.   Sales calls with the salespeople,
8  conference calls.
9  Q.   So you participated in conference calls
10 between the account executives and senior account
11 executives and the customers?
12 A.   Yes.
13 Q.   What was your role on the call?
14 A.   Just the director.
15 Q.   To provide direction to them in their sales
16 activities?
17 A.   No.  I was the director.
18 Q.   I think I'm not understanding.  What did
19 you do on the calls?
20 A.   I listened and interacted whenever
21 necessary, and made sure they knew they had
22 support from higher-up.
23 Q.   I think he said "make sure they had support

Page 40

1  from higher-up."  Was that your testimony?
2  A.   Yes.
3  Q.   How often did you see customers
4  face-to-face?
5  A.   Weekly.
6  Q.   So you would travel to go on sales calls?
7  A.   Yes.
8  Q.   Was that throughout your employment?  For
9  the sake of clarification, when I say "your
10 employment," I'm limiting it to the period 2004
11 through the date your job was eliminated.  I'm
12 not going all the way back to the '80s.
13 A.   Okay.
14 Q.   So was the weekly travel to interact with
15 customers, was that consistent from 2004 through
16 the date your position was eliminated?
17 A.   Weekly, biweekly, biweekly at the most.
18 Q.   Biweekly?
19 A.   Biweekly at the most, sometimes weekly.
20 Q.   Biweekly at the most.  Was that true in
21 2014 and 2015?
22 A.   Yes.
23 Q.   How often were the account executives and

Page 41

1 senior account executives interacting directly
2 with -- when I say "directly," I mean
3 face-to-face -- with customers?
4 A.   About the same.
5 Q.   Is it fair to say that the account
6 executives and the senior account executives had
7 more frequent contact with the customers than you
8 did?
9 A.   Yes.
10 Q.   In your position, did you set sales goals
11 and direct the account executives and senior
12 account executives on ways to achieve those
13 goals?
14 A.   Yes.  I monitored their progress.
15     (Whereupon, Defendant's Exhibit Number 9
16 was marked for identification, a copy of which is
17 attached to the original of the transcript.)
18 Q.   I'll show you Defendant's Exhibit 9.  Have
19 you seen Defendant's Exhibit 9 before?  I, again,
20 apologize for the very tiny writing.
21 A.   Yes.
22 Q.   Is this a document that you created?
23 A.   Yes.

Page 42

1 Q.   Do you know what year you created this?
2 A.   I'm not sure what year this would be.
3 Q.   What does EEA mean?
4 A.   I can't remember.
5 Q.   Are these goals that you set?
6 A.   I set based on my goals.
7 Q.   So they were based on directives that you
8 received from higher-up the management chain; is
9 that correct?
10 A.   Yes.
11 Q.   Are things like Exhibit 9, was this
12 something that you would give to your account
13 executives and senior account executives
14 frequently?
15 A.   Annually.
16 Q.   Annually.  And then you would monitor their
17 progress meeting these goals?
18 A.   Yes.
19 Q.   So you primarily worked out of a home
20 office; is that correct?
21 A.   Toward the end.
22 Q.   When did you start -- I guess when did you
23 become more focused on staying in your home

Page 43

1 office?
2     MS. HAYNES:  Object to the form.
3 A.   When I moved back to Birmingham, I didn't
4 work out of the plant.
5 Q.   Was that in 2004?
6 A.   No.  That would have been 2008, maybe.
7 Q.   So starting in 2008, you worked primarily
8 out of your home; is that your testimony?
9 A.   That was my home office.  I still traveled
10 with people, traveled to both plants, Salt Lake
11 City and Jeffersonville.
12 Q.   About how many hours a week did you work?
13 A.   Probably 50, 55, counting travel and all.
14 Q.   And at the time your position was
15 eliminated, were you reporting to Steve Moyer?
16 A.   Yes.
17 Q.   When did Steve become your supervisor?
18 A.   Maybe nine months ahead of that.
19 Q.   Around March of 2014?
20 A.   Could have been.
21 Q.   Who did you report to before Steve?
22 A.   Rick Ebrey.
23 Q.   Is that Steve's boss?

Page 44

1 A.   Yes.
2 Q.   Where is Steve based?
3 A.   I think he might be in San Antonio.  I'm
4 not sure now.
5 Q.   Where is Rick based?
6 A.   Rick Ebrey?
7 Q.   Yes.
8 A.   Oh, Steve is in Kansas City.  I'm sorry.
9 Q.   Is Rick in San Antonio?
10 A.   Yes, Rick is in San Antonio.  At least when
11 I left, that's where they were.
12     MS. HAYNES:  I'm confused.  Moyer is San
13 Antonio or Ebrey?
14     THE WITNESS:  Ebrey is San Antonio, Moyer
15 is Kansas City.
16     MS. HAYNES:  Okay.  Thanks.
17 Q.   How often did you see Steve Moyer?
18 A.   Rarely ever.
19 Q.   Rarely ever?
20 A.   Yes.
21 Q.   About how many times?
22 A.   Twice.
23 Q.   You saw him twice?

Page 45

1  A.   Yes.

2  Q.   When was the first time you saw him?

3  A.   It was in Kansas City at a directors'

4  meeting he called.

5  Q.   At a directors' meeting?

6  A.   Yes.

7  Q.   When was that?

8  A.   Probably a few months after he became my

9  boss.

10  Q.   A few months after he became your

11  supervisor?

12  A.   Yes.  Last time was in Puerto Rico at a

13  sales meeting.

14  Q.   And that was in December of 2014?

15  A.   Yes.

16  Q.   How often did you talk to Steve Moyer on

17  the phone?

18  A.   Maybe weekly, in a weekly huddle.

19  Q.   Was that with all of the directors under

20  his supervision?

21  A.   Yes.

22  Q.   How often did you talk one-on-one?

23  A.   Maybe biweekly, maybe monthly.

Page 46

1  Q.   Maybe biweekly, maybe monthly?

2  A.   Yes.

3  Q.   During your time as a director in the Forms

4  Division, did you ever review any documents that

5  reflected the sales revenue in the Forms

6  Division?

7  A.   Yes.

8  Q.   We've been going for about an hour.  Do you

9  need a break, or are you okay?

10     MS. HAYNES:  I could use a break.

11     (Whereupon, at this time a short break

12  was taken from 10:25 a.m. until 10:40 a.m.)

13  Q.   We're back on the record after a break.

14  Mr. Collier, do you have any answers that you

15  need to change or clarify?

16  A.   Not that I'm aware of.

17  Q.   Before we went on break, I had just started

18  asking you about whether you had reviewed any

19  documents reflecting the sales in the Forms

20  Division.  Were you aware that in the, I guess,

21  years leading up to the reduction in force, that

22  the revenue in the Forms Division had been

23  declining?

Page 47

1  A.   Yes.

2  Q.   Was that because people were using less

3  paper?

4     MS. HAYNES:  Object to the form.

5  A.   Probably so, yes.

6  Q.   There's more online banking?

7  A.   Yes.

8     (Whereupon, Defendant's Exhibit Number 10

9  was marked for identification, a copy of which is

10  attached to the original of the transcript.)

11  Q.   I'll show you Defendant's Exhibit 10.  I

12  apologize in advance for the smallness of the

13  print.

14  A.   That's okay.

15  Q.   Have you seen Defendant's Exhibit 10

16  before?

17  A.   Yes.

18  Q.   Are these the sales reports that would come

19  out?

20  A.   Yes, they are.

21  Q.   How often did these sales reports come out?

22  A.   Monthly.

23  Q.   Monthly?  I'm looking at the column in the

Page 48

1  middle, that says Variance.  Do you see that

2  column?

3  A.   I've got it, yes.

4  Q.   Am I reading this correctly, that the

5  variance is comparing the revenue from, on this

6  particular form, the difference between February

7  of 2013 and February of 2014?

8  A.   Yes.

9  Q.   There are a lot of negatives on the numbers

10  in that Variance column; is that correct?

11     MS. HAYNES:  Object to form.

12  A.   Yes.

13  Q.   Do you agree with me that this document

14  shows that revenue was down?  In February of 2014

15  it was down from February of 2013?

16     MS. HAYNES:  Object to form.

17  A.   Yes.  Factors come into play.

18  Q.   What factors?

19  A.   Like a large conversion the year before.

20  Q.   What do you mean?  What's a conversion?

21  A.   A large conversion, like when a bank buys

22  another bank.

23  Q.   Wouldn't that lead to an increase in sales?

Page 49

1  A.   Well, the year before it took place.

2  Q.   You might have to explain it to me a little

3  bit more.

4  A.   A large conversion takes place in '12, and

5  you've got the basis numbers in '13.

6  Q.   Because two banks combined?

7  A.   Yes.

8  Q.   So instead of two banks buying forms,

9  there's just one; is that what you're saying?

10 A.   No, not at all.  Just say Wells Fargo buys

11 SouthTrust.  Well, SouthTrust, all the branches

12 that are still there have to convert to Wells

13 Fargo forms.  So it's a large conversion,

14 one-time event.

15 Q.   How does that show as decreased revenue?

16 A.   Because it took place in '13, didn't take

17 place again in '14, so you're facing that number

18 in '14.

19 Q.   So you're saying -- if I'm misstating your

20 testimony, I want you to correct me.  Is your

21 testimony that '13 sales are higher because of

22 the conversion?

23 A.   Could be.

Page 50

1  Q.   Do you know if there was a big conversion

2  in 2013?

3  A.   I don't know for a fact about February, but

4  I know some took place in '13, didn't repeat in

5  '14.

6  Q.   What conversions took place in '13?

7  A.   I don't recall right off the top of my

8  head.

9  Q.   Who would know?

10 A.   Moyer should know.  Moyer should know.

11     (Whereupon, Defendant's Exhibit Number 11

12 was marked for identification, a copy of which is

13 attached to the original of the transcript.)

14 Q.   I'll show you Defendant's 11.  Have you

15 seen Defendant's 11 before?

16 A.   Yes.

17 Q.   It's the same sales report we looked at

18 previously, but this one is comparing December of

19 2013 to December of 2014 year-to-date; is that

20 correct?

21 A.   Yes.

22 Q.   Again, looking at the Variance column,

23 would you agree with me that Defendant's Exhibit

Page 51

1  11 shows declining sales in the Forms Division,

2  from 2013 to 2014?

3  A.   Yes.

4      MS. HAYNES:  Do you know what is on those

5  documents that has the redaction?

6      MS. WILKES:  It is the name of the specific

7  customer, the specific financial institution.

8      MS. HAYNES:  For all three of those areas?

9      MS. WILKES:  I believe it is just two

10 specific banks that have been redacted.  I can

11 give you that information in an unredacted form.

12     MS. HAYNES:  I'm just looking right here,

13 because it looks like three.

14     MS. WILKES:  I believe it's just two, but I

15 can check.  It is just the name of the

16 specific -- a very large financial institution

17 client.  After the deposition I'm happy to give

18 you an unredacted version.

19     MS. HAYNES:  Okay.

20 A.   It makes a big difference.

21 Q.   I'm sorry, what was that?

22 A.   It makes a large difference, because the

23 one we redacted, the Division 800, was up a

Page 52

1  million-three.

2  Q.   What line are you looking on?

3  A.   Under Redacted.

4  Q.   What's Division 800?

5  A.   I'm not sure what that is.

6  Q.   But that particular division, you're

7  saying, looks like it was profitable?

8  A.   It was a million dollars, a million point

9  three, 1.3 million.

10     MS. HAYNES:  On which exhibit?

11     MS. WILKES:  11.

12 Q.   But is it also correct that other divisions

13 had lost some; is that correct?  Like Division

14 500?

15 A.   Its sales were down.

16 Q.   Its sales were down.  And also sales were

17 down in Division 700, correct?

18 A.   Correct.

19 Q.   And Division 749, also sales were down,

20 correct?

21     MS. HAYNES:  900, did you say?

22 A.   749 was up $72,000.

23 Q.   I think I said 749.

Page 53

1  A.   It was up $72,000.

2  Q.   749, you're saying, was up $72,000?

3  A.   72.3.

4  Q.   I don't see what you're looking at.

5  A.   I'm looking at the Variance column, all the

6  way over.

7  Q.   How about you mark for me where you're

8  saying that sales were up in Division 749?  In

9  the Variance column, I see negative 98.  You're

10 looking at 10, I'm looking at 11.

11 A.   I'm sorry.

12 Q.   I'm sorry.  On Defendant's Exhibit 11?

13 A.   Yes, it is down.

14 Q.   It is down, all right.

15     (Whereupon, Defendant's Exhibit Number 12

16 was marked for identification, a copy of which is

17 attached to the original of the transcript.)

18 Q.   I'll show you Defendant's Exhibit 12.

19 Defendant's Exhibit 12 is a document that your

20 attorney produced to me, so I'm assuming it is a

21 document that you gave to her?

22 A.   Yes.

23 Q.   So I assume you recognize it.  Is that your

Page 54

1  2011 performance appraisal?

2  A.   Yes, it is.

3  Q.   My question about this performance

4  appraisal is, was there anything in your 2011

5  performance appraisal that you disagreed with?

6      MS. HAYNES:  At the time, or reading it

7  today specifically?

8  Q.   I guess either.  I mean, did you agree with

9  your 2011 performance evaluation at the time?

10 A.   I protested the ratings.

11 Q.   Any specific ratings that you protested?

12 A.   The ratings in general.

13 Q.   The ratings in general.  All of them?

14 A.   Yes.

15 Q.   You thought they were too low?

16 A.   I did.  You know, it was kind of

17 discretionary.

18 Q.   I'm sorry, what was that?

19 A.   It's discretionary, how you rate the

20 numbers.  You know, he said 3 was excellent.

21 Q.   So Rick Ebrey was your supervisor at the

22 time, and he was conducting your performance

23 evaluation?

Page 55

1  A.   Yes.

2  Q.   So he rated you -- Rick told you that 3 was

3  excellent?

4  A.   That's what he said, you're doing your job.

5  Q.   So it looks like a lot of your ratings

6  are -- I see some 2.5's, I see some 3's.  Do you

7  believe they should be higher than 3?

8  A.   Well, the boss I had before him rated them

9  higher, the same performance.

10 Q.   Who was your previous boss?

11 A.   Don Dolan.  D-O-L-A-N, Don Dolan.  I'm not

12 sure who was right and who was wrong.

13 Q.   Who did you protest the ratings to?

14 A.   Rick.

15 Q.   To Rick?

16 A.   Yes.  I questioned it.

17 Q.   You questioned it, okay.  What did Rick

18 tell you?

19 A.   He told me that 3 was doing your job

20 completely.

21 Q.   Did you get a merit increase based on this

22 2011 --

23 A.   I believe I did, yes.

Page 56

1  Q.   You did?  Did anything negative happen to

2  you as a result of this 2011 performance

3  evaluation?

4  A.   No.

5      (Whereupon, Defendant's Exhibit Number 13

6  was marked for identification, a copy of which is

7  attached to the original of the transcript.)

8  Q.   I'm going to show you Defendant's Exhibit

9  13.  Have you seen Defendant's Exhibit 13 before?

10 A.   I'm sure I probably have.

11 Q.   Is this your 2012 performance appraisal?

12 A.   Yes.

13     MS. HAYNES:  2004?

14     MS. WILKES:  '12.

15 Q.   Steve Moyer was not your supervisor in

16 2012, though; is that correct?

17 A.   I don't think so.  I think maybe he just

18 inherited -- I'm not sure he was or wasn't.

19 Q.   Do you know why he was doing your

20 performance appraisal?

21 A.   Probably because it was handed-off to him.

22 Q.   It was handed-off to him?

23 A.   Yes.

Page 57

1   Q.   From Rick?
2   A.   Yes.
3   Q.   At the time you were given this performance
4   evaluation, was there anything you disagreed
5   with?
6   A.   I disagreed with the rating numbers.
7   Q.   You disagreed with the rating numbers?
8   A.   Yes.
9   Q.   How did you disagree with the rating
10  numbers?
11  A.   I thought they were too high, too low.
12  Q.   You said both.  Do you think they were too
13  high or too low?
14  A.   They were too high.  Low is better.
15  Q.   Low is better?
16  A.   1 through 5, and 1 is better.
17  Q.   Did you voice your disagreement to anyone?
18  A.   Moyer.
19  Q.   To Steve.  What did you tell Steve?
20  A.   I felt like the ratings were too high.
21  Q.   What did he say?
22  A.   He said, "It is what it is."
23  Q.   Did you get a merit raise, I guess, as a

Page 58

1   result of this 2012 evaluation?
2   A.   I believe I did.
3   Q.   Did anything negative happen to you as a
4   result of this 2012 evaluation?
5   A.   No.  Back on Exhibit 13 --
6   Q.   What page are you on?
7   A.   I'm on page 6 of 8.  Look under Employee
8   (Areas of Opportunity/Development).
9   Q.   Okay.
10  A.   Fell short of revenue goal of 1.2 million.
11  Primary reason of shortfall was unexpected
12  sunsetting of the PCS program which had an
13  estimated negative effect of 2.25.
14  Q.   What does that mean?
15  A.   That means that the company did away with
16  the program that we were producing.
17  Q.   And that, according to this, impacted
18  revenue negatively?
19  A.   2.25 million.
20  Q.   Is there anything else you want to point
21  out?
22  A.   That's all.
23  Q.   Do you know why the company got rid of the

Page 59

1   PCS program?
2   A.   I don't know.  I wasn't involved in the
3   decision.
4   Q.   What was the PCS program?
5   A.   It was like selling schools checks, things
6   like that.
7   Q.   It was selling schools checks?
8   A.   Training programs.
9   Q.   For public schools?
10  A.   Yes.
11       (Whereupon, Defendant's Exhibit Number 14
12  was marked for identification, a copy of which is
13  attached to the original of the transcript.)
14  Q.   Let me show you Defendant's 14.  Do you
15  recognize Defendant's Exhibit 14?
16  A.   I do.
17  Q.   That's your performance evaluation for
18  2013?
19  A.   Yes.
20  Q.   It was, again, conducted by Steve Moyer?
21  A.   Yes.
22  Q.   At the time, was there anything in your
23  2013 performance evaluation that you disagreed

Page 60

1   with?
2   A.   No, I don't think so.
3   Q.   What was your final salary at Harland
4   Clarke?
5   A.   $122,636, I believe.
6   Q.   Was that your base salary?
7   A.   Yes.
8   Q.   Then did you earn an incentive, or I guess
9   were you eligible to earn incentive compensation
10  on top of that?
11  A.   Yes, based on growth, year over year
12  growth, year over year revenue growth.
13  Q.   That was based on revenue in the Forms
14  Division?
15  A.   Yes.
16       (Whereupon, Defendant's Exhibit Number 15
17  was marked for identification, a copy of which is
18  attached to the original of the transcript.)
19  Q.   I apologize, it's the smallest one yet.  I
20  know it's going to be an eyesight test.  I'll
21  show you Defendant's Exhibit 15.  Just for ease
22  of looking at the numbers, what I have done is,
23  the first page is the full spreadsheet, and then

**Robert Birchfield Collier, Jr.**                **16 (61 - 64)**

Page 61

1 behind it documents Bates-stamped 830 through 833
2 are blown-up larger versions of it.  You can
3 either look at the first page with the magnifying
4 glass, or you're welcome to look at the other
5 larger pages.
6 A.   I'll take the larger pages.
7 Q.   Okay.  Have you seen this document, Exhibit
8 15 before?
9 A.   I have.
10 Q.   Are these the reports of the incentive
11 payments that you received?  And this one, I'll
12 represent to you, was for 2011.
13 A.   Yes, I've seen it.
14 Q.   It's got a column there at the end, AG, it
15 says, "Total earned under 2011 plan."  In 2011,
16 was your incentive 1.5 percent on year over year
17 growth dollars up to $3,000,000?
18 A.   Yes.  It changed from 2010.  It was three
19 percent, but they had paid too much.
20 Q.   So it was three percent in 2010, and in
21 2011 they reduced it to --
22 A.   1-1/2 percent, yes.
23 Q.   -- 1-1/2.  The incentive plan, the same

Page 62

1 incentive plan applied to all directors; is that
2 correct?
3 A.   I don't know that for a fact.  I don't
4 think so.
5 Q.   So does Defendant's Exhibit 15 show the
6 incentive compensation that you received in 2011?
7 A.   Yes.
8 Q.   It looks like some quarters you received a
9 pay-out and some quarters you didn't; is that
10 correct?
11 A.   Correct.  Yes.
12 Q.   And that was based on the sales revenue for
13 that particular quarter?
14 A.   Yes, and they always held back 60 -- they
15 paid out 60 percent until the end.  They would
16 write it up at the end, here (indicating).
17 Q.   I see that.  Are you looking at column K --
18 A.   I'm looking here (indicating).
19 Q.   -- where it says, "Q1 pay-out, 60 percent"?
20 Let's make sure we're talking about the same
21 thing.  Yes, we are.  What do you mean, they held
22 back 60 percent?
23 A.   They paid out 60 percent, and they held

Page 63

1 back 40 in case you had a decline in the
2 following quarters.  They would write it at the
3 end of the year.
4 Q.   So they held back 40 percent; but if sales
5 continued to be up, you would get that extra
6 40 percent at the end of the year?
7 A.   Yes.
8     (Whereupon, Defendant's Exhibit Number 16
9 was marked for identification, a copy of which is
10 attached to the original of the transcript.)
11 Q.   I'll show you Defendant's Exhibit 16.
12 Again, it's the same way as the other one.  There
13 are bigger versions behind the first page.  Does
14 Defendant's Exhibit 16 appear to be your 2012
15 incentive compensation?
16 A.   Yes.
17 Q.   Is it correct that you did not receive
18 incentive compensation in 2012?
19 A.   Yes.
20 Q.   And the formula was the same in 2012,
21 wasn't it?
22 A.   Yes.
23 Q.   1.5 percent, correct?

Page 64

1 A.   Right.  Yes.
2     (Whereupon, Defendant's Exhibit Number 17
3 was marked for identification, a copy of which is
4 attached to the original of the transcript.)
5 Q.   Do you recognize Defendant's Exhibit 17?
6 A.   Yes.
7 Q.   Is that your 2013 incentive compensation?
8 A.   Yes.
9 Q.   Am I correct that the formula was the same,
10 it was 1.5 percent of growth?
11 A.   Correct.  Yes.
12 Q.   Is it correct that you did not receive
13 incentive compensation in 2013?
14 A.   Yes.
15     (Whereupon, Defendant's Exhibit Number 18
16 was marked for identification, a copy of which is
17 attached to the original of the transcript.)
18 Q.   I'll show you Defendant's Exhibit 18.  Have
19 you seen Defendant's Exhibit 18 before?
20 A.   Yes.
21 Q.   Are these the incentive plans that would
22 come out every year?
23 A.   Yes, they are.

**Robert Birchfield Collier, Jr.**          17 (65 - 68)

Page 65

1 Q.  Is this document what tells you how your
2 incentive payment was calculated?
3 A.  Yes.
4 Q.  Do you know if this document applied to
5 all -- I'm looking on the first page.  It says,
6 2014 Sales Incentive Plan Document, Forms -
7 Director.  Do you know if this incentive plan
8 applied for all directors in the Forms Division?
9 A.  There was only one director in the Forms
10 Division.
11 Q.  Just you?
12 A.  I was the only one.
13 Q.  Do you know what the incentive plans were
14 for directors in other divisions?
15 A.  I don't know.
16 Q.  In 2014 was the plan again -- was it 1.5
17 percent again in 2014?
18 A.  Yes.  It appears it was, yes.
19    (Whereupon, Defendant's Exhibit Number 19
20 was marked for identification, a copy of which is
21 attached to the original of the transcript.)
22 Q.  Let me show you Defendant's Exhibit 19.
23 A.  I'm not sure why it says "MAISD" at the top

Page 66

1 of the forms.
2    MS. HAYNES:  MAISD in the eligible
3 positions?
4    THE WITNESS:  Major Account Investment
5 Services Division.
6 Q.  But at the top of the page it says Forms -
7 Director, and that was your position, correct?
8 A.  Yes.
9    MS. HAYNES:  So this last one was 19?
10    MS. WILKES:  Yes.
11 Q.  Have you seen Defendant's Exhibit 19
12 before?
13 A.  Yes, I think I have.
14 Q.  At some point in 2014 was there a special
15 incentive for commercial print?
16 A.  There was.
17 Q.  On the document it says that incentive
18 period ran from August 1st of 2014 through
19 December 31st of 2014; is that correct?
20 A.  Yes, that's correct.
21 Q.  And under this special incentive plan, it
22 says the directors would get one percent of
23 commercial print billing.  Is that your

Page 67

1 understanding?
2 A.  My understanding, yes.
3 Q.  Is that your understanding?
4 A.  Yes, it is.
5 Q.  Was the purpose of this incentive to
6 encourage you and the account executives in the
7 Forms Division to start selling commercial print?
8 A.  Yes.  One thing I objected to was starting
9 to sell commercial print.
10 Q.  You objected to it?
11 A.  Well, I objected to the practice of
12 Marketing Services Division.  We were offering
13 50 percent marketing credits toward the purchase
14 of commercial print, and we were not allowed to
15 do that.
16 Q.  Tell me a little bit more about that.  Who
17 did you object -- you said you objected to --
18 A.  Steve Moyer.
19 Q.  I'm sorry, let me finish my question.
20 A.  I'm sorry.
21 Q.  No, you're fine.  I just want to make sure
22 that you're answering my question accurately.
23 You said that you objected to the practice of

Page 68

1 selling commercial print, correct?
2    MS. HAYNES:  Object to the form.
3 A.  Not objected to the commercial print sales,
4 but there was another division in our company
5 that also sold commercial print, Marketing
6 Services Division, and they were allowed to give
7 marketing credits.
8 Q.  What are marketing credits?
9 A.  Like 50 percent off the cost of the job.
10 Q.  The cost of the commercial print job?
11 A.  Yes.  We didn't manufacture commercial
12 print.  We bought it all out.
13 Q.  I'm sorry, I didn't hear that.
14 A.  We outsourced the commercial print.  We
15 didn't produce it ourself.
16 Q.  So you outsourced the commercial print?
17 A.  The company outsourced commercial print.
18 Q.  So you're saying -- are you saying that
19 both Marketing Services and Forms were selling
20 commercial print, correct?
21 A.  Correct.  Yes.  They were selling it first.
22 Q.  But Marketing Services was allowed to offer
23 discounts --

Page 69

1 A.   Yes.

2 Q.   -- and Forms was not, is that your

3 testimony?

4 A.   I objected to them not making it a level

5 playing field.

6 Q.   You believe that Forms should have also

7 been able to offer marketing credits?

8 A.   Yes, or they shouldn't be able to, one or

9 the other.

10 Q.   When did you voice, I guess, your opinion

11 on the marketing?

12 A.   When this came out.

13 Q.   Do you recall when this came out?

14 A.   I don't remember exactly.

15 Q.   Would it have been sometime around

16 August of 2014?

17 A.   Probably, yes.  This says August 1st to

18 December 31st.

19 Q.   Somewhere around then?

20 A.   Yes.

21 Q.   And you voiced those concerns to Steve

22 Moyer?

23 A.   I did.

Page 70

1 Q.   What did he say?

2 A.   He checked with Ebrey, and Ebrey said "No,"

3 he couldn't do it.

4 Q.   Why not?

5 A.   No reason.

6 Q.   Do you believe Marketing Services being

7 allowed to give marketing credits impacted the

8 Forms Division?

9 A.   Absolutely, it did.

10 Q.   Okay.  How?

11 A.   Well, if the check salespeople who owned

12 the accounts, Community Bank accounts, choose

13 between us and Marketing Services, they're going

14 to choose the lowest price every time.  The

15 Community reps, the Community AEs, if they had a

16 choice between selling a lower price or a higher

17 price, they would sell a lower price every time.

18 Q.   So that would affect Forms' ability to sell

19 commercial print products, correct --

20 A.   Absolutely, it did.

21 Q.   -- in your opinion, but it would not affect

22 the Forms Division's ability to sell forms; is

23 that right?

Page 71

1 A.   That's correct.  We're the only one that

2 sold forms.

3        (Whereupon, Defendant's Exhibit Number 20

4 was marked for identification, a copy of which is

5 attached to the original of the transcript.)

6 Q.   I'll show you Defendant's Exhibit 20.  Do

7 you recognize Defendant's Exhibit 20?

8 A.   I believe I do.

9 Q.   You do?  Is it your 2014 incentive

10 compensation?

11 A.   It appears so.

12        MS. HAYNES:  I thought we had already

13 marked 2014.  That is 18.

14        MS. WILKES:  18 is 2013.

15        MS. HAYNES:  I thought that was 17.

16        MS. WILKES:  No.  18 is the actual plan.

17 This is 18.  It's the incentive plan document,

18 not the pay-off.

19        MS. HAYNES:  Right.  I had Defendant's 18

20 was the 2014 sales incentive plan, actual

21 document, but I had Defendant's 17 was the '13

22 incentive.

23        MS. WILKES:  Right.

Page 72

1        MS. HAYNES:  So this one is?

2        MS. WILKES:  '14.

3        MS. HAYNES:  Okay.

4 A.   I never saw the last one.  I never saw the

5 end of it.

6 Q.   You never saw 2014?

7 A.   I never saw the final on it.

8 Q.   Do you recall getting incentive

9 compensation in 2014?

10 A.   I don't recall.

11 Q.   When you received incentive compensation,

12 that was reflected on your paychecks?

13 A.   Yes.  They didn't pay off the bonuses until

14 later.

15 Q.   Later in the year?

16 A.   And I was gone in February or January.

17 Q.   Did they pay them out in the calendar year?

18 A.   No.

19 Q.   So you're saying the 2014 incentive would

20 have been paid out in --

21 A.   '15.

22 Q.   -- '15?

23 A.   Yes.

**Robert Birchfield Collier, Jr.**                    **19 (73 - 76)**

Page 73

1  Q.   Did you receive employee handbooks when you
2  worked for Harland Clarke?
3  A.   I did.
4      (Whereupon, Defendant's Exhibit Number 21
5  was marked for identification, a copy of which is
6  attached to the original of the transcript.)
7  Q.   I'll show you Defendant's Exhibit 21.
8  Looking at the first page, do you recognize the
9  first page that's Bates-stamped 201 at the
10 bottom?
11 A.   Yes, I do.
12 Q.   This is your Handbook Acknowledgment of the
13 handbook that was effective June 29, 2004?
14 A.   Yes.
15 Q.   That's your signature at the bottom?
16 A.   Yes.
17 Q.   If you look at the second page that's
18 Bates-stamped 202, is that an acknowledgment of
19 another handbook you received in August of 2000?
20 A.   Yes.
21 Q.   Then the third page that's Bates-stamped
22 255, is that acknowledgment of another handbook
23 version that you received in 1990?

Page 74

1  A.   Yes, it is.
2  Q.   Was the handbook something that you could
3  access online?
4  A.   It was eventually, but not during this
5  time.
6  Q.   When do you recall the handbook being
7  available online?
8  A.   I don't recall.
9  Q.   In 2014 and '15, was the handbook available
10 online?
11 A.   It was, yes.
12 Q.   How often was the handbook revised?
13 A.   I don't recall.
14 Q.   Do you recall if it was revised every year?
15 A.   I don't recall.
16     (Whereupon, Defendant's Exhibit Number 22
17 was marked for identification, a copy of which is
18 attached to the original of the transcript.)
19 Q.   This is Defendant's Exhibit 22.  It's front
20 and back.  Do you recognize Defendant's Exhibit
21 22?
22 A.   I do.
23 Q.   Is this the Employee Handbook that was

Page 75

1  available online?
2  A.   Yes.  Is this 2012?
3  Q.   That's the version this one is.
4  A.   It says, "Last revised 2012."
5  Q.   That's what this version is.  But you don't
6  recall how often handbooks were revised, correct?
7  A.   I don't recall.
8  Q.   When handbooks were revised, were you
9  notified that a revised handbook was available?
10 A.   Yes.
11 Q.   Was that an e-mail notification?
12 A.   It was.
13 Q.   Did you ever review the handbook online?
14 A.   I did.
15 Q.   You did?  How often did you review the
16 handbook online?
17 A.   Whenever it came out.
18 Q.   Whenever it came out?
19 A.   When the revision was made.
20 Q.   Will you turn with me to page 36?  And I'm
21 referring to the numbers at the top of the page
22 this time, not the bottom.  Were you aware that
23 Harland Clarke had an equal employment

Page 76

1  opportunity policy?
2  A.   Yes.
3  Q.   And were you aware that under that policy,
4  it was the policy of Harland Clarke not to
5  discriminate against employees on the basis of
6  age?
7  A.   Yes.
8  Q.   Did you understand that under that policy,
9  it was the policy of Harland Clarke not to
10 discriminate against employees on the basis of
11 disability?
12 A.   Yes.
13 Q.   Here at the bottom of the policy, there's
14 an arrow that says, "For a full copy of the Equal
15 Employment Opportunity policy" and it says "go
16 to" and it gives a website?
17 A.   Yes.
18 Q.   Did you ever click on those links?
19 A.   No, I don't think so.
20 Q.   No, okay.
21 A.   I never had cause to do it.
22 Q.   What was that?
23 A.   I never had cause to do it.

Page 77

1 Q.   You never had cause to do it.

2    (Whereupon, Defendant's Exhibit Number 23

3 was marked for identification, a copy of which is

4 attached to the original of the transcript.)

5 Q.   I'll show you Defendant's Exhibit 23.  Have

6 you ever seen Defendant's Exhibit 23?

7    MS. HAYNES:  This is the one that was

8 produced Friday night?

9    MS. WILKES:  Yes.

10    MS. HAYNES:  Three days ago?

11    MS. WILKES:  That's correct.

12    MS. HAYNES:  I thought you said you were

13 not asking questions about any of those.

14    MS. WILKES:  I did not say I was not asking

15 questions about the equal employment policy.

16 Q.   My question is simply, have you ever seen

17 it?

18 A.   I saw it Saturday morning.

19 Q.   You saw it Saturday morning, okay.  You

20 don't recall seeing it during your employment?

21 A.   I don't recall.

22 Q.   On the first page, it mentions a complaint

23 procedure?

Page 78

1 A.   Yes.

2 Q.   Were you aware of the complaint procedure?

3 A.   I don't recall.

4 Q.   The first page also mentions there's an

5 employee hotline.  Were you aware that there was

6 an employee hotline that you could call?

7 A.   I don't recall.

8 Q.   Did you ever call the employee hotline?

9 A.   I didn't call the employee hotline.

10 Q.   Turn to the second page for me.  Number 7

11 where it says Alternative Legal Remedies, it

12 says, "Nothing in this policy shall prevent the

13 complainant or respondent from pursuing formal

14 legal remedies or resolutions from state, local,

15 or federal agencies or the courts."  Did you

16 understand that to be the case?

17    MS. HAYNES:  Object to form.

18 A.   I don't recall.

19 Q.   Did anyone at Harland Clarke ever tell you

20 that you could not pursue remedies in state,

21 local, or federal agencies or the courts?

22 A.   No.

23 Q.   I'm looking back at the handbook,

Page 79

1 Defendant's Exhibit 22.  I'm back on page 36.

2 Under Equal Employment Opportunity, do you see

3 the Reasonable Accommodation policy?

4 A.   I do.

5 Q.   Did you understand that it was the policy

6 of Harland Clarke to reasonably accommodate all

7 qualified individuals with disabilities, unless

8 the accommodation requested would pose an undue

9 hardship?

10 A.   I do.

11    (Whereupon, Defendant's Exhibit Number 24

12 was marked for identification, a copy of which is

13 attached to the original of the transcript.)

14 Q.   I'll show you Defendant's Exhibit 24.  Have

15 you ever seen Defendant's Exhibit 24?

16 A.   Saturday morning.

17 Q.   Looking back at Exhibit 22, the Reasonable

18 Accommodation policy on page 36, do you see where

19 it's got another little arrow that says, "For a

20 full copy of the Reasonable Accommodation policy,

21 go to," and it gives you a website?

22 A.   Yes.

23 Q.   Did you ever click on that arrow and go to

Page 80

1 the --

2 A.   I never did.

3 Q.   Never did.  All right, I'm back on 24.  I'm

4 looking on the second page that's got the Bates

5 stamp 765 at the bottom.  I'm looking at numbered

6 paragraph 5 that says Requesting a Reasonable

7 Accommodation, and I'm looking at the third

8 paragraph where it says, "An employee with a

9 disability is responsible for requesting an

10 accommodation from the Human Resources Department

11 or his or her supervisor, and providing medical

12 documentation regarding the disability when

13 requested."  Were you aware that that was the

14 policy?

15 A.   No.

16 Q.   Did you know how to request a reasonable

17 accommodation?

18 A.   Talk to your boss.

19 Q.   Talk to your boss.  I'm looking at the

20 third page, the page that's Bates-stamped 766,

21 paragraph 8.  Again, do you see that it

22 reiterates the policy of Harland Clarke to

23 prohibit harassment of or discriminatory

Page 81

1 treatment of employees on the basis of
2 disability, or because an employee has requested
3 a reasonable accommodation?
4 A.   Yes.
5 Q.   Do you understand that that was the policy?
6 A.   I didn't know that.
7 Q.   You did not know that was the policy?
8 A.   I've never seen this document saying that.
9 Q.   Were you aware that if you felt like you
10 had been discriminated against on the basis of
11 disability, there was a complaint procedure for
12 you to follow?
13 A.   No.
14 Q.   Look back at the handbook.  I'm looking on
15 page 40, 40 and 41.  Were you aware of the
16 company's harassment and discrimination policy
17 that's in that employee handbook?
18 A.   Yes.
19 Q.   And you were aware that the company
20 prohibited harassment or discrimination on the
21 basis of age, correct?
22 A.   Yes.
23 Q.   You were aware that the company prohibited

Page 82

1 harassment or discrimination on the basis of
2 disability, correct?
3 A.   Sure.  I followed the policy.  I followed
4 the policy.
5 Q.   Look on page 41 for me.  Do you see where
6 it says Harassment/Discrimination Complaints?
7 A.   Yes.
8 Q.   Actually, I'm looking at the top of page
9 41, very top where it says, "Employees who
10 believe in good faith that they have been
11 harassed or discriminated against on account of
12 race, color, sexual orientation, religion,
13 gender, national origin, age or disability, or as
14 otherwise defined under relevant law, must report
15 the conduct immediately to their supervisor,
16 department director, or the Human Resources
17 Department."  Did you understand that to be the
18 complaint procedure?
19 A.   Yes.
20 Q.   The second sentence says, "Employees should
21 report harassment or discrimination before it
22 becomes severe or pervasive."  Did you understand
23 that to be a policy?

Page 83

1 A.   Yes.
2 Q.   In the third sentence, it says, "If the
3 complaint involves someone in the employee's
4 direct line of supervision, the employee must go
5 directly to the facility manager, the Human
6 Resources Department, or a Company officer."  Did
7 you understand that to be the policy?
8 A.   Yes, I did.
9 Q.   Then the final sentence says, "If the
10 reporting employee does not receive an adequate
11 response to any initial report, the employee is
12 required to report the conduct to the Human
13 Resources Department."  Did you understand that
14 to be the policy?
15 A.   Yes.
16 Q.   Now under Harassment/Discrimination
17 Complaints that's the bold heading, there's a
18 little arrow again, and it says, "For a full copy
19 of the Harassment Prevention Policy, go to," and
20 then it gives a website.  Do you see that?
21 A.   I see it, yes.
22 Q.   Did you ever go to the website?
23 A.   No.

Page 84

1    (Whereupon, Defendant's Exhibit Number 25
2 was marked for identification, a copy of which is
3 attached to the original of the transcript.)
4 Q.   Let me show you Defendant's Exhibit 25.
5 The title says Harassment Prevention Policy.
6 Have you ever seen Defendant's Exhibit 25 before?
7 A.   Saturday morning.
8 Q.   Saturday morning.  The second page, the
9 page that's Bates-stamped 882, do you see the
10 Complaint Procedure again?
11 A.   Yes.
12 Q.   Does that paragraph also mention a 24-hour
13 hotline?
14 A.   That's what it says.
15 Q.   Were you aware that there was a hotline?
16 A.   I'm not aware there's a hotline.
17 Q.   Look back one last time for me at page 41
18 of the handbook.  Under the bold
19 Harassment/Discrimination Complaints, right
20 before the little arrow that tells you to go to
21 the website, do you see where it says, "As
22 discussed above, Harland Clarke prohibits
23 retaliation, harassment or intimidation against

Page 85

1 employees reporting or complaining of harassment
2 and/or discrimination"?
3 A.   Yes.
4 Q.   Did you understand that to be the policy?
5 A.   Yes.
6     (Off-the-record discussion.)
7 Q.   Let's talk about the reduction-in-force.
8 You were informed of the reduction-in-force
9 decision on January 9, 2015; is that correct?
10 A.   Yes.  Correct.
11 Q.   Do you know who made the reduction-in-force
12 decision?
13 A.   I was told Steve Moyer.
14 Q.   You were told that Steve Moyer made the
15 decision?
16 A.   Yes.
17 Q.   Who told you that he made the decision?
18 A.   He did.
19 Q.   Do you know when Steve Moyer made the
20 reduction-in-force decision?
21 A.   I have no idea.
22 Q.   Do you know if Steve Moyer consulted with
23 anyone else at Harland Clarke in making the

Page 86

1 reduction-in-force decision?
2 A.   I don't know.
3 Q.   Do you know what factors were considered in
4 making the reduction-in-force decision?
5 A.   No.
6 Q.   Do you know why you were selected for the
7 reduction-in-force?
8 A.   No idea.
9 Q.   You don't know?  "No idea," is that what
10 you said?
11 A.   No idea.
12 Q.   How were you informed?
13 A.   I had the Friday call.
14 Q.   It was a phone call?
15 A.   On Friday before.  It was a conference call
16 one-on-one with Steve Moyer, so I called in, and
17 he got on the phone and said Sonia Ellison was on
18 the phone also.
19 Q.   Sonia Ellison was in Human Resources?
20 A.   Yes.
21 Q.   Was she your human resources point of
22 contact?
23 A.   She was.

Page 87

1 Q.   Did Sonia participate in the call?
2 A.   She did.  Moyer called back in two minutes
3 and told me that my job had been eliminated.
4 Q.   Did he say anything else?
5 A.   That's all he said.  He said, "I'm going to
6 leave Sonia on the phone with you to tell you all
7 the details."  He dropped off the call after two
8 minutes.
9 Q.   Then Sonia Ellison took over?
10 A.   Yes.
11 Q.   What was Sonia's role in the call?
12 A.   To tell me all the details and the package
13 that would be coming, so on and so on and so on.
14 She told me to think it over throughout the
15 weekend and call her back on Monday if I had any
16 questions.
17 Q.   So no reason for the reduction-in-force was
18 given to you on the call?
19 A.   Not at all, no, just my job was being
20 eliminated.
21 Q.   On the call, did Steve or Sonia tell you
22 that you would be considered for any open
23 position you applied for in the company?

Page 88

1 A.   Yes.
2 Q.   Who told  you that, was it Steve or Sonia?
3 A.   Sonia.  I asked Steve before he dropped off
4 if I could drop into a sales position and keep
5 selling forms and commercial print, and he said
6 there wasn't a position available.
7 Q.   Did Steve or Sonia say anything else on the
8 call?
9 A.   That's all I can recall.
10 Q.   At some point after the call, you got a
11 package, severance package?
12 A.   Yes, about two weeks later.
13 Q.   Was that in the mail, or was that e-mailed
14 to you?
15 A.   In the mail.
16     MS. HAYNES:  Did you say mail or e-mail?
17     THE WITNESS:  Mail.
18     (Whereupon, Defendant's Exhibit Number 26
19 was marked for identification, a copy of which is
20 attached to the original of the transcript.)
21 Q.   I'll show you Defendant's Exhibit 26, a
22 document that your attorney produced to me.
23 First of all, do you recognize this document?

Page 89

1  A.   Yes, I do.

2  Q.   Was this Benefits Summary Sheet part of the

3  severance package you received?

4  A.   It was, yes.

5  Q.   So you received this about two weeks later?

6  A.   Yes.

7  Q.   In the mail?

8  A.   Yes, in the mail.  FedEx.

9      MS. HAYNES:  Did you say "FedEx"?

10     THE WITNESS:  Federal Express, yes.

11  Q.   And this Benefits Summary Sheet told you

12  the severance benefits you were entitled to?

13  A.   Yes, it did.

14      (Whereupon, Defendant's Exhibit Number 27

15  was marked for identification, a copy of which is

16  attached to the original of the transcript.)

17  Q.   I'll show you Defendant's Exhibit 27.  Do

18  you recognize Defendant's Exhibit 27?

19  A.   I don't recall.

20  Q.   Those reduction-in-force things you need to

21  know?

22  A.   I don't recall.

23  Q.   This is a document that your lawyer

Page 90

1  provided to me, which leads me to believe that

2  she received it from you.

3      MS. HAYNES:  If it has an HH, that means it

4  came from our firm; but if you don't recall

5  receiving it, fine.

6  A.   It could be part of the package.

7  Q.   You think it was part of the severance

8  package you received?

9  A.   I don't know, it could be.

10  Q.   Could have been, okay.  On the first page

11  where it says -- under Key Information, it says,

12  Job Opportunities Within The Company?

13  A.   Yes.

14  Q.   It says, again, the last sentence, "You

15  will be considered for any open position that you

16  apply for, based on your qualifications for the

17  position."  Did you understand that you would

18  have to apply for any open positions?

19  A.   I did, yes.

20  Q.   Did you apply for any open positions?

21  A.   No.  I went online and looked, but there

22  was never anything available.

23  Q.   Is it your testimony there were no open

Page 91

1  positions?

2  A.   That could fit my skill-set.

3  Q.   There were no open positions that fit your

4  skill-set?

5  A.   And geography.

6  Q.   You wanted to stay in Alabama?

7  A.   I preferred the home office in Alabama.

8  Q.   You preferred to keep your home office?

9  A.   In Birmingham, yes.

10  Q.   After the call with Steve and Sonia, did

11  you ask if you could claim STD and LTD?

12  A.   I did.

13      (Whereupon, Defendant's Exhibit Number 28

14  was marked for identification, a copy of which is

15  attached to the original of the transcript.)

16  Q.   I'll show you Defendant's 28.  Is

17  Defendant's 28 the e-mail where you asked if you

18  could claim STD and LTD?

19  A.   Yes.

20  Q.   By "STD and LTD," I mean short-term

21  disability and long-term disability.

22  A.   Yes.

23  Q.   You had to exhaust short-term disability

Page 92

1  before you went on long-term disability; is that

2  correct?

3  A.   Yes.

4  Q.   Was this the first time you had asked to go

5  out on short-term disability?

6  A.   After my second back surgery, I went on

7  short-term disability.  After my second back

8  surgery in '14, I went on three months'

9  short-term disability.

10  Q.   This was the first time you had requested

11  it since then?

12  A.   Yes.

13  Q.   In this e-mail, you said your doctor had

14  suggested that you go out on leave, and that you

15  were trying to work through it?

16      MS. HAYNES:  Object to leading.

17  A.   Yes.

18  Q.   What doctor suggested it?

19  A.   Dr. Nichols.

20  Q.   Dr. Nichols?

21  A.   He did my back surgery.

22  Q.   Is that at Andrews?

23  A.   That's Andrews.  Sonia told me that I could

**Robert Birchfield Collier, Jr.**                          **24 (93 - 96)**

Page 93

1 not apply, that I'd have to be there, when I came
2 back.
3 Q.   Dr. Nichols told you that you could not
4 apply?
5 A.   No.  Sonia told me that I could not apply.
6 Q.   Sonia told you that you could not apply,
7 okay.  When did Sonia tell you that you could not
8 apply?
9 A.   Like two weeks after this, maybe a week
10 after.
11       (Whereupon, Defendant's Exhibit Number 29
12 was marked for identification, a copy of which is
13 attached to the original of the transcript.)
14 Q.   I'll show you Defendant's Exhibit 29.  Have
15 you seen Defendant's Exhibit 29 before?  Right
16 now, I'm just looking at the first page, the
17 first e-mail.
18 A.   Yes.
19 Q.   It's an e-mail from Sonia Ellison to you
20 that's dated January 13, 2015?
21 A.   Yes.
22 Q.   And she says, "Thanks for speaking with me.
23 Here is the information to request STD leave."

Page 94

1 Is that correct?
2 A.   Yes.
3 Q.   And she's providing you the attached
4 information about how to file for STD leave; is
5 that correct?
6 A.   Correct.  Yes.  She maybe telephoned after
7 that and told me I could not apply, because I
8 wouldn't have a job to come back to.
9 Q.   When did she do that?
10 A.   It was after this, after this.
11 Q.   Was anyone else on the telephone call?
12 A.   No, just Sonia.
13       (Whereupon, Defendant's Exhibit Number 30
14 was marked for identification, a copy of which is
15 attached to the original of the transcript.)
16 Q.   I'll show you Defendant's Exhibit 30.  Do
17 you recognize the e-mail string that is
18 Defendant's Exhibit 30?
19 A.   I do.
20 Q.   And I'm looking at the bottom where there's
21 an e-mail that you sent, appears that you sent to
22 Sonia on January 16, 2015, where, among other
23 things, you're asking Sonia if Steve Moyer signed

Page 95

1 off on your STD request; is that correct?
2 A.   Yes.
3 Q.   Then it looks like there's a response from
4 Steve Moyer on that same date, January 16, 2015,
5 where he's saying he did approve your STD
6 request; is that correct?
7 A.   Yes.Sonia had some personal revenge, and
8 she didn't respond back to me in a timely manner.
9       (Whereupon, Defendant's Exhibit Number 31
10 was marked for identification, a copy of which is
11 attached to the original of the transcript.)
12 Q.   I'll show you Defendant's Exhibit 31.  Do
13 you recognize the e-mail string that is
14 Defendant's Exhibit 31?
15 A.   Yes.
16 Q.   I'm looking at the bottom of the first page
17 that looks like it's Bates-stamped HH 47.  At the
18 very bottom of the page, it looks like there's a
19 January 30, 2015 e-mail from Sonia Ellison to
20 you.  Do you recall that?
21 A.   I do.
22 Q.   And in that e-mail, did Sonia tell you,
23 "After additional research, you will be able to

Page 96

1 participate on STD even though you are not
2 active"?
3 A.   Yes.
4 Q.   So at some point did she come back to you
5 and say you can get STD leave?
6 A.   Yes, nine days before my last day at the
7 company.  Nine calendar days, not business days.
8 Q.   Did you apply for short-term disability
9 after she told you you could?
10 A.   Yes.
11 Q.   Were you aware that in order to get
12 short-term disability, a doctor had to provide
13 supporting information?
14 A.   Yes.
15 Q.   Do you know what information your doctor
16 provided, if any, in connection with your
17 short-term disability request?
18 A.   He wrote a letter and said I should get it,
19 that I was disabled.
20 Q.   He wrote a letter?
21 A.   Yes.
22 Q.   Do you know if that was in connection with
23 your application, or after the decision had been

**Robert Birchfield Collier, Jr.**                    **25 (97 - 100)**

Page 97

1  made on whether or not you would get it?

2  A.  I guess before.  It wasn't after.

3  Q.  You guess before, okay.  Was your

4  short-term disability claim denied?

5  A.  Yes.

6  Q.  Do you know on what basis?

7  A.  I don't know.

8  Q.  UNUM was the short-term disability

9  provider; is that correct?

10  A.  Yes.

11  Q.  Did UNUM make the decision on whether or

12  not you got short-term disability?

13      MS. HAYNES:  Object to form.

14  A.  I'm assuming they did.  I'm not sure how it

15  works.  I know the company is self-funded on

16  that.

17  Q.  Do you have any reason to believe that UNUM

18  did not make the decision to deny your short-term

19  disability?

20  A.  I don't know.  I thought it was odd that

21  they did.

22  Q.  You thought it was odd that they --

23  A.  Denied it, with the supporting letter from

Page 98

1  the doctor.

2  Q.  Are you aware of any information that

3  Harland Clarke provided to UNUM in connection

4  with your short-term disability claim?

5  A.  I don't know.

6  Q.  Is it correct that Harland Clarke extended

7  your last day of employment from January 31st of

8  2015 to February 9th of 2015, so you could

9  maintain your health benefits and apply for

10  short-term disability leave?

11      MS. HAYNES:  Object to form.

12  A.  No.

13  Q.  That's not correct?

14  A.  They extended it, but I figured it was

15  because it was a different pay period.

16  Q.  You think the reason they extended it was

17  so your last day of your employment would be the

18  end of a pay period?

19  A.  Yes.

20  Q.  No one told you they were extending your

21  employment so you could apply for short-term

22  disability?

23  A.  No.

Page 99

1  Q.  Did you ever tell anyone that you were

2  planning to have surgery and needed your

3  termination date to be extended?

4  A.  No.

5  Q.  Did you inform anyone of a need for surgery

6  prior to the RIF decision?

7  A.  No.

8      MS. HAYNES:  Other than what he had already

9  received, because he had two back surgeries

10  previously?

11      MS. WILKES:  Right.

12      MS. HAYNES:  You're not counting that?

13      MS. WILKES:  I'm talking about future

14  surgeries.

15  A.  No, not at all.

16  Q.  Have you had any surgeries after your two

17  back surgeries?

18  A.  No.

19      (Whereupon, Defendant's Exhibit Number 32

20  was marked for identification, a copy of which is

21  attached to the original of the transcript.)

22  Q.  I'll show you Defendant's 32.  I'm looking

23  at the e-mail that's dated February 9, 2015, to

Page 100

1  you from Sonia Ellison.  Do you recall this

2  e-mail?  I'm looking on the first page, the page

3  that's got the number at the bottom HH 52.

4  A.  Yes.

5  Q.  In that e-mail, Sonia is telling you that

6  they were waiting for UNUM to respond back with

7  final disposition of your claim for short-term

8  disability?

9  A.  Yes.

10  Q.  Who informed you that your claim was

11  denied?  Was that UNUM?

12  A.  UNUM.  There's a page missing in this

13  e-mail trail.

14  Q.  What are you saying?

15  A.  There's a page missing in this e-mail

16  trail.

17  Q.  They left something out?

18  A.  Yes.

19  Q.  Okay.  Well, these are documents -- the

20  Bates stamps are 52 and 53, and these are

21  documents that were produced by your attorney.

22  A.  It's where I asked Sonia what the favorable

23  news was, and she responded back and told me that

Page 101

1 they had finally decided that I could claim STD.
2 Q.   Where are you referring to?
3 A.   It's not in this trail.
4 Q.   These documents say it's page 1 of 2 and
5 then page 2 of 2.  Are you saying there's another
6 e-mail that comes before?
7 A.   I asked what the favorable news was.  I
8 asked her right here (witness indicating.)
9 Q.   What exhibit are you on, 31?
10 A.   31, yes.  "Can you share the favorable news
11 with me prior to next week?  We are in the
12 process of making life decisions" --
13       (Whereupon, Defendant's Exhibit Number 33
14 was marked for identification, a copy of which is
15 attached to the original of the transcript.)
16 Q.   You've beat me to it.  Here is my
17 Defendant's Exhibit 33.  This is an e-mail.  Do
18 you recognize this e-mail?
19 A.   I do.
20 Q.   It's an e-mail from Sonia Ellison to you on
21 January 28, 2015, where she tells you that your
22 last day at Harland Clarke has been changed to
23 February 9th, correct?

Page 102

1 A.   Uh-huh.
2 Q.   Did she tell you why your last day of
3 employment was being changed?
4 A.   (Witness nodded no.)
5 Q.   You're shaking your head, now.
6 A.   I don't know.  I'm sorry.
7 Q.   Then she said, "I also have favorable news
8 to share with you as well"; is that correct?
9 A.   That's correct, yes.
10 Q.   What was the favorable news?
11 A.   Well, I asked her what it was, and she
12 finally responded back on the 30th that it was
13 that I could file for UNUM, short-term disability
14 with UNUM.
15 Q.   And that's the e-mail that you were
16 referring to as Exhibit 31?
17 A.   Well, I'm saying that her response back is
18 not in here, to my question, "What's the
19 favorable news?"
20 Q.   But you later spoke to her on the phone,
21 and she told you what it was?
22 A.   It was an e-mail, her and Patty Flanders.
23 Q.   So the favorable news was that you could

Page 103

1 apply for STD benefits; is that correct?
2 A.   That's correct, yes.
3       (Whereupon, Defendant's Exhibit Number 34
4 was marked for identification, a copy of which is
5 attached to the original of the transcript.)
6 Q.   I'll show you Defendant's Exhibit 34.  Do
7 you recognize this e-mail?
8 A.   Yes.
9 Q.   Is that an e-mail you received from Sonia
10 Ellison on February 6, 2015?
11 A.   Yes.
12 Q.   It's letting you know that you would be
13 covered by the health insurance, and a portion of
14 your premiums would be paid by Harland Clarke
15 until your last day of employment?
16 A.   Yes.
17 Q.   And then you could continue on COBRA; is
18 that correct?
19 A.   Yes.
20       MS. HAYNES:  What is the redaction on this
21 document?
22       MS. WILKES:  That, I do not know, but I
23 will check.  My guess is that it's a social or

Page 104

1 something along those lines, but I will check.
2       (Whereupon, Defendant's Exhibit Number 35
3 was marked for identification, a copy of which is
4 attached to the original of the transcript.)
5 Q.   I'll show you Defendant's Exhibit 35.  Have
6 you ever seen Defendant's Exhibit 35 before?
7 A.   I don't recall seeing it.
8 Q.   My question is, after all the little boxes
9 that have checks, it shows you were supposed to
10 be paid out 32.92 hours of PTO?
11 A.   Yes.
12 Q.   Did you receive that PTO pay-out?
13 A.   I did in my final check.
14       (Whereupon, Defendant's Exhibit Number 36
15 was marked for identification, a copy of which is
16 attached to the original of the transcript.)
17 Q.   I'm showing you Defendant's Exhibit 36.  Do
18 you recognize Defendant's Exhibit 36?
19 A.   I do.
20 Q.   Is that the separation agreement that you
21 received from Harland Clarke?
22 A.   Yes, it is.
23 Q.   You chose not to sign this separation

Page 105

1  agreement, correct?

2  A.   Correct.

3  Q.   Nothing in the separation agreement

4  prohibits you from filing a Charge of

5  Discrimination with the EEOC, does it?

6  A.   If you sign it, you couldn't file.

7  Q.   Where in this document does it state that

8  you cannot file a Charge of Discrimination with

9  the EEOC?

10  A.   I believe it does.  I'm not finding it in

11  here, but I know I saw it somewhere.

12  Q.   And my question is very simply, where does

13  it say in this agreement that you may not file a

14  Charge of Discrimination with the EEOC?

15  A.   I don't know.  I don't see it in here.

16      (Whereupon, Defendant's Exhibit Number 37

17  was marked for identification, a copy of which is

18  attached to the original of the transcript.)

19  Q.   I'll show you Defendant's 37.

20  A.   Can I go back to this one?

21  Q.   Okay.  What do you need to add to your

22  testimony?

23  A.   Can I have time to research it a little

Page 106

1  bit?

2  Q.   Do you need more time to read it?  You can

3  take as long as you need to read it.

4  A.   I know there was something I saw that said

5  I waived all my rights.

6  Q.   What is it that you think you saw?

7  A.   A statement in there by accepting the

8  agreement, you waive your rights to an Equal --

9  Q.   You think it says that in this document?

10  A.   I didn't see it, no.

11  Q.   You've already testified that you don't see

12  the statement that you may not file an EEOC

13  Charge in Defendant's Exhibit 36?

14      MS. HAYNES:  He says waive his rights, is

15  what he said.

16  Q.   Where in Defendant's Exhibit 36 does it say

17  that you waive your rights?

18  A.   I don't know, that's what I'm saying.

19  Q.   Take as long as you need to read it.

20  A.   You may not have the document.  I think

21  it's in Section 7.

22  Q.   Where in Section 7 does it tell you that

23  you cannot file a Charge of Discrimination with

Page 107

1  the EEOC?

2  A.   It doesn't say EEOC.  It doesn't say about

3  EEOC.

4  Q.   So that language does not appear in Section

5  7; is that correct?

6  A.   It doesn't say anything about EEOC, but it

7  talks about "voluntarily and knowingly release

8  and discharge the Company, all related,

9  affiliated, parent," I read this that it waives

10  my rights.

11  Q.   So you're referencing paragraph 7.  Your

12  testimony is that your understanding of that

13  provision is that you are waiving your rights; is

14  that correct?

15  A.   Yes.

16  Q.   That's what you're saying, okay.  You agree

17  with me that nothing in paragraph 7 states that

18  you may not file a Charge of Discrimination with

19  the EEOC; is that correct?

20  A.   I don't see that language in there

21  particularly.  Can you explain what Section 7

22  means?

23  Q.   Your lawyer can go over that with you.  I

Page 108

1  want to ask you about a different document.  I'm

2  asking questions now about Defendant's Exhibit

3  37.  Do you recognize Defendant's Exhibit 37?

4  A.   I do.

5  Q.   Is this the COBRA notice you received?

6  A.   Yes, it is.

7  Q.   Telling you how you could continue your

8  health insurance benefits?

9  A.   Yes.

10  Q.   Was Defendant's Exhibit 37 also in the

11  package you received?

12  A.   Yes.

13  Q.   Other than -- well, was Defendant's Exhibit

14  36 also in the package you received, or was that

15  separate?

16  A.   I'm not sure, but I believe it was.

17  Q.   I think you've testified Defendant's 37 was

18  in the package you received, and Defendant's 27

19  you believe was also in the package you received;

20  is that correct?

21  A.   Yes.

22  Q.   Defendant's Exhibit 26 you believe was also

23  in the package you received?

Page 109

1   A.   Yes.

2   Q.   Do you recall any other documents being in

3   the separation package that you received?

4   A.   I don't recall.

5        (Whereupon, Defendant's Exhibit Number 38

6   was marked for identification, a copy of which is

7   attached to the original of the transcript.)

8   Q.   Do you recognize Defendant's Exhibit 38,

9   this e-mail string?

10  A.   Yes.

11  Q.   Looking at the e-mail that's at the bottom

12  of the page, is an e-mail from you, I guess, to

13  your sales team, dated February 4, 2015; is that

14  correct?

15  A.   Yes.

16  Q.   In this e-mail, the last two sentences

17  where you say, "My last bit of coaching is to

18  ramp up quickly on CP," that was to ramp up

19  quickly on commercial print?

20  A.   Yes.

21  Q.   Is that because commercial print was

22  becoming more important to Harland Clarke?

23  A.   Yes.

Page 110

1   Q.   Then you said in that same sentence, "Do

2   not, under any circumstances, trust Corwin"?

3   A.   Debra Corwin.

4   Q.   Who is Debra Corwin?

5   A.   She's the VP of marketing.

6   Q.   She's the VP of marketing.  Why were you

7   advising your sales team not to trust Debra?

8   A.   Because I feel like she discriminated

9   against me.

10  Q.   How did Debra Corwin discriminate against

11  you?

12  A.   In the sales meeting in Puerto Rico, she

13  questioned my voice and said "I can barely hear

14  you."

15  Q.   What else?

16  A.   Prior to that, I know she mentioned to one

17  of my salespeople, "You need to get rid of Bob

18  Collier."  To Maria Robinson, "You need to get

19  rid of Collier."

20  Q.   Told Maria Robinson?

21  A.   Yes.

22  Q.   Anything else?

23  A.   That's all.  She undermined me to my

Page 111

1   salespeople.

2   Q.   What was Debra's position within your chain

3   of command?

4   A.   She was vice president of marketing, and

5   she had us under her.  We depended on her for

6   marketing advice.

7   Q.   Did she have any supervisory responsibility

8   over you?

9   A.   No, nor my people.

10  Q.   Were you at the same level of management as

11  her?

12  A.   I was a director, she was a vice president.

13  Q.   So she was higher-up in the company than

14  you?

15  A.   She was higher.

16  Q.   But not in your division; is that correct?

17  A.   She supported our division.  She was an

18  officer of the company, and I was not.

19  Q.   Do you know if she played any role in the

20  reduction-in-force decision?

21  A.   I have no idea.

22  Q.   Any other reason that you wrote "Don't

23  trust Corwin" in this e-mail?

Page 112

1   A.   I think that's plenty.

2        (Whereupon, at this time a short break was

3   taken from 12:17 p.m. until 12:27 p.m.)

4        MS. WILKES:  While you finish your

5   banana, Alicia, I just wanted to clarify on the

6   record that the customer names that are redacted

7   in Exhibits 10, 11, I think 10 and 11, and there

8   might be a third one, I'm going to have to

9   investigate whether we can provide that

10  information further.  It's my understanding that

11  those names might have been redacted pursuant to

12  a confidentiality agreement between those

13  particular clients and Harland Clarke.  I don't

14  know that we can disclose who they are.  I'll

15  have to look into it and get back to you.

16       MS. HAYNES:  Well, it's going to be hard to

17  try and figure out what's going on if the names

18  are not there, because I don't know what the

19  different divisions are, and if I can't have a

20  name to ask my client about --

21       MS. WILKES:  Let me just say that I'll have

22  to discuss it with my client and figure out how

23  we can -- what information we can give to you and

**Robert Birchfield Collier, Jr.**                    **29 (113 - 116)**

Page 113

1  how we can do it without violating agreements
2  that they have.  I can't answer your question, as
3  we sit here today.  All I can say is, I will have
4  to discuss with my client the scope of their
5  confidentiality agreement and figure out what
6  information we can give you.
7     MS. HAYNES:  When do you think you might
8  know?
9     MS. WILKES:  Next week sometime.
10  Q.   Are you ready, Mr. Collier?
11  A.   Ready.
12  Q.   We're back from a break.  Mr. Collier, do
13  you need to change or clarify any of your prior
14  testimony?
15  A.   No.
16  Q.   Did you hire Debra Corwin?
17  A.   Yes.
18  Q.   When did you hire her?
19  A.   Gosh, probably back -- I don't know.  It's
20  been many years ago.
21  Q.   What position did you hire her for?
22  A.   Salesperson, account executive.
23  Q.   So at some point she moved from Forms over

Page 114

1  to Marketing?
2  A.   Yes.
3  Q.   How often did you interact with her?
4  A.   Maybe once a month.  She participated in my
5  huddles.
6  Q.   Your huddles?
7  A.   My huddles with my salespeople.
8  Q.   Is it your contention that someone replaced
9  you in your position?
10  A.   I don't know.
11  Q.   That's not a claim that you're making?
12  A.   My understanding was when I left, they
13  divided my duties up with three other directors.
14  Q.   How is that?  How did you come to that
15  understanding?
16  A.   Steve and Sonia.
17  Q.   Steve and Sonia told you they were dividing
18  your duties up between three other directors?
19  A.   Yes.
20  Q.   When did they tell you that?
21  A.   Either that first call or afterwards.
22  Q.   What directors did they tell you were
23  assuming your duties?

Page 115

1  A.   Brent Cox, Larry Fineburg, and Greg Gould.
2  Q.   Do you know the job duties that Brent Cox,
3  Larry Fineburg or Greg Gould performed?
4  A.   Their job description, I don't know.
5  Q.   Do you know what job duties they're
6  performing?
7  A.   They were over a group of salespeople.
8  Q.   I'm asking now.  Do you know what job
9  duties they're performing now?
10  A.   I don't know now.
11  Q.   Do you have any knowledge of the job duties
12  that they performed after your position was
13  eliminated?
14  A.   No.  I can assume, but I'm not going to
15  assume.
16  Q.   Do you know Brent, Larry, or Greg's ages?
17  A.   I would say -- I know Larry is older, he's
18  probably high 50s.
19  Q.   Late 50s?
20  A.   Yes.
21  Q.   What about Brent?
22  A.   Brent is probably mid 40s, and Greg about
23  the same.

Page 116

1  Q.   Greg is about mid 40s?
2  A.   Yes.  I'm just guessing.  I don't know for
3  a fact.
4  Q.   Do you know if Brent, Larry or Greg have
5  any medical conditions?
6  A.   I don't know their medical conditions.
7  Q.   Let's talk about your medical conditions.
8  What medical conditions do you have?
9  A.   Diabetes.
10  Q.   Is that Type II?
11  A.   It's Type II.
12  Q.   Just give me a list, and then we'll go back
13  through them in more detail.
14  A.   My back surgeries, PSP.
15  Q.   Is that Parkinson's?
16  A.   No.  It's progressive supranuclear palsy.
17  Q.   Okay.  What else?
18  A.   That's really all.
19  Q.   Have you also been diagnosed with
20  Parkinson's disease?
21  A.   Parkinson's, they misdiagnosed the
22  Parkinson's.  They always diagnose Parkinson's,
23  but it's PSP.  What happened, the medication

Page 117

1 don't work on Parkinson's.
2 Q.   So there are medications that don't work on
3 Parkinson's that work on PSP?
4 A.   Nothing works on PSP.  The medicines they
5 prescribed for Parkinson's weren't working, so I
6 went for a second opinion at UAB.
7 Q.   So it was PSP?
8 A.   Yes.
9 Q.   So the diabetes, back surgeries, and the
10 PSP.  Any other medical conditions?
11 A.   That's all I can think of right now.
12 Q.   When were you diagnosed with diabetes?
13 A.   Probably 25 years ago.
14 Q.   Who treats you?  Let me ask you this.  Are
15 you still receiving treatments for your Type II
16 diabetes?
17 A.   I go for checkups to Dr. Farley.  He treats
18 me with pills.
19 Q.   Dr. Farley?
20 A.   F-A-R-L-E-Y.
21 Q.   How often do you see Dr. Farley for
22 checkups?
23 A.   Once every six months.

Page 118

1 Q.   Once every six months.  How does the Type
2 II diabetes affect you?
3 A.   It stays under control.
4 Q.   It's controlled by medication?
5 A.   Yes.  Yes.
6 Q.   Other than maybe the foods you can eat, is
7 there any activity that the Type II diabetes
8 prevents you from performing?
9 A.   Not at all.
10 Q.   Let's talk about the PSP, and then I'll
11 come back to back surgeries.
12 A.   Okay.
13 Q.   Who treats you?  Well, I guess are you
14 currently being treated for the PSP?
15 A.   It's Dr. Atchison at UAB.
16 Q.   Dr. Atchison at UAB.  What type of
17 treatment are you receiving for the PSP?
18 A.   There is no treatment for PSP.
19 Q.   No treatment.  So if there's no treatment,
20 what does Dr. Atchison do for you?
21 A.   He just sees me and --
22 Q.   Monitors the progression of your symptoms?
23 A.   -- monitors the progression of it, yes.

Page 119

1 You just keep your stress level down.  Stress
2 accelerates it, stress level.
3 Q.   Stress level accelerates the symptoms?
4 A.   Yes.  I exercise and walk a little bit.
5 Q.   Has Dr. Atchison told you that you should
6 not work?
7 A.   Yes.  I can't drive.
8 Q.   So because of the PSP, you can't drive.
9 What other activities does the PSP prevent you
10 from performing?
11 A.   Playing golf.
12 Q.   So you can't drive, and Dr. Atchison has
13 told you that you cannot work?
14 A.   Yes.
15 Q.   Basically, is it fair to say it prevents
16 you from doing most types of physical activity?
17 A.   I walk a lot in the pool.
18 Q.   You walk?
19 A.   In the pool.
20      MS. HAYNES:  In the pool.
21 Q.   Oh, in the pool, okay.
22      (Whereupon, Defendant's Exhibit Number 39
23 was marked for identification, a copy of which is

Page 120

1 attached to the original of the transcript.)
2 Q.   I'll show you Defendant's 39.  Here are
3 some medical records that your attorney produced
4 to us from Dr. Pearson?
5 A.   Yes.
6 Q.   Is Dr. Pearson who you saw before
7 Dr. Atchison?
8 A.   Yes.
9 Q.   I'm looking on the second page.  It looks
10 like this is a note dated July 30th of 2015.
11 It's a little hard to read.  Does that look like
12 the date?
13 A.   It does, yes.
14 Q.   On the second page, it says, "The patient
15 is permanently and totally disabled due to
16 Parkinson's disease"?
17 A.   Yes.
18 Q.   Is Dr. Pearson who diagnosed you with
19 Parkinson's disease?
20 A.   Yes, she is.
21 Q.   And she started you on some medication; is
22 that correct?
23 A.   Yes.

Page 121

1  Q.   When you provide information to your doctor
2  about your symptoms, are you always truthful and
3  candid?
4  A.   Somewhat, yes.
5  Q.   Somewhat.
6  A.   I tend to be more positive than I am.
7  Q.   So when you're telling the doctors your
8  symptoms, you're putting a sunnier spin on it, is
9  that your testimony?
10  A.   Sometimes.
11  Q.   Sometimes, okay.
12  A.   Not anymore.
13  Q.   So you're saying in some of your medical
14  records, your symptoms might actually have been
15  worse than you communicated, is that fair?
16  A.   Could be.
17  Q.   Was there ever an occasion where you
18  overstated the severity of your symptoms?
19  A.   No.
20  Q.   Do you believe that you were permanently
21  and totally disabled as of July 30, 2015?
22  A.   I don't believe that.
23  Q.   Do you think you could have worked?

Page 122

1  A.   I could have worked, yes.  She said that
2  because of disability reasons.
3  Q.   She wrote that to help you apply for
4  disability?
5  A.   That's my opinion, yes.
6  Q.   Did she tell you that?
7  A.   No.
8       (Whereupon, Defendant's Exhibit Number 40
9  was marked for identification, a copy of which is
10  attached to the original of the transcript.)
11  Q.   I'll show you Defendant's 40.  This is
12  another note from Dr. Pearson.  It looks like
13  it's dated 2-2 of 2016, does that look right?
14  A.   '16, yes.
15  Q.   I'm looking on the second page.  She noted
16  that she believed you remained permanently and
17  totally disabled; is that correct?  Do you see
18  that under Plan?
19  A.   I see it, yes.
20  Q.   Did she communicate that to you at the
21  time?
22  A.   Yes.
23  Q.   But you don't agree with her assessment; is

Page 123

1  that correct?
2  A.   I don't.
3       (Whereupon, Defendant's Exhibit Number 41
4  was marked for identification, a copy of which is
5  attached to the original of the transcript.)
6  Q.   I'll show you Defendant's Exhibit 41.  This
7  is another note from Dr. Pearson.  This one is a
8  little clearer copy, dated March 31st of 2016; is
9  that correct?
10  A.   Yes.
11  Q.   On the second page under Plan, it says, "He
12  remains permanently and totally disabled."  Did
13  she communicate that to you?
14  A.   I don't remember.
15  Q.   Are you still being treated by Dr. Pearson?
16  A.   No.
17  Q.   So at some point after March 31st of 2016,
18  you switched doctors to Dr. Atchison?
19  A.   Yes.
20  Q.   And he diagnosed you with PSP; is that
21  correct?
22  A.   Yes.
23  Q.   Has Dr. Atchison expressed any opinion to

Page 124

1  you on whether or not you are disabled?
2  A.   Yes.
3  Q.   What has he told you?
4  A.   He told me I'm disabled.
5  Q.   Has Dr. Atchison expressed any opinion to
6  you as to whether or not you can work?
7  A.   No.  I can't drive.
8  Q.   You can't drive, okay.  What else can you
9  not do because of the PSP?
10  A.   That's all.  That's all currently.
11       MS. HAYNES:  How about your voice?
12  A.   My voice, yes.  I wouldn't make a very good
13  customer service rep, would I?
14  Q.   And the lower sound of your voice, is that
15  caused by the PSP?
16  A.   Yes.
17  Q.   And it also affects your mobility; is that
18  correct?
19  A.   No.
20  Q.   You're not limited in your mobility?
21  A.   I don't have tremors at all.
22  Q.   Does the PSP affect your ability to walk?
23  A.   It's either that or the back surgery, one.

**Robert Birchfield Collier, Jr.**                    **32 (125 - 128)**

Page 125

1 Q. You don't know which one?

2 A. I don't know which one.

3 Q. What symptoms led you to seek, I guess,

4 treatment for what has been diagnosed as PSP?

5 A. I wasn't getting any better with

6 Dr. Pearson, and I went for a second opinion to a

7 mobility specialist.

8 Q. I guess my question is a little bit

9 different. What physical symptoms were you

10 experiencing that led you to seek a medical

11 diagnosis that turned out to be --

12 A. My voice began to get low.

13 Q. It was your voice, okay. Any other

14 physical symptoms that led you to seek medical

15 treatment that led to the PSP diagnosis?

16 A. She kept increasing the dosage on the

17 carbidopa and the other medicine, and I wasn't

18 getting any better.

19 Q. So in addition to your voice, was there

20 anything else that led you to seek treatment from

21 a doctor?

22 A. Balance.

23 Q. Balance, okay. What symptoms were you

Page 126

1 experiencing with your balance?

2 A. I would fall backwards sometimes.

3 Q. How often?

4 A. Maybe once a week.

5 Q. Is that a symptom you still experience?

6 A. Yes.

7 Q. Is it still once a week?

8 A. Once a week, yes, if that.

9 Q. Other than your voice and your balance,

10 what other physical symptoms led you to seek

11 treatment?

12 A. That's all.

13 Q. That's it, okay. Other than your voice and

14 your balance, what other physical symptoms does

15 the PSP cause?

16 A. That's all. Eventually I won't be able to

17 walk, but I'm not having that yet.

18 Q. Has Dr. Atchison told you how long he

19 thinks it will be before you can't walk?

20 A. No. Every case is different.

21 Q. Has he given you a time range at all?

22 A. No.

23 Q. Other than eventually not being able to

Page 127

1 walk, are there any other physical symptoms that

2 you might experience in the future related to the

3 PSP?

4 A. Swallowing.

5 Q. Difficulty swallowing? So that might

6 affect your ability to eat at some point?

7 A. It could, yes.

8 Q. What else?

9 A. That's all I know of.

10 Q. How often do you see Dr. Atchison?

11 A. Once every three months.

12 Q. Once every three months. Could you perform

13 your director of sales position with Harland

14 Clarke?

15     MS. HAYNES: At what point?

16     MS. WILKES: Right now.

17 A. No.

18 Q. In your current physical condition, could

19 you perform your director of sales position with

20 Harland Clarke?

21 A. At this moment right now, probably not. I

22 could have when I was gone -- when I was

23 eliminated, though.

Page 128

1 Q. At what point do you think you became

2 unable to perform the job?

3 A. I don't know.

4 Q. Would it have been in 2015?

5 A. Probably in '16.

6     MS. HAYNES: '16?

7     THE WITNESS: Yes, '16.

8 Q. Do you think it would have been around

9 1-20-15 when you sought treatment from

10 Dr. Pearson?

11 A. It would have probably been the middle of

12 the year. In July of '16, probably. I'm just

13 guessing, now.

14 Q. That's fine. So your testimony is that you

15 believe that you could have performed your job

16 with Harland Clarke until July of 2016; is that

17 correct?

18     MS. HAYNES: Object to form.

19 A. Well, it's hard to say, because the stress

20 of losing my job accelerated the symptoms.

21 Q. Well, with your accelerated symptoms, I

22 believe you testified earlier -- correct me if

23 I'm misstating your testimony -- that you believe

Page 129

1 you were unable to work in approximately July of
2 2016 to present?
3     MS. HAYNES:  Object to form.  He said he
4 would be guessing; and he told you that, that he
5 was guessing.
6 Q.    You can answer.
7 A.    I'm guessing.
8 Q.    Let's talk about your back issues.  In
9 2012, you broke a bone in your back; is that
10 correct?
11 A.    It was sometime before that.
12 Q.    You had surgery in 2012?
13 A.    Yes, August or September of '12.
14 Q.    When did the injury occur?
15 A.    I don't know.
16 Q.    The surgery, you said, was August 2012?
17 A.    August 2012.
18 Q.    And for that surgery, am I correct that you
19 took accrued vacation rather than FMLA?
20 A.    I did.
21 Q.    And did you apply for short-term disability
22 leave in the fall of 2013?
23 A.    Yes.

Page 130

1 Q.    And that was denied by UNUM?
2 A.    Yes.
3 Q.    Was that for your back condition?
4 A.    It was.
5 Q.    Did you take leave at that time, in the
6 fall of 2013?
7 A.    It was denied.
8 Q.    You didn't take vacation or FMLA, or any
9 other type of leave at that time, correct?
10 A.    No.
11 Q.    So in March of 2014, you had a second back
12 surgery; is that correct?
13 A.    Yes.  Two of the six screws were broke in
14 my back.
15 Q.    Two of six screws were broken.
16 A.    That's what was causing the pain in
17 October.
18 Q.    Oh, of 2013?
19 A.    Yes.
20 Q.    And that was Dr. Nichols at Andrews?
21 A.    Yes.
22 Q.    And I think you told me earlier that you
23 took two months of short-term disability leave in

Page 131

1 connection with that surgery?
2 A.    Yes, I did.
3 Q.    And that was from March to May of 2014?
4 A.    Yes.
5 Q.    How does your back condition affect you
6 today?
7 A.    Affects mobility.
8 Q.    It limits your ability to do physical
9 activity?
10 A.    Lifting.
11 Q.    Lifting.  Does it affect your ability to
12 walk?
13 A.    Well, again, I don't know if it's my back
14 or the PSP.
15 Q.    Fair enough.
16 A.    They damaged some nerves in my left leg
17 during the surgery, and I've got severe foot drop
18 in my left foot.
19 Q.    You said during the second surgery?
20 A.    First surgery.
21 Q.    First surgery.  So was that foot drop an
22 issue starting in 2012?
23 A.    It was.  I had a brace they put on my shoe,

Page 132

1 and it kept my foot up.
2 Q.    Do you still have to wear the brace?
3 A.    I'm supposed to.  I don't wear it anymore.
4 Q.    Do you still have the issue with the foot
5 drop and the nerve pain?
6 A.    A little bit, yes.
7 Q.    Was the second surgery supposed to correct
8 that?
9 A.    No.
10 Q.    It was the screws?
11 A.    The screws, yes.
12     (Whereupon, Defendant's Exhibit Number 42
13 was marked for identification, a copy of which is
14 attached to the original of the transcript.)
15 Q.    I'll show you Defendant's 42.  Have you
16 seen Defendant's Exhibit 42 before?
17 A.    I have.
18 Q.    Is that a Fitness for Duty Certification
19 after your second back surgery?
20 A.    Yes.
21 Q.    And that was your doctor releasing you to
22 return to work with no restrictions?
23 A.    Yes.

Page 133

1  Q.   This was something that was provided to
2  Harland Clarke?
3  A.   Yes.
4  Q.   Are you still being treated by Dr. Nichols?
5  A.   No.
6      (Whereupon, Defendant's Exhibit Number 43
7  was marked for identification, a copy of which is
8  attached to the original of the transcript.)
9  Q.   I'll show you Exhibit 43.  This is a clinic
10 note from Dr. Nichols, dated November 7, 2013.
11 I'm looking at the second paragraph under
12 Diagnostic Studies, okay?
13 A.   Okay.
14 Q.   It says, "This patient's job requires that
15 he travel frequently, which means negotiating
16 airports and catching flights.  He certainly is
17 having difficulty ambulating and has had to use a
18 cane and drop foot brace on the left.  He has
19 significant weakness.  He cannot walk fast, let
20 alone carry a bag for travel."  Is that
21 information that you relayed to Dr. Nichols when
22 you saw him on November 7, 2013?
23 A.   It is.

Page 134

1  Q.   Those were difficulties you were having
2  with the travel component of the job?
3  A.   Yes.  I used to carry my bag on, and I
4  started checking all my bags.  Made arrangements
5  to work it out.
6  Q.   Okay.
7  A.   So I would take a cart in the airport.
8      (Whereupon, Defendant's Exhibit Number 44
9  was marked for identification, a copy of which is
10 attached to the original of the transcript.)
11 Q.   I'll show you Exhibit 44.  This is actually
12 an earlier note.  It's from Birmingham Internal
13 Medicine Associates, dated August 27, 2013.  Was
14 this an annual physical?
15 A.   It was.
16 Q.   Are you still seeing someone at Birmingham
17 Internal Medicine Associates?
18 A.   Dr. Farley.
19 Q.   It looks like you were seen by Dr. --
20 A.   Leong.
21 Q.   Dr. Farley was out?
22 A.   He was out, yes, that day.
23 Q.   At this visit, did you report -- I'm

Page 135

1  looking at the second paragraph --
2      MS. HAYNES:  On the first page?
3      MS. WILKES:  Yes.
4  Q.   I'm looking at the last, I guess, three
5  lines.  It says, "He states that he is looking
6  into applying for disability for his condition.
7  He travels frequently with his job, which
8  necessitates walking long distances in the
9  airport.  He is finding this increasingly
10 difficult," I think due, "to pain in his back and
11 legs."  Is that what you reported at that time?
12 A.   Yes.  This is prior to them finding the
13 broken screws in my back.
14 Q.   That was before they knew the screws were
15 broken?
16 A.   Yes.
17     (Whereupon, Defendant's Exhibit Number 45
18 was marked for identification, a copy of which is
19 attached to the original of the transcript.)
20 Q.   I'm handing you Defendant's Exhibit 45, the
21 note from Dr. Nichols that's dated May 15th of
22 2014 --
23     MS. HAYNES:  You said May what?

Page 136

1      MS. WILKES:  15, 2014, I think that's what
2  I said.
3  Q.   This was after your second surgery; is that
4  correct?
5  A.   Yes.
6  Q.   I'm looking under the Plan section.  It
7  says, "He wants to try to return to work"; is
8  that correct?
9  A.   That's correct, yes.
10 Q.   And the doctor noted, "He does have to
11 travel extensively, and I am concerned about
12 that.  I am not sure he is going to be able to do
13 it.  He thinks he can, for the most part."  Did
14 Dr. Nichols express concern to you about your
15 ability to travel?
16 A.   He suggested stay off 30 more days.
17 Q.   30 more days?
18 A.   Yes.
19 Q.   Did you request an additional 30 days of
20 leave?
21 A.   No, I did not.  I only took two months.  I
22 could have taken three.
23 Q.   You could have taken three, but you came

**Robert Birchfield Collier, Jr.**                    **35 (137 - 140)**

Page 137

1 back after two?

2 A.   I came back early, yes.

3      (Whereupon, Defendant's Exhibit Number 46

4 was marked for identification, a copy of which is

5 attached to the original of the transcript.)

6 Q.   Defendant's Exhibit 46, this is another

7 note from Dr. Nichols dated July 22nd of 2014.

8 I'm looking in the section that says History of

9 Present Illness in the second paragraph.  It

10 notes that you're back at work on this date and

11 that you were "having a little back pain, as we

12 expected, because of his work.  It involves

13 traveling through airports."  Were you still

14 having back pain in July of 2014?

15 A.   Somewhat.

16 Q.   Had it improved?

17 A.   It had improved, yes.

18 Q.   After the surgery?

19 A.   Yes.

20      (Whereupon, Defendant's Exhibit Number 47

21 was marked for identification, a copy of which is

22 attached to the original of the transcript.)

23 Q.   I'm showing you Defendant's 47.  It's a

Page 138

1 note from Dr. Nichols dated October 21st of 2014.

2 I'm looking in the section History of Present

3 Illness.  Dr. Nichols noted that you were doing

4 better, but you still had some back pain with the

5 travel; is that correct?

6      MS. HAYNES:  Where are you?

7      MS. WILKES:  I'm in the second paragraph,

8 History of Present Illness.

9      MS. HAYNES:  Object to form.

10 A.   My back pain was better when I was

11 traveling.

12 Q.   You were still having some pain, but it was

13 better?

14 A.   Better, yes.

15      (Whereupon, Defendant's Exhibit Number 48

16 was marked for identification, a copy of which is

17 attached to the original of the transcript.)

18 Q.   This is Defendant's Exhibit 48.  This is a

19 note from Dr. Nichols dated January 20th of 2015.

20      MS. HAYNES:  That's 48?

21      MS. WILKES:  Yes.

22 Q.   I'm looking where it says Plan.

23 Dr. Nichols says, "I do not feel that he is able

Page 139

1 to return to work due to his increased pain and

2 more functional loss from his residual left

3 radiculitis, including weakness."  Do you see

4 that?

5 A.   I see that, yes.

6 Q.   Did Dr. Nichols communicate that to you at

7 this visit?

8 A.   He did.

9 Q.   This note also notes that you had some

10 numbness at this time?

11 A.   Yes.

12 Q.   And you were requiring a cane; is that

13 correct?

14 A.   Yes.

15 Q.   When did you start using the cane?

16 A.   Probably after my first surgery, then after

17 the second surgery, so about August of '12 to

18 December of '12, then --

19 Q.   Okay.  Well, I guess my question then --

20      MS. HAYNES:  Hold on, he wasn't through.

21      MS. WILKES:  I'm sorry.

22 A.   Then I picked it back up after the second

23 surgery in March of '14, and use it continually

Page 140

1 on.

2 Q.   Okay.

3      MS. HAYNES:  That was March of '13 or '14

4 that you started using it continuous?

5      THE WITNESS:  It was '14.

6 Q.   For the record, since you're referring to a

7 document, I'll just note that you were looking at

8 what appears to be a timeline.  Is that a

9 document that you prepared?

10 A.   It was '14.

11 Q.   Is the timeline a document that you

12 prepared?

13 A.   Yes.

14 Q.   Since it's a document that you prepared and

15 you're using it to refresh your recollection as

16 to dates, which is fine, I'm just going to ask

17 that you give a copy to your attorney with

18 instructions to provide that to me.

19      MS. HAYNES:  No, you can have them.  I told

20 him that you would ask for it.  Because there's

21 so many dates, he wanted to be exact.

22      MS. WILKES:  Sure, absolutely.  Absolutely,

23 continue to refer to it.  I just wanted to make

Page 141

1 sure that I get a copy of it when you're done
2 referring to it.
3 Q.   By all means, refer to it as you need to,
4 to refresh your recollection.  The reason I'm
5 asking about the cane is Dr. Nichols notes that
6 "He is requiring cane for ambulation now."  Based
7 on this note, it makes it sound like the cane was
8 something new.
9 A.   No, it wasn't new.
10 Q.   Okay.  The note says, "I would recommend
11 that he retire at this time on disability, and we
12 have discussed that in detail."  What did you
13 discuss with Dr. Nichols about retiring on
14 disability?
15 A.   He was supporting my short-term disability.
16 Q.   Did he tell you that he was of the opinion
17 you needed to retire on disability?
18 A.   He did.
19      (Whereupon, Defendant's Exhibit Number 49
20 was marked for identification, a copy of which is
21 attached to the original of the transcript.)
22 Q.   I'll hand you Defendant's 49.  This is a
23 note from Dr. Nichols that's dated April 23rd of

Page 142

1 2015.  I'm looking under the section that says
2 Plan, and I'm looking at the second sentence.  It
3 says, "Again, I would not recommend returning to
4 his previous job."
5 A.   This was on UNUM's denial on my short-term
6 disability claim.
7 Q.   Is that information that Dr. Nichols
8 provided to you, that he did not recommend
9 returning to your job?
10 A.   We discussed it, yes.
11      (Whereupon, Defendant's Exhibit Number 50
12 was marked for identification, a copy of which is
13 attached to the original of the transcript.)
14 Q.   I'll show you Defendant's Exhibit 50.  Have
15 you seen Defendant's Exhibit 50 before?
16 A.   I have.
17 Q.   Earlier I think you mentioned a letter that
18 Dr. Nichols provided to UNUM in connection with
19 your short-term disability claim?
20 A.   Yes.
21 Q.   Is Exhibit 50 the letter you're referring
22 to?
23 A.   Yes.

Page 143

1 Q.   And I'm looking on the first page, the
2 second paragraph up from the bottom, where it
3 says, "In my opinion, he simply has too much
4 residual nerve damage with associated pain and
5 weakness to return to his previous job"?
6 A.   Yes.
7 Q.   Was that a recommendation or an opinion
8 that Dr. Nichols expressed to you?
9 A.   No.
10 Q.   It's not?
11 A.   He expressed it to UNUM.
12 Q.   No.  My question is, at any time, whether
13 in this letter or just in a conversation with
14 you, did Dr. Nichols tell you that same opinion?
15 A.   I'm not sure he discussed what he was going
16 to write in the letter with me.
17 Q.   When did he discuss writing the letter with
18 you?
19 A.   He didn't discuss writing the letter, he
20 just wrote the letter.
21 Q.   Okay.  Have you ever been treated for
22 depression?
23 A.   No.  I take that back.  After I lost my

Page 144

1 job, he prescribed Cymbalta, I think.
2 Q.   Who prescribed that?
3 A.   Dr. Pearson.
4 Q.   Dr. Pearson?
5 A.   Yes.
6 Q.   How long did you take Cymbalta?
7 A.   Probably a year-and-a-half.
8 Q.   You're not taking it currently?
9 A.   I'm not taking it currently.
10 Q.   Did you ever go see any sort of counselor
11 or therapist, psychologist, psychiatrist?
12 A.   (Witness nodded no.)
13 Q.   No mental health professional?
14 A.   (Witness nodded no.)
15      MS. HAYNES:  You'll have to answer out.
16 A.   No.  No.  No.  No.  No.
17      (Whereupon, Defendant's Exhibit Number 51
18 was marked for identification, a copy of which is
19 attached to the original of the transcript.)
20 Q.   I'll show you Defendant's Exhibit 51.  Did
21 you file a claim for Social Security disability
22 benefits?
23 A.   Yes.

Page 145

1  Q.    Was that in February of 2015?  To help you,
2  I'll draw your attention to the date I'm looking
3  at.  This is it, says, Authorization to Disclose
4  Information to the Social Security
5  Administration."
6  A.    I see it.
7  Q.    And it's electronically signed by you on
8  February 17, 2015; is that correct?
9       MS. HAYNES:  Where do you see that?
10      MS. WILKES:  Down at the bottom.
11      MS. HAYNES:  On the first page?
12      MS. WILKES:  Yes.
13  A.    I changed my mind and retracted it.
14  Q.    I'm going to ask you about that.  Right now
15  my question is just, is February 17, 2015 the
16  date that you initiated your claim with Social
17  Security for disability?
18  A.    The first one.
19  Q.    Right.  I've turned to the second page, and
20  there's a lot of information.  This says it's a
21  disability report, and there's a lot of questions
22  and answers that are listed.  Was this a
23  telephone interview that you did with someone at

Page 146

1  Social Security?
2  A.    Yes.
3  Q.    They asked you questions, and you provided
4  information?
5  A.    Yes.
6  Q.    And I'm looking on the page that's marked
7  SSA 2 at the bottom, okay?
8  A.    Got it.
9  Q.    Up here at the top where it says
10  Identifying Information, do you see number 2 that
11  says "Claimant's alleged onset date"?
12  A.    Yes.
13  Q.    Do you see that it says January 22, 2015?
14  A.    Yes.
15  Q.    That's a date that you provided to Social
16  Security?
17  A.    Yes.
18  Q.    What's the significance of that date?
19  A.    It's probably the date I was talking to
20  them on the phone, I guess.  I'm not sure what it
21  was.
22  Q.    Turn with me to page SSA 6 at the bottom.
23  I'm looking at the bottom where it says If You

Page 147

1  Have Stopped Working, the question, "When did you
2  stop working," and the date is February 9, 2015,
3  correct?
4  A.    Yes.
5  Q.    That's information you provided to Social
6  Security?
7  A.    Yes.
8  Q.    Then the question under that says, "Why did
9  you stop working?"  And it says, "Because of my
10  condition."  Is that information that you
11  provided to Social Security?
12  A.    I guess it is.
13      (Whereupon, Defendant's Exhibit Number 52
14  was marked for identification, a copy of which is
15  attached to the original of the transcript.)
16  Q.    I'll show you Defendant's Exhibit 52.  This
17  is a Disability Determination Explanation, and I
18  am looking at the page that is SSA 176.
19      MS. HAYNES:  On Defendant's Exhibit 52?
20      MS. WILKES:  Yes.
21  Q.    I'm looking at the second sentence at the
22  top where it says Details.  The second sentence
23  says, "On 3-23-15, I was able to get in touch

Page 148

1  with," I think that's "'claimant' for the first
2  time.  He stated he had the forms but did not
3  want to return them at this time because he did
4  not want to pursue disability.  I asked him why,
5  and he stated he was going to return to work."
6  Is that information that you shared with the
7  Social Security officer on March 23, 2015?
8  A.    Yes.  I was trying real hard, I was looking
9  for a job.
10  Q.    You were looking for a job?
11  A.    Yes.  I was trying to keep working.
12  Q.    I think earlier there were some exhibits
13  that we talked about where you were looking for a
14  job?
15  A.    Yes.
16      (Whereupon, Defendant's Exhibit Number 53
17  was marked for identification, a copy of which is
18  attached to the original of the transcript.)
19  Q.    I'll show you Defendant's Exhibit 53.  At
20  some point did you apply for Social Security
21  disability benefits a second time?
22  A.    Yes, I did.
23  Q.    And I'm looking at the first page of

Page 149

1 Defendant's Exhibit 53 that's SSA 190.  It's
2 another Authorization to Disclose Information To
3 The Social Security Administration, and it looks
4 to me like it is signed and dated by you, is that
5 March 1st of 2016?
6 A.   Yes.
7 Q.   That's when you filed your second
8 application for Social Security disability
9 benefits?
10 A.   Yes.
11 Q.   And did you have another telephone
12 interview with someone from Social Security?
13 A.   Face-to-face.
14 Q.   Face-to-face, okay.  And I'm looking on the
15 page that's marked SSA 191, again, in Defendant's
16 Exhibit 53.  Do you see about halfway down that
17 page, it says Potential Onset Date?
18 A.   Yes.
19 Q.   Actually, number 2 says Claimant's Alleged
20 Onset Date.  But, again, it has February 9, 2015
21 listed?
22 A.   Yes.
23 Q.   And that's the date that you gave to Social

Page 150

1 Security?
2 A.   Yes.
3 Q.   Now I'm looking at page SSA 195.
4 A.   Okay.
5 Q.   I'm looking at that section that we talked
6 about before.  It says you had stopped working;
7 and then 4C says, "When did you stop working,"
8 and it says February 9, 2015, correct?
9 A.   Correct.
10 Q.   This is information you provided to Social
11 Security, correct?
12 A.   Yes.
13 Q.   Then it says, "Why did you stop working?"
14 And, again, it says, "Because of my conditions,"
15 correct?
16 A.   Yes.
17 Q.   And then it also says, "Because of other
18 reasons"?
19 A.   Yes.
20 Q.   Then below that it says, "Please explain
21 why you stopped working," and then it says, "Job
22 was phased out and I could not find other work
23 due to my condition"?

Page 151

1 A.   Yes.
2 Q.   Is that information you provided to Social
3 Security?
4 A.   Yes.
5 Q.   Is "Job was phased out and I could not find
6 other work due to my condition," the other reason
7 referred to in the section right before it?  Two
8 lines above it.
9 A.   Say that again.
10 Q.   Where it says, "Why did you stop working?"
11 "Because of my condition," and then it also says,
12 "Because of other reasons," are the other reasons
13 you were referring to where you have written "Job
14 was phased out and I could not find other work
15 due to my condition"?  Are those the other
16 reasons that you were referring to?
17 A.   I'm not sure.
18 Q.   Do you know what "Because of other reasons"
19 means?
20 A.   I was thinking it meant I got terminated;
21 otherwise, I would have still been working.
22 Q.   I'm sorry?
23 A.   Otherwise, I would have still been working.

Page 152

1 Q.   Otherwise, you would have still been
2 working?
3 A.   Yes.
4     (Whereupon, Defendant's Exhibit Number 54
5 was marked for identification, a copy of which is
6 attached to the original of the transcript.)
7 Q.   I'll show you Defendant's Exhibit 54.  Is
8 that a Disability Determination Explanation?
9 A.   Yes.
10 Q.   I am looking at the page that is SSA 423.
11 And I'm looking at the bottom where it says
12 Determination.  Do you see where it says that you
13 are disabled?
14 A.   Yes.
15 Q.   As of February 9, 2015?
16 A.   Yes.
17 Q.   Let's turn to page 427, SSA 427.  It says
18 Disability Determination and Transmittal?  Do you
19 see that at the top?
20 A.   Yes.
21 Q.   And in the box, it says 31 down at the
22 bottom.  Does it appear to be dated May 5, 2016?
23 A.   Yes.

**Robert Birchfield Collier, Jr.**                    **39 (153 - 156)**

Page 153

1  Q.   And then I'm looking at box 15 on the left
2  side of the page.  Do you see it's checked that
3  your disability began on February 9, 2015?
4  A.   Yes.
5  Q.   They have listed that your primary
6  diagnosis is Parkinson's disease?
7  A.   Yes.
8  Q.   Do you recall when Dr. Atchison determined
9  that you had PSP and not Parkinson's?
10  A.   June of '16, something like that.
11  Q.   June of '16, okay.  Then it also has
12  "Affective/Mood disorders"?
13  A.   Depression.
14  Q.   You were suffering from depression in May
15  of 2016?
16  A.   Yes.
17  Q.   And you say that was due to losing your job
18  at Harland Clarke; is that correct?
19  A.   Yes.
20      (Whereupon, Defendant's Exhibit Number 55
21  was marked for identification, a copy of which is
22  attached to the original of the transcript.)
23  Q.   I'll show you Defendant's Exhibit 55.  Do

Page 154

1  you recall receiving the letter, referring to the
2  first and second page of Defendant's Exhibit 55?
3  A.   I believe so.
4  Q.   It's telling you that you meet medical and
5  nonmedical requirements to be entitled to
6  disability benefits, correct?
7  A.   Yes.
8  Q.   In this notice, did they change the date of
9  the onset of your disability, because they had
10  previously denied your claim as a result of you
11  not wanting to pursue it?
12      MS. HAYNES:  Object to form.
13  Q.   I'm looking at the paragraph that's three
14  up from the bottom.
15  A.   Ask that again, please.
16  Q.   In this letter, did they tell you that they
17  changed the date of the onset of your disability
18  to April 7, 2015?
19  A.   Yes.
20  Q.   Because they had previously denied your
21  application after you no longer wanted to pursue
22  it; is that correct?
23      MS. HAYNES:  Object to form.

Page 155

1  A.   I'm not sure they denied it.  I pulled it
2  out.  They didn't deny it, I canceled the claim.
3  Q.   Have you been receiving Social Security
4  disability benefits since April 7, 2015?
5  A.   Yes.
6      MS. HAYNES:  That's when he was approved,
7  they went back, but he didn't start receiving it
8  then.  And that's in the documents.
9  Q.   When did you start receiving benefits?
10  A.   There was a six-month waiting period or
11  something like that.
12  Q.   I'm sorry?
13  A.   There was a six-month waiting period.
14  Q.   There was a six-month waiting period?
15  Would Social Security's records reflect whatever
16  date you started actually receiving checks in the
17  mail?
18  A.   They would.
19  Q.   Did anyone at Harland Clarke know that you
20  suffered from diabetes?
21  A.   I'm sure they did.
22  Q.   Do you recall having conversations with
23  people at Harland Clarke about your diabetes?

Page 156

1  A.   I don't really remember.
2  Q.   Well, do you know if Steve Moyer was aware
3  of your back condition?
4  A.   Yes, he was.
5  Q.   When did he become aware of your back
6  condition?
7  A.   I don't know.
8  Q.   Was that sometime after he became your
9  supervisor?
10  A.   It could have been before.  I'm not sure.
11  Q.   How do you know he knew about it?
12  A.   He asked me how I was feeling, my back was
13  doing, so on and so on.
14  Q.   When do you recall him asking how you were
15  doing?
16  A.   In several calls I had with him, several
17  calls.
18  Q.   How many times do you think Steve Moyer
19  asked you how you were doing with your back?
20  A.   I don't recall.
21  Q.   Was it something he would ask you on every
22  call?
23  A.   Not every call.

Page 157

1  Q.    Would you say it was more than ten times?
2  A.    I don't recall.
3  Q.    More than five?
4  A.    I don't recall.
5  Q.    Who else at Harland Clarke was aware of
6  your back condition?
7  A.    Ebrey.
8  Q.    How did Rick know about it?
9  A.    When I had my second back surgery, I had to
10 report to him I was going to be out.
11 Q.    Did Rick say anything to you about your
12 back condition?
13 A.    Yes.
14 Q.    And what did he say?
15 A.    When I saw him in Puerto Rico, he asked me
16 how I was doing.
17 Q.    That was in the summer of 2014?
18 A.    Yes.
19 Q.    Anything else?
20 A.    He said it looked like I was struggling to
21 get around.
22 Q.    Was anyone else present in the conversation
23 where he said you looked like you were struggling

Page 158

1  to get around?
2  A.    I don't recall.
3  Q.    Did Rick say anything else about your back
4  condition?
5  A.    That's all.
6  Q.    Who else at Harland Clarke was aware of
7  your back?
8  A.    Dan Singleton.
9  Q.    Ann Singleton?
10 A.    Dan, Dan.
11 Q.    Dan.  Dan Singleton, okay.  Who is Dan
12 Singleton?
13 A.    He's president of Harland Clarke.
14 Q.    How did Dan know about your back condition?
15 A.    I don't know how he knew.
16 Q.    How do you know he knew?
17 A.    He came up to me in the lunchroom, and I
18 started to get up and shake hands with him, and
19 he said, "Don't get up.  Don't get up.  I know
20 you had back surgery."
21 Q.    Did you say that was in Puerto Rico?
22 A.    Puerto Rico, yes.
23 Q.    Did he say anything else?

Page 159

1  A.    That's all, just small talk.
2  Q.    All right.  Who else knew that you had back
3  surgery?
4  A.    Debra Corwin knew.
5  Q.    How did Debra Corwin know?
6  A.    I guess just from word of mouth.
7  Q.    And you told me some things that Debra
8  Corwin had said earlier.  Did Debra Corwin ever
9  say anything to you about your back?
10 A.    Yes.
11 Q.    What did she say?
12 A.    "It looks like you're struggling to get
13 around."
14 Q.    When was that?
15 A.    That was in Puerto Rico also.
16 Q.    Any other comments?
17 A.    That's all I can recall right now.
18 Q.    Who else knew about your back surgery?
19 A.    All my people knew.  My five reports knew.
20 Q.    Your reports knew.  Those would be the five
21 account executives and two senior account
22 executives that reported to you?
23 A.    Yes.

Page 160

1  Q.    Did you ever have any conversations with
2  them about your back?
3  A.    I don't recall.
4  Q.    Who else knew about your back?
5  A.    A lot of people in the company knew, just
6  word of mouth, in both plants.
7  Q.    Do you recall any specific -- other than
8  the conversations we've discussed with Steve and
9  Rick, with Dan, with Debra, do you recall any
10 other specific conversations about your back?
11 A.    No, I don't recall.  Some people walked up
12 and asked me how I was doing.  Sonia Ellison did.
13 Sonia said, "Do you wish you had taken the extra
14 30 days off?"
15 Q.    Sonia told you you should have taken the
16 extra 30 days off?
17 A.    She asked me if I wished I had.
18 Q.    Sonia asked if you wished you had?
19 A.    Yes.
20 Q.    When was that?
21 A.    In Puerto Rico.
22 Q.    The conversation that you had with Rick in
23 Puerto Rico, do you recall if anyone else was in

Page 161

1 that conversation and witnessed it?

2 A.    I don't recall.

3 Q.    What about the conversation with Dan in

4 Puerto Rico?  Do you know if anyone else

5 witnessed that conversation?

6 A.    I know Tom Jones was sitting there.

7 Q.    Tom Jones was sitting there.  Anyone else?

8 A.    That's all I can remember right now.

9 Q.    What about the conversation with Debra

10 Corwin in Puerto Rico, did anyone else witness

11 that conversation?

12 A.    My whole team was in there.  It was a

13 break-out session.

14 Q.    So it would be the five people who reported

15 to you?

16 A.    Yes.

17 Q.    What about Sonia Ellison, the conversation

18 with her in Puerto Rico, did anyone else witness

19 that conversation?

20 A.    Maybe Tom Jones.  I'm not sure.

21 Q.    Any other conversations with anyone about

22 your back?

23 A.    In Puerto Rico or just in general?

Page 162

1 Q.    Well, we'll start with in Puerto Rico.

2 A.    There were several other people.  I can't

3 name them all.

4 Q.    You can't remember anyone else?

5 A.    John Swick, Tal Swails.

6 Q.    John Swick?

7 A.    Yes.

8 Q.    What did he tell you?

9 A.    He just asked how I was doing.

10 Q.    What's his position?

11 A.    He's vice president of TranSource.

12 Q.    He's not your supervisor?

13 A.    No.

14 Q.    Was anyone around, or did anyone witness

15 this conversation?

16 A.    It was a cocktail party.  I don't really

17 know.

18 Q.    And you said somebody else?

19 A.    Tal Swails.

20 Q.    Tals Wells?

21 A.    Tal, T-A-L, Swails, S-W-A-I-L-S.

22 Q.    What's his position?

23 A.    Vice president for TranSource.

Page 163

1 Q.    What did he say to you?

2 A.    About the same, just "How is your back

3 doing?"

4 Q.    Who else was in the conversation with him?

5 A.    John Swick.

6 Q.    They were together?

7 A.    Yes.

8 Q.    It was at a cocktail party?

9 A.    Yes, it was.

10 Q.    Any other comments or conversations about

11 your back in Puerto Rico?

12 A.    That's all I can remember right off the top

13 of my head.

14 Q.    Do you recall any other conversations

15 outside of Puerto Rico with anyone about your

16 back?

17 A.    Clients.

18 Q.    With who?

19 A.    Tom Bartle.

20 Q.    What's Tom's position?

21 A.    He was plant manager.

22 Q.    Of what plant?

23 A.    Jeffersonville.

Page 164

1 Q.    What did Tom say to you?

2 A.    "How are you doing?"  Same stuff, "It looks

3 like you're struggling to get around."

4 Q.    Was anyone else in that conversation?

5 A.    Probably Mandy and Tracy, two people that

6 report to me.

7 Q.    When did this conversation occur?

8 A.    Probably summer of '14.

9 Q.    Any other conversations with anyone about

10 your back?

11 A.    Salt Lake City people, Nick Perrino.

12 Q.    Nick Perrino.

13 A.    He's plant manager of Salt Lake City.

14 Q.    What did he say?

15 A.    Same thing.

16 Q.    Asking you how you were doing?

17 A.    Yes.  Lillian Vincent.

18 Q.    When was the conversation with Nick?

19 A.    Probably around the same time as Tom.  It

20 was more than one conversation.  Every time I saw

21 them, they would ask about it.

22 Q.    Were the nature of your conversations with

23 the plant manager all "How are you doing" type

**Robert Birchfield Collier, Jr.**                                    **42 (165 - 168)**

| Page 165 |
|---|

1  conversations?

2  A.   Yes.

3  Q.   And they all occurred in the summer of

4  2014?

5  A.   Well, it was constant, really.

6  Q.   Any comments other than, "Bob, how are you

7  doing?"

8       MS. HAYNES:  Object to form.

9  Q.   Other than what we've discussed?

10 A.   Well, they were all worried about how I was

11 getting around, struggling.

12 Q.   Do you know if they communicated any

13 concerns about your ability to get around to

14 Steve Moyer?

15 A.   I don't know.

16      MS. HAYNES:  And there was a name, I think

17 you glossed over it, maybe you didn't hear him,

18 but he mentioned.

19 A.   Lillian Vincent.

20 Q.   Lillian Vincent.  Where is Lillian?

21 A.   She's in Salt Lake City.

22 Q.   Was that also where Nick is?

23 A.   Yes.

| Page 166 |
|---|

1  Q.   What is Lillian's position?

2  A.   She's over front end.

3  Q.   What conversation did you have with Lillian

4  about your back?

5  A.   Same.

6  Q.   "How are you doing?"

7  A.   "How are you doing?"

8  Q.   Well, let me ask you this.  The comments

9  from plant managers asking you how you're doing,

10 did you ever complain to anyone about those

11 comments?

12 A.   No.

13 Q.   The comments in Puerto Rico from Steve,

14 from Rick, from Dan, from Debra, from Sonia, from

15 John and Tal --

16 A.   Tal.

17 Q.   -- did you complain to anyone about those

18 comments?

19 A.   No.  I knew there was no need to complain

20 at that point.

21      (Whereupon, at this time, the

22 deposition was postponed at 1:42 p.m., to be

23 concluded June 2, 2016 at 9:30 a.m.)

| Page 167 |
|---|

1            FURTHER DEPONENT SAITH NOT.

| Page 168 |
|---|

1            C E R T I F I C A T E

2

3  STATE OF ALABAMA)

4  JEFFERSON COUNTY)

5

6       I hereby certify that the above and

7  foregoing deposition was taken down by me in

8  stenotype and the questions and answers thereto

9  were reduced to typewriting under my supervision

10 and that the foregoing represents a true and

11 correct record of the testimony/evidence given by

12 the deponent.

13      I further certify that I am neither of

14 counsel nor of kin to any of the parties to the

15 action, nor am I in anywise interested in the

16 results of said cause.

17

18

19      /s/Donna L. Winters

20      Donna L. Winters, Commissioner

21      ACCR Certificate Number: AL-373

22      Commissioner for State of Alabama

23      Notary commission expires: 10-22-2017

Page 169

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NUMBER:  2:15-CV-01006-MHH

ROBERT COLLIER, JR.,
PLAINTIFF,

V.

HARLAND CLARKE CORP.,
DEFENDANTS.

CONTINUATION DEPOSITION TESTIMONY OF:
ROBERT COLLIER, JR.
VOLUME 2

S T I P U L A T I O N S
IT IS STIPULATED AND AGREED by and
between the parties through their respective
counsel that the deposition of ROBERT
COLLIER, JR., may be taken before Mallory

Page 170

1  Bradberry Gray, a Court Reporter and Notary
2  Public for the State at Large, at Burr &
3  Forman LLP, 420 N. 20th Street, Suite 3400,
4  Birmingham, Alabama 35203, on the 2nd of June
5  2017, commencing at approximately 9:37 a.m.
6       IT IS FURTHER STIPULATED AND AGREED
7  that the signature to and the reading of the
8  deposition by the witness is not waived.
9       IT IS FURTHER STIPULATED AND AGREED
10  that it shall not be necessary for any
11  objections to be made by counsel to any
12  questions except as to form or leading
13  questions and that counsel for the parties
14  may make objections and assign grounds at the
15  time of trial or at the time said deposition
16  is offered in evidence, or prior thereto.
17       In accordance with Rule 5(d) of the
18  Alabama Rules of Civil Procedure, as amended,
19  effective May 15, 1998, I, Mallory Bradberry
20  Gray, am hereby delivering to Amy Jordan
21  Wilkes, the original transcript of the oral
22  testimony taken the 2nd of June 2017, along
23  with the exhibit.

Page 171

1       Please be advised that this is the
2  same and not retained by the Court Reporter,
3  nor filed with the Court.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 172

1            I N D E X
2
3  EXAMINATION BY:            PAGE NO.
4  Ms. Wilkes            175
5
6
7       On the record 94 minutes.
8
9          E X H I B I T S
10
11  FOR THE DEFENDANT:            PAGE NO.
12  No. 56, EEOC charge            215
13  No. 57, evaluation report            227
14  No. 58, summary of monetary damages    251
15  No. 59, supplemental disclosures    254
16  No. 60, skipped
17  No. 61, PSP information    184
18  No. 62, information provided to Unum    187
19  No. 63, letter            188
20  No. 64, retirement card    233
21  No. 65, e-mail            235
22  No. 66, non-compete agreement        245
23

Page 173

A P P E A R A N C E S

FOR THE PLAINTIFF:
    BY:  Alicia K. Haynes
         Haynes& Haynes, P.C.
         1600 Woodmere Drive
         Birmingham, Alabama 35226

FOR THE DEFENDANT:
    BY:  Amy Jordan Wilkes
         Burr & Forman, L.L.P.
         420 20th Street North
         Suite 3400
         Birmingham, Alabama 35203

ALSO PRESENT:

         Ms. Collier

---

Page 174

1          I, Mallory Bradberry Gray, a Court
2    Reporter and Notary Public, State of Alabama
3    at Large, acting as Commissioner, certify
4    that on this date, pursuant to the Alabama
5    Rules of Civil Procedure and the foregoing
6    stipulation of counsel, there came before me
7    at Burr & Forman LLP, 420 N. 20th Street,
8    Suite 3400, Birmingham, Alabama 35203,
9    commencing at approximately 9:37 a.m.  On the
10   2nd of June 2017, Robert Collier, Jr.,
11   witness in the above cause, for oral
12   examination, whereupon the following
13   proceedings were had:
14
15          Robert Collier, Jr.,
16    being first duly sworn, was examined
17       and testified as follows:
18
19       COURT REPORTER:  Usual stipulations
20   with the exception of read and sign?
21       MS. WILKES:  Yes.
22       MS. HAYNES:  Yes.
23

---

Page 175

1                EXAMINATION
2    BY MS. WILKES:
3        Q.  Good to see you again, Mr. Collier.
4        A.  Good morning, Ms. Wilkes.
5        Q.  We are continuing your deposition
6    from May 15th.  Before we get started, do you
7    have anything that you need to change or
8    clarify from your previous testimony?
9        A.  I don't think so.
10       Q.  Okay.
11          MS. HAYNES:  Now, he did do his -- I
12   don't know that I have it.  I know he sent it
13   to Linda, his errata sheet.
14          MS. WILKES:  Errata sheet.
15          MS. HAYNES:  I haven't looked at it,
16   but you're welcome to look at it.
17          MS. WILKES:  Sure.  I'll take a look
18   at it.
19          THE WITNESS:  There's some changes
20   on here.
21          MS. HAYNES:  Spellings.
22          (Discussion off the record.)
23       Q.  (By Mr. Wilkes) Okay.  Other than

---

Page 176

1    your errata sheet, which I just reviewed, is
2    there any other testimony you need to change
3    or clarify?
4        A.  That's all I can think of right now.
5        Q.  Okay.  I think when we last ended, I
6    was talking to you, asking you some questions
7    about your medical conditions, and I have a
8    couple of questions about that before we move
9    on.
10          Your PSP diagnosis?
11       A.  Yes.
12       Q.  Okay.  When were you diagnosed with
13   PSP?
14       A.  It would have been, I believe, July
15   of '16.
16       Q.  Okay.  Could it have been September
17   of '16?
18       A.  Could have been, but I'm not really
19   sure.
20       Q.  Was it whenever you saw Dr. Atchison
21   at UAB?
22       A.  Yes.
23       Q.  Whatever date you first saw him

---

Page 177

1   would be reflected in his records?
2       A.  Yes.
3   (Whereupon, Defendant's Exhibit No. 61 was
4   marked for identification and is attached to
5   the original transcript.)
6       Q.  Okay.  I'll show you what I marked
7   as Defendant's 61.  And since I did not know
8   a lot about PSP when we met last time, I
9   pulled some information on it.  I just want
10  to ask you about it, get an idea of what kind
11  of symptoms you experience.
12          MS. HAYNES:  Is this Defendant's 61?
13          MS. WILKES:  Yes.
14      Q.  (By Mr. Wilkes) I'm looking -- and
15  I know -- to save your voice, I'm looking at
16  the second, I guess, set --
17      A.  I see.
18      Q.  Yeah.  Where it says "What are the
19  Symptoms," a little bit down the page.  Will
20  you read that over and tell me if you agree
21  if that's an accurate summary of the symptoms
22  that you will experience or are experiencing
23  or will experience with PSP?

Page 178

1          MS. HAYNES:  Object to the form.
2          THE WITNESS:  Yes.
3          MS. HAYNES:  I mean, I don't know
4   how he can answer what he will experience.
5          MS. WILKES:  That's fair.
6       Q.  (By Mr. Wilkes) I will rephrase my
7   question.
8          Is this an accurate summary of
9   symptoms that you have experienced with PSP?
10      A.  I haven't had an alteration of mood
11  behavior.  I have not.
12      Q.  You have not had an alternation of
13  mood or behavior.
14          Has Dr. Atchison or any other doctor
15  told you that is something you may experience
16  in the future?
17      A.  Don't recall.
18      Q.  Are there any other symptoms of PSP
19  that are described that you have not
20  experienced?
21      A.  I don't cry for no apparent reason.
22      Q.  Anything else?
23      A.  No angry outburst.

Page 179

1       Q.  Okay.  Anything else?
2       A.  That's all.
3       Q.  You told me earlier that you could
4   not drive?
5       A.  Yes.
6       Q.  Okay.  Can you fly?
7       A.  I can fly, yes.
8       Q.  Would you need the assistance --
9       A.  I couldn't fly the plane, but I
10  could fly on the plane.
11      Q.  Would you need the assistance of
12  another person to navigate through an
13  airport?
14          MS. HAYNES:  Now or when?
15          MS. WILKES:  Now.
16          THE WITNESS:  Probably now would.
17      Q.  (By Mr. Wilkes) Would you need the
18  assistance of another person to carry
19  luggage?
20      A.  Yes.
21      Q.  And the difficulty that you have
22  speaking, that's a symptom of PSP?
23      A.  Yes, it is.

Page 180

1       Q.  I want to ask you a couple of
2   questions about your 2015 short-term
3   disability claim.
4          MS. HAYNES:  Did you say 2013?
5          MS. WILKES:  2015.
6   (Whereupon, Defendant's Exhibit No. 62 was
7   marked for identification and is attached to
8   the original transcript.)
9       Q.  (By Mr. Wilkes) Are you aware
10  Dr. Nichols provided some information to Unum
11  in connection with that claim?
12      A.  I am.
13      Q.  I'm going to mark this one as
14  Defendant's 62.  I'll show you Defendant's
15  Exhibit 62.
16          Have you ever seen Defendant's
17  Exhibit 62 before?
18      A.  Yes.
19      Q.  It's some information that looks
20  like Dr. Nichols provided in February 2015,
21  is that your understanding?
22      A.  Yes.
23      Q.  Were you aware that Dr. Nichols told

3 (Pages 177 to 180)

1    Unum that you would never be able to return
2  to your job as director at Harland Clarke?
3        MS. HAYNES:  Was he aware at the
4  time in 2015 or later when he saw this?
5        MS. WILKES:  I mean, just are you
6  aware?
7        MS. HAYNES:  Currently.
8        THE WITNESS:  Currently, aware, yes.
9     Q.  (By Mr. Wilkes)  Were you not aware
10  in February of 2015 that he represented to
11  Unum that you could never return to your job
12  at Harland Clarke?
13    A.  After the fact.
14    Q.  When did you become aware that
15  Dr. Nichols told Unum that you could never
16  return to your job at Harland Clarke?
17    A.  I'm not positive.
18    Q.  Was it in 2015?
19    A.  Yes.
20    Q.  I'm looking on the second page.  I'm
21  looking about half way down the page where it
22  says, "how long will these restrictions and
23  limitations be applicable."

1        Were you aware that Dr. Nichols told
2  Unum that your restrictions and limitations
3  were permanent?
4     A.  After the fact.
5     Q.  When did you learn that?
6     A.  Not certain.
7     Q.  Was it in 2015?
8     A.  Yes.
9     Q.  I'll show you what I marked as
10  Defendant's Exhibit 63.  Have you seen this
11  document before?
12    A.  Yes.
13  (Whereupon, Defendant's Exhibit No. 63 was
14  marked for identification and is attached to
15  the original transcript.)
16    Q.  (By Ms. Wilkes)  Is Defendant's
17  Exhibit 63 a letter that you wrote to Unum?
18    A.  Yes, it is.
19    Q.  It looks like it was -- it's got a
20  stamp that says received May 26 of 2015.  Did
21  you write this letter sometime in May of
22  2015?
23    A.  Yes.

1     Q.  Okay.  Is this a letter that you
2  wrote as part of your appeal of Unum's
3  decision to deny your short-term disability
4  claim?
5     A.  Yes.
6     Q.  Down at the bottom, the last --
7  well, second to last paragraph in the first
8  sentence, you stated that you planned -- "I
9  plan to participate in extensive physical
10  therapy that will give me the greatest
11  opportunity to improve my health and enable
12  me to return to work"?
13    A.  Yes.
14    Q.  Did you ever do any physical
15  therapy?
16    A.  Yes.
17    Q.  Okay.  Who did you do physical
18  therapy with?
19    A.  I can't remember right now.
20    Q.  When did you do it?
21    A.  It was early 2015.
22    Q.  How long did you do it?
23    A.  About three months.

1     Q.  Did it help?
2     A.  Some.
3     Q.  Did you do any other physical
4  therapy other than what you did early in
5  2015?
6     A.  Just walked.
7     Q.  Okay.  I'm going to move now to your
8  specific claims against Harland Clarke in
9  this case.  I'm going to ask you about each
10  of your claims.
11        Are you claiming that Harland Clarke
12  discriminated against or harassed you based
13  on your age?
14    A.  Yes.
15    Q.  Okay.  How did Harland Clarke
16  discriminate against you based on your age?
17    A.  Let me go.
18    Q.  The reduction in force?
19    A.  Termination of my job.
20    Q.  Okay.  Other than your termination,
21  any other way that you're claiming that
22  Harland Clarke discriminated against you
23  based on your age?

1      A.  Told customers that I had retired.
2      Q.  Okay.  Told customers you had
3    retired.
4          All right.  Any other way that
5    Harland Clarke discriminated against you
6    based on your age, that you're claiming?
7      A.  That's all I can think of at the
8    moment.
9      Q.  Okay.  The telling customers you had
10   retired, who did Harland Clarke tell that you
11   had retired?
12     A.  SunTrust Bank.
13     Q.  South West?
14     A.  SunTrust Bank.
15     Q.  SunTrust?
16     A.  SunTrust Bank.
17     Q.  Who told SunTrust Bank you had
18   retired?
19     A.  Barbara Murnane, M-u-r-n-a-n-e.
20     Q.  What was her first name?
21     A.  Barbara Murnane, M-u-r-n-a-n-e.
22     Q.  Okay.  Murnane?
23     A.  Murnane.

1          MS. HAYNES:  Murnane.
2      Q.  (By Mr. Wilkes)  Who's Barbara
3    Murnane?
4      A.  Vice president of major accounts.
5      Q.  Was she your supervisor?
6      A.  No.
7      Q.  Was she in your division?
8      A.  No.  Cross divisions.
9      Q.  Did she have any role in the RIF
10   decision?
11     A.  I don't know.
12     Q.  How often did you work with Barbara?
13     A.  About once a quarter.
14     Q.  How do you know that she told
15   SunTrust you retired?
16     A.  I received a card congratulating me
17   on my retirement.
18     Q.  From SunTrust?
19     A.  I asked them who said I retired and
20   they said Barbara Murnane.
21     Q.  Who did you talk to at SunTrust?
22     A.  I'll have to think of her name.
23     Q.  Do you still have the card?

1      A.  I do.
2      Q.  Did you give --
3          MS. HAYNES:  I thought we produced
4    it.  Was it an e-mail or a card?
5          THE WITNESS:  It was a card.
6      Q.  (By Ms. Wilkes)  You may have.  Was
7    it someone you worked with on a regular basis
8    at SunTrust?
9      A.  Yes.  I'll think of her name.
10     Q.  And I'll put a little star here, and
11   I'll get my paralegal to look for it.
12         Did you complain to anyone about
13   Barbara telling SunTrust that you had
14   retired?
15     A.  After I was already gone.
16     Q.  So no?
17     A.  No.
18     Q.  Were there any, other than SunTrust,
19   are there any other customers that Harland
20   Clarke told that you retired?
21     A.  That's all I'm aware of.
22     Q.  The only one you're aware of?
23     A.  Yes.

1      Q.  Okay.  Are you also claiming that
2    Harland Clarke harassed you on the basis of
3    your age?
4      A.  I can't say they harassed me.
5          MS. HAYNES:  Object to the form.
6      Q.  (By Mr. Wilkes)  Did --
7      A.  They let me go.  They harassed me.
8    They let me go.
9      Q.  Are you saying there was no
10   harassment until they let you go?
11     A.  I didn't know they were until they
12   let me go.
13     Q.  You didn't know that they were until
14   they let you go?
15     A.  They could have been behind the
16   scenes.
17     Q.  They could have been behind the
18   scenes?
19     A.  They could have been, yes.
20     Q.  You're not aware of anything else
21   that was happening behind the scenes?
22     A.  No.
23     Q.  Did you ever report any harassment

1    to anyone at Harland Clarke?
2        A.  No.
3        Q.  Did you ever make a complaint of
4    harassment to human resources?
5        A.  No.
6        Q.  Did you ever call the employee
7    hotline and report any sort of age
8    harassment?
9        A.  No.
10       Q.  Did you ever report any type of
11   age-based harassment to Steve Moyer?
12       A.  No.
13       Q.  Or did you report any type of
14   age-based harassment to Sonia Ellison?
15       A.  No.
16       Q.  Did you ever report any type of
17   age-discrimination to anyone at Harland
18   Clarke?
19       A.  No.
20       Q.  Never reported any type of
21   age-discrimination to anyone in human
22   resources?
23       A.  No.

1        Q.  Never reported age-discrimination to
2    Steve Moyer?
3        A.  No.
4        Q.  Never reported age-discrimination to
5    Sonia Ellison?
6        A.  No.
7        Q.  Never called the employee hotline to
8    report the age discrimination?
9        A.  No.
10       Q.  Did anyone ever tell you that your
11   position was being eliminated because of your
12   age?
13       A.  No.
14       Q.  Did anyone ever say anything leading
15   you to believe that your position was being
16   eliminated due to your age?
17       A.  No.
18       Q.  Do you have any evidence that but
19   for your age, your position would not have
20   been eliminated?
21       A.  I don't have any solid evidence, but
22   I have suspicion.
23       Q.  You don't have any solid evidence

1    but you have suspicion?
2        A.  Yeah.
3        Q.  And what are your suspicions?
4        A.  My suspicions, they got rid of me
5    because of my age.
6        Q.  What are your suspicions based on?
7        A.  Based on the fact they let me go and
8    I was making more money than some of the
9    other directors.  I had been there a long
10   time.
11       Q.  So you said based on the fact they
12   let you go and you were making more money
13   than some of the directors and you had been
14   there a long time?
15       A.  Yes.
16       Q.  And again, I'm not trying to testify
17   for you.  I'm trying to help the court
18   reporter.
19       A.  I understand, yes.
20       Q.  Was your suspicion that your
21   position was eliminated because of your age
22   based on anything else?
23       A.  That's all I can think of right now.

1        Q.  Okay.  Are you also claiming that
2    Harland Clarke discriminated against you
3    based on a disability?
4        A.  Yes.
5        Q.  Okay.  What medical condition are
6    you basing that disability claim on?
7        A.  I guess my back surgeries and...
8        Q.  Back surgery and?
9        A.  And struggle getting around.
10       Q.  Back surgery and struggle to get
11   around?
12       A.  And I felt like I -- since they were
13   self-funded on the medical insurance, I was
14   causing them a lot of money.
15       Q.  Okay.  Because they were self-funded
16   on the medical insurance, you felt like you
17   were costing them a lot of money?
18       A.  Yes.
19       Q.  Were you aware of anyone else at
20   Harland Clarke that had surgeries while you
21   worked there?
22       MS. HAYNES:  Object to the form.
23       THE WITNESS:  A lot of people.

1    Q.  (By Mr. Wilkes)  A lot of people
2  did?
3    A.  Yes.
4    Q.  Are you aware of anyone else who had
5  back surgery at Harland Clarke?
6    A.  Not that I can recall.
7    Q.  Okay.  How did Harland Clarke
8  discriminate against you on the basis of your
9  disability, your back surgery?
10    A.  Terminated my job.
11    Q.  Okay.  Termination.  Anything else?
12    A.  That's all I can think of.
13    Q.  Okay.  I want to ask you -- well,
14  let me ask you this.  Are you also claiming
15  that Harland Clarke harassed you on the basis
16  of your back condition?
17    MS. HAYNES:  Object to the form.
18    THE WITNESS:  Termination.
19    Q.  (By Mr. Wilkes)  By terminating your
20  job?
21    A.  Yes.  All of this was going on
22  behind the scenes until it happened.
23    Q.  Do you have any knowledge of

1  anything going on behind the scenes related
2  to your disability?
3    A.  No.  But I felt like -- went to
4  Porta Rico in December of '14, they saw me
5  down there.  Termination decision was shortly
6  after that, after they had me come meet.
7    Q.  Okay.  Other than the fact that you
8  went to the sales meeting in Porta Rico in
9  '14 and people saw you there, do you have any
10  other reason to think something was going on
11  behind the scenes?
12    A.  No.
13    Q.  I want to follow up with you on some
14  comments that you mentioned previously from
15  Debra Corwin?
16    A.  Yes.
17    Q.  I think you told me when we
18  previously were in your deposition, that
19  Debra Corwin said -- made a comment to you
20  that she could barely hear you?
21    A.  Yes.
22    Q.  And that was in Porta Rico?
23    A.  Yes, it was.

1    Q.  Who else was around when she said
2  that?
3    A.  The whole team.
4    Q.  Your whole team.  That would be the
5  account executives and senior account
6  executives.
7    A.  Yes.
8    Q.  Those five people?
9    A.  Yes.
10    Q.  Anyone else?
11    A.  That's all.
12    Q.  Okay.  So Debra and your team?
13    A.  Right.
14    Q.  Did you report that comment to
15  anyone?
16    A.  No.
17    Q.  Did you call human resources about
18  the comment?
19    A.  No.
20    Q.  Okay.  Did you say anything to Steve
21  Moyer about the comment?
22    A.  No.
23    Q.  Did you say anything to Sonia

1  Ellison about the comment?
2    A.  No.
3    Q.  Did you call the employee hotline
4  about the comment?
5    A.  No.
6    Q.  I think you also told me Debra
7  Corwin said that it looked like you were
8  struggling to get around?
9    A.  Yes.
10    Q.  Was that also in Porta Rico?
11    A.  Yes, it was.
12    Q.  Was that at the same time he made
13  the comment about your voice?
14    A.  Yes.
15    Q.  Okay.  So the same people were
16  around?
17    A.  Yes, they were.
18    Q.  Did you report that comment to
19  anyone at Harland Clarke?
20    A.  No.
21    Q.  Okay.  I believe you also told me
22  that Debra Corwin said you need to get rid of
23  Bob Collier to Maria Robinson?

1    A.  Yes.
2    Q.  When did Debra make that comment?
3    A.  Probably like October of '14.
4    Q.  October of '14.  And Maria Robinson,
5    she's an account executive that reported to
6    you?
7    A.  Yes.
8    Q.  So you were her supervisor, Maria's
9    supervisor?
10    A.  Yes.
11    Q.  How do you know that Debra made that
12    comment to Maria Robinson?
13    A.  How do I know?
14    Q.  How do you know she made it?
15    A.  Someone told me.
16    Q.  Who told you?
17    A.  Tom Jones told me.
18    Q.  How does Tom Jones know that Debra
19    Corwin made that comment to Maria Robinson?
20    A.  Somebody told him.
21    Q.  Somebody told him?  Who told him?
22    A.  I think Mandy Bennett or Tracy
23    Harley.

1    Q.  Mandy Bennett or Tracy Harley?
2    A.  Yes.
3    Q.  Do you know how Mandy Bennett or
4    Tracy Harley knows that Debra Corwin made
5    that comment to Maria Robinson?
6    A.  Maria told them.
7    Q.  Maria told them?
8    A.  Yes.
9    Q.  So Maria told Mandy or Tracy who
10    told Tom who told you; is that correct?
11    A.  Yes, correct, yes.
12    Q.  Okay.  Did you ever talk to Maria
13    about that comment?
14    A.  No.
15    Q.  Do you know if anyone else was
16    present in the conversation between Maria and
17    Debra?
18    A.  I don't know who was on the phone.
19    Q.  It was a phone call?
20    A.  Phone call, yes.
21    Q.  You don't know if anyone else was on
22    the phone call?
23    A.  I don't know for a fact.

1    Q.  Did you report Debra's comment to
2    Maria to someone at Harland Clarke?
3    A.  No.
4    Q.  Did you ever tell Steve Moyer about
5    it?
6    A.  No.
7    Q.  Did you ever report it to anyone
8    else?
9    A.  I did talk to Steve Moyer about it.
10    Q.  When did you talk to Steve Moyer
11    about it?
12    A.  About two weeks after, I think.
13    Q.  Okay.  So that would have been in, I
14    guess, October of '14?
15    A.  Right, yes.
16    Q.  What did you say to Steve Moyer?
17    A.  Told him what Debra told to Maria.
18    Q.  What did Steve say?
19    A.  He said don't worry about it.
20    Q.  Was that it?
21    A.  That was all.
22    Q.  Do you know if Maria Robinson had
23    any role in the reduction in force in the

1    decision making?
2    A.  I don't know.  I don't think so.
3    Q.  You don't think so?
4    A.  I don't think so.
5    Q.  After Steve Moyer told you not to
6    worry about the comment and you kept working
7    for Harland Clarke?
8    A.  Yes.
9    Q.  Okay.  Other than your termination,
10    are there any other ways that you believe you
11    were harassed or discriminated against
12    because of your back condition?
13    A.  No.
14        MS. HAYNES:  And what he told you
15    the last -- the first part of the deposition.
16        MS. WILKES:  Your lawyer is
17    reminding you of something.
18        MS. HAYNES:  No.  I'm reminding you
19    that he did talk about other things.
20    Q.  (By Mr. Wilkes)  You're referencing
21    the comments?
22    A.  Yes.
23    Q.  Okay.  And just for reference, I

```
 1    want to make sure we're talking about the
 2    same thing. I'm not going to make you go
 3    through it again, but the other things --
 4    let's see, starting on page 156 of your
 5    deposition transcript --
 6        A.  Yes.  Comments people made in Porta
 7    Rico.
 8        Q.  The comments that were made in Porta
 9    Rico that I believe are pages 156 through 166
10    of your deposition. I don't know if you want
11    to take a minute and skim back through that
12    and tell me if that's the comments that
13    you're referring to.  Starting here, just
14    through the end.
15        A.  (Reviewing document.)
16          That's correct, yes.
17        Q.  Okay.  So, the comments and
18    conversations that are reflected on pages 156
19    through 166 of your deposition, you believe
20    those are ways that you were harassed or
21    discriminated against based on your back
22    condition, correct?
23        A.  Yes.
```

```
 1        Q.  Did you ever report any of those
 2    comments or conversations to anyone at
 3    Harland Clarke?
 4        A.  No.
 5        Q.  You never reported those to H.R.?
 6        A.  No.
 7        Q.  Never called the employee hotline
 8    about any of those comments or conversations?
 9        A.  No.
10        Q.  Never reported any of those comments
11    or conversations to Steve Moyer?
12        A.  No.
13        Q.  Okay.  You never reported --
14        A.  I didn't know they were
15    discriminating against me when they were.
16        Q.  You didn't know they were
17    discriminating against you when they were
18    discriminating against you?
19        A.  Yes.
20        Q.  All right.  Are there any other
21    comments or conversations that you believe
22    support your claim that you were harassed or
23    discriminated against based on your back
```

```
 1    condition that we have not discussed?
 2        A.  That's all I can think of at the
 3    time.
 4        Q.  Are you also claiming that Harland
 5    Clarke perceived you as disabled?
 6        A.  Yes.
 7        Q.  How were you perceived as disabled?
 8        A.  Struggling to get around and my
 9    voice.
10        Q.  You're saying the fact you were
11    struggling to get around and your voice,
12    because of those two things --
13        A.  Yes.
14        Q.  -- Harland Clarke perceived you as
15    disabled?
16        A.  Yes.
17        Q.  Okay.  Did anyone ever tell you that
18    they perceived you as being unable to perform
19    the functions of your job because you were
20    struggling to get around?
21        A.  No.
22        Q.  Did anyone ever say anything leading
23    you to believe that they perceived you as
```

```
 1    being unable to perform the functions of your
 2    job because you were struggling to get
 3    around?
 4        A.  No.
 5        Q.  Did anyone ever tell you that they
 6    perceived you as being unable to perform the
 7    functions of your job because of your voice?
 8        A.  No.
 9        Q.  Did anyone ever say, leading you to
10    believe, that they perceived you as being
11    unable to perform the functions of your job
12    because of your voice?
13        A.  No.
14        Q.  Okay.  Did you request any type of
15    accommodations for your back condition?
16        A.  No.
17        Q.  Okay.
18        A.  Let me rephrase that.  When I would
19    travel, I go out a day early.
20        Q.  When you travelled, you would go out
21    a day early?
22        A.  Right.  So I wouldn't have to get
23    off a plane and go straight into meetings.
```

1    Q.  Sorry.  So you wouldn't have to get
2  off a plane and go straight into meetings?
3    A.  Yes.
4    Q.  So that you would have a day to
5  rest?
6    A.  Yes.
7    Q.  Is that an accomodation that you
8  asked Harland Clarke to let you do?
9    A.  Yes.
10    Q.  Okay.  Who did you ask?
11    A.  Steve Moyer.
12    Q.  Steve Moyer?
13    A.  Yes.
14    Q.  When was that?
15    A.  Probably '14.
16    Q.  2014?
17    A.  January, February of '14.
18    Q.  Did Moyer let you travel a day early
19  for meetings?
20    A.  Yes.
21    Q.  Any other type of accomodation that
22  you requested because of your back condition?
23    A.  No.

1    Q.  Okay.  Did you ever request any type
2  of accomodation because of your voice?
3    A.  No.
4    Q.  Okay.  Anyone ever tell you that
5  your position was being eliminated because of
6  your medical condition?
7    A.  No.
8    Q.  Did anyone ever tell you that your
9  position was being eliminated because they
10  perceived that you could not perform the
11  functions of your job?
12    A.  No.
13    Q.  Did anyone say anything leading you
14  to believe that your position was being
15  eliminated because of your medical condition?
16    A.  No.
17    Q.  Did anyone say anything leading you
18  to believe that your position was being
19  eliminated because they perceived you to be
20  unable to perform the functions of your job?
21    A.  No.
22    Q.  Are you also claiming that Harland
23  Clarke retaliated against you?

1    MS. HAYNES:  Object to the form.
2    THE WITNESS:  I don't know.
3    Q.  (By Mr. Wilkes)  You don't know.
4    Did you ever make any complaints of
5  age or disability discrimination during your
6  employment with Harland Clarke?
7    A.  No.
8    Q.  Did you ever make any complaints of
9  age or disability harassment during your
10  employment with Harland Clarke?
11    A.  No.  Didn't know they were doing it
12  until after terminated from my position.
13    Q.  There was nothing you could do until
14  after they terminated your position?
15    A.  Right.  I didn't know it was going
16  on until they terminated my position.
17    Q.  You didn't know it was going on
18  until after they terminated your position?
19    A.  Yes.
20    Q.  Okay.  Following your termination,
21  the elimination of your position and the
22  reduction in force, did you file a charge of
23  discriminating with the Equal Employment

1  Opportunity Commission?
2    A.  Yes.
3    Q.  I'll show you Defendant's Exhibit
4  56.
5    Now --
6  (Whereupon, Defendant's Exhibit No. 56 was
7  marked for identification and is attached to
8  the original transcript.)
9    MS. HAYNES:  You're going back?
10    MS. WILKES:  Yeah.  To keep everyone
11  on their toes.
12    Q.  (By Mr. Wilkes)  Looking at
13  Defendant's Exhibit 56, is that your
14  signature on the first page at the bottom?
15    A.  Yes, it is.
16    Q.  Okay.  And the date is January 27,
17  2015?
18    A.  Correct.
19    Q.  Okay.  That's the date you filed
20  your EEOC charge?
21    A.  Yes.
22    Q.  And Exhibit 56 is the EEOC charge
23  that you filed?

1      A.  It appears to be.
2      Q.  Okay.  So you had already been
3  informed of the reduction of force decision
4  when you filed the EEOC charge, correct?
5      A.  Yes, January 9th.  January 9th is
6  when I received it.
7      Q.  February 9th was your last day of
8  work?
9      A.  January 9th.
10     Q.  January 9th, okay.  That's the day
11 you received notification?
12     A.  Yes.
13     Q.  Okay.  Looking at the first page
14 about half way down, there's a lot of little
15 check boxes.
16     A.  Yes.
17     Q.  Do you see that card?  It says
18 "discrimination based on," it says, "check
19 appropriate boxes."  Do you see where I'm
20 looking?
21     A.  Yes, I do.
22     Q.  Okay.  The box for retaliation is
23 not checked, is it?

1      A.  No.
2      Q.  No.  And looking at your EEOC
3  charge, your charge doesn't mention any
4  complaints about age or disability
5  discrimination, does it, that you made during
6  your employment?
7      A.  No.
8      Q.  Did you ever file an amended charge
9  of discriminating?
10     A.  I don't -- I don't know.
11     Q.  You don't know?
12     A.  Until after the fact.
13     Q.  I'm sorry?
14     A.  After the fact.
15     Q.  After the fact?
16     A.  Charge of discrimination.
17     Q.  Yeah.  Did you ever amend this?  Did
18 you ever file a second charge of
19 discrimination, is my question?
20     A.  I'm not sure.
21     Q.  You're not sure.  Do you have any
22 memory of ever filing a charge that ever
23 looked like this?

1      A.  I'm not sure.
2      Q.  Did Ms. Haynes assist you in filing
3  this charge?
4      A.  Yes.
5      MS. HAYNES:  Has my name on it that
6  I notarized it.
7      MS. WILKES:  That does look like
8  your signature.
9      Q.  (By Mr. Wilkes)  Okay.  I'm looking
10 at the bottom of page three and top of page
11 four of your charge.
12     A.  Okay.
13     Q.  Okay.  I'm looking at the last
14 sentence that starts on page two, and it
15 says, "I'm being refused employee benefits
16 namely FMLA leave and short and long-term
17 disability benefits and refused a transfer to
18 other available positions within the
19 company."
20     I want to start with the first part
21 of that where it says you're being refused
22 FMLA leave and short and long-term disability
23 benefits.

1      A.  Yes.
2      Q.  Who refused you FMLA leave and short
3  and long-term disability benefits?
4      A.  Sonia Ellison.
5      Q.  And --
6      A.  And then I was denied the STD.
7      Q.  Unum denied the STD claim?
8      A.  Yes.
9      Q.  How did Sonia Ellison refuse you
10 FMLA leave and --
11     A.  She first told me I was not eligible
12 for it.
13     Q.  She first told you you weren't, but
14 she later told you that you were?
15     A.  Five days before my last day.
16     Q.  Five days before your last day?
17     A.  Yes.
18     Q.  Okay.  But you were able to apply
19 for short-term disability leave, correct?
20     A.  Yes.
21     Q.  Okay.  Is FMLA leave at Harland
22 Clarke unpaid?
23     A.  Yes, it is.

Page 213

1    Q.   Okay.  The second part of that
2  sentence, it says you were refused a transfer
3  to other available positions within the
4  company?
5    A.   Right.
6    Q.   Did you ask to be transferred?
7    A.   I asked for an opportunity to move
8  to a sales position.
9    Q.   You asked for an opportunity to move
10  to a sales position?
11    A.   Yes.
12    Q.   Who did you ask?
13    A.   Steve Moyer.
14    Q.   Was that on the call where they
15  informed you of the RIF decision?
16    A.   Yes, it was.
17    Q.   I think we may have discussed that
18  before, but remind me.  What did he tell you
19  in response?
20    A.   Told me there was nothing available.
21    Q.   Nothing available.
22      Did Steve and Sonia tell you on that
23  same call that you were welcome to apply for

Page 214

1  any open positions at the company?
2    A.   Yes.
3    Q.   Did you apply for any open
4  positions?
5    A.   Nothing fit my job skill set.
6    Q.   Nothing that fit your job skill set?
7    A.   Yes.  Like plant manager, I couldn't
8  be a plant manager.
9    Q.   You couldn't be a plant manager.
10    A.   That kind of thing.
11    Q.   How many times did you look to see
12  what open positions there were?
13    A.   Numerous times.
14    Q.   Numerous times?
15    A.   (Witness nods head.)
16    Q.   Would you say more than five?
17    A.   More than five, yes.
18    Q.   More than five.  More than ten?
19    A.   More than ten.
20    Q.   More than ten.  More than 20?
21    A.   Probably so.
22    Q.   Okay.  More than 30?
23    A.   Probably -- I'm not sure about that.

Page 215

1    Q.   Okay.  Where do you look?
2    A.   Online.
3    Q.   Online?
4    A.   Uh-huh.
5    Q.   Is that on the Harland Clarke
6  website?
7    A.   Yes.
8    Q.   When was the last time you recall
9  looking to see if there were any open
10  positions at Harland Clarke that fit your
11  skill set?
12    A.   Probably last year.
13    Q.   Okay.  Did anyone say that you
14  couldn't be transferred to another position
15  because you had filed an EEOC charge?
16    A.   No.
17    Q.   Did anyone say anything leading you
18  to believe that you couldn't be transferred
19  to another position because you filed an EEOC
20  charge?
21    A.   No.
22    Q.   Okay.  Did anyone tell you that you
23  were not transferred to an open position

Page 216

1  because of your age?
2    A.   No.
3    Q.   Did anyone say anything leading you
4  to believe that you were not transferred to
5  an open position because of your age?
6    A.   Rephrase that again.
7    Q.   Did anyone say anything leading you
8  to believe that you were not transferred to
9  an open position because of your age?
10    A.   No.
11    Q.   Did anyone tell you that were you
12  not transferred to an open position because
13  of your medical condition?
14    A.   No.
15    Q.   Did anyone say anything leading you
16  to believe you were not transferred to an
17  open position because of your medical
18  condition?
19    A.   No.
20    Q.   Okay.
21      MS. WILKES:  All right.  We can take
22  a break.
23        (Short recess.)

1      Q.  (By Mr. Wilkes)  We are back on the
2   record, Mr. Collier.  Do you need to change
3   or clarify any of your previous testimony
4   today?
5      A.  Not that I'm aware of.
6      Q.  Okay.  Did anyone tell you that but
7   for the fact you filed an EEOC charge, you
8   would have been transferred or hired for
9   another position?
10      A.  No.
11      Q.  Did anyone say anything leading you
12   to believe that but for the fact you filed an
13   EEOC charge, you would have been transferred
14   or hired for another position?
15      A.  No.
16      Q.  Your complaint has a, I know lawyers
17   draft these things, but your complaint has a
18   claim for intentional infliction of emotional
19   distress?
20      A.  Yes.
21      Q.  What intentional actions of Harland
22   Clarke are you claiming caused you emotional
23   distress?

1      A.  Termination.
2      Q.  Okay.  Anything else?
3      A.  All I can think of.
4      Q.  Okay.  And how has the termination
5   caused you emotional distress?
6      A.  How has it?
7      Q.  I'm sorry?
8      A.  How has it or...
9      Q.  How has it caused you emotional
10   distress?
11      A.  Depression.
12      Q.  Caused you depression.
13      A.  Caused financial issues.
14      Q.  Financial issues, okay.
15   I'll ask you about those in a minute.
16   Anything else?
17      A.  Embarrassment.
18      Q.  Embarrassment.  Okay.  Anything
19   else?
20      A.  Sleep disorder.
21      Q.  Sleep disorder.  Have you been
22   diagnosed with a sleep disorder?
23      A.  I have now.

1      Q.  Who diagnosed you with a sleep
2   disorder?
3      A.  Dr. Farley.
4      Q.  When did Dr. Farley diagnosis you
5   with a sleep disorder?
6      A.  Nine months ago.
7      Q.  Nine months ago.
8         What type of treatment are you
9   receiving for the sleep disorder?
10      A.  CPAP machine.
11      Q.  CPAP?
12      A.  (Witness nods head.)
13      Q.  Anything else?
14      A.  That's all.
15         MS. HAYNES:  I'm sorry.  Object to
16   the form if you were asking -- I don't know
17   what -- is that all -- if that went back to
18   emotional or disorder --
19         MS. WILKES:  That's fair.
20      Q.  (By Mr. Wilkes)  Any other treatment
21   of your sleep disorder other than the CPAP?
22      A.  No.
23      Q.  The depression that you say that

1   you've suffered, have you received any
2   medical treatment for depression?
3      A.  Lyrica.
4      Q.  Lyrica.  Who prescribed you Lyrica?
5      A.  Dr. Farley.
6      Q.  When were you diagnosed with
7   depression?
8      A.  I guess probably in '15.
9      Q.  In '15.  Do you think that would be
10   reflected in Dr. Farley's records?
11      A.  I'm sure it would be.
12      Q.  Okay.  I'll show you Defendant's
13   Exhibit 57.  Have you ever seen Defendant's
14   Exhibit 57 before?
15      A.  Yes, I have.
16   (Whereupon, Defendant's Exhibit No. 57 was
17   marked for identification and is attached to
18   the original transcript.)
19      Q.  (By Ms. Wilkes)  It's a
20   psychological evaluation report.
21      A.  Yes.
22         MS. HAYNES:  Is there any reason
23   it's not Bates numbered?

13 (Pages 217 to 220)

1    MS. WILKES: It is.
2    MS. HAYNES: I see it now. Thanks.
3    MS. WILKES: I think you produced
4  it. SSA 393 through 395.
5    Q. (By Mr. Wilkes) I would just -- oh,
6  date of evaluation, April 13, 2016.
7    A. Yes.
8    Q. Was this performed in connection
9  with your Social Security --
10   A. Yes.
11   Q. -- application?
12   A. Yes, it was.
13   Q. Okay. Was this a telephone
14 interview?
15   A. No. It was in person.
16   Q. This was in person with Sally
17 Gordon.
18   A. Yes.
19   Q. She's a licensed psychologist
20 according to this?
21   MS. HAYNES: Object to the form.
22   THE WITNESS: Yes.
23   Q. (By Mr. Wilkes) Okay. Do you know

1  why this psychological evaluation was
2  ordered?
3    A. I'm not positive. Social Security.
4    Q. Social Security just told you you
5  had to get it done?
6    A. Yes.
7    Q. Okay. I think this report mentions
8  that you had a history of depression. Is the
9  first time you were diagnosed with depression
10 by Dr. Farley in 2015?
11   MS. HAYNES: Object to the form.
12   THE WITNESS: I think so.
13   Q. (By Mr. Wilkes) Do you have any
14 prior diagnosis of depression?
15   A. Not that I'm aware of.
16   Q. Not that you're aware of. Okay.
17   Other than Dr. Farley, do you see
18 any other medical provider for any aspect of
19 your mental health?
20   A. No.
21   Q. You don't see a therapist?
22   A. No.
23   Q. Okay. Have you ever received any

1  type of counselling?
2    A. No.
3    MS. HAYNES: Are you talking about
4  medical?
5    Q. (By Mr. Wilkes) Mental or health
6  counselling?
7    A. No.
8    Q. Are you still taking Lyrica today?
9    A. Yes.
10   Q. Okay. Does your depression prevent
11 you from performing any of your normal daily
12 activities?
13   A. No.
14   Q. Okay. What about your sleep
15 disorder?
16   Does that prevent you from
17 performing any of your normal daily
18 activities?
19   A. No.
20   Q. You mentioned that the reduction in
21 force caused you embarrassment?
22   A. Yes.
23   Q. How did that cause you

1  embarrassment?
2    A. Never been fired in my life.
3  Embarrassment with my friends and family.
4    Q. Embarrassed with friends and family?
5    A. Yes.
6    Q. Okay. Your complaint also contains
7  an invasion of privacy claim.
8    What private information did Harland
9  Clarke communicate about you?
10   A. That I retired.
11   Q. That you retired? Is that the
12 SunTrust retirement --
13   A. Yes.
14   Q. -- conversation that we talked about
15 earlier?
16   A. (Witness nods head.)
17   Q. Did Harland Clarke share the fact
18 that you had retired with anyone else?
19   A. Not that I'm aware of.
20   Q. Okay. And who is it again that
21 Harland Clarke shared that information with
22 SunTrust?
23   A. I'm trying to think of the name. I

Page 225

1    can't remember off the top of my head.
2        Q.   Was it just one person at SunTrust?
3        A.   Two people.
4        Q.   Two people.  You don't remember
5    either of their names?
6        A.   I don't remember off the top of my
7    head.
8        Q.   Did Harland Clarke ever publically
9    announced that you had retired?
10        A.   I'm not aware of it.
11        Q.   Not that you're aware of.  Okay.
12    Your complaint also contains an allegation
13    that Harland Clarke placed you in a false
14    light, and I know that's a legal term.  But
15    my question to you is, what false information
16    about you did Harland Clarke publicize?
17        MS. HAYNES:  Object to the form.
18        THE WITNESS:  That I retired.
19        Q.   (By Mr. Wilkes)  That you retired.
20        Any other false information about
21    you that you believe Harland Clarke shared?
22        A.   All I can think of.
23        Q.   That's all you can think of.

Page 226

1        MS. WILKES:  If we can take a break
2    for two minutes, I think I need the card.
3        (Short recess.)
4    (Whereupon, Defendant's Exhibit No. 64 was
5    marked for identification and is attached to
6    the original transcript.)
7        Q.   (By Mr. Wilkes)  Okay.  I'm going to
8    mark this Defendant's Exhibit 64.  Showing
9    you Defendant's Exhibit 64, is that the card
10    that you testified you received from
11    SunTrust?
12        A.   Yes.
13        Q.   Okay.  Let me see it for a second.
14    And the handwriting on the first page, is
15    that yours?
16        A.   It's mine, yes.
17        Q.   Okay.  What does that say?
18        A.   Says received card from contacts at
19    SunTrust Bank.
20        Q.   From contacts at --
21        A.   Contacts at SunTrust Bank.
22        Q.   Okay.  I don't see a date anywhere
23    on the card, do you?

Page 227

1        A.   No, I don't see a date on it.
2        Q.   Okay.  Do you remember when you
3    received it?
4        A.   Probably months after I was
5    dismissed.
6        Q.   Months after you were.
7        And it says, the handwritten note
8    says, "Bob, I'm going to miss you at Harland
9    Clarke.  Enjoy your retirement.  I hope our
10    paths cross again some day," right?
11        A.   Yes.
12        Q.   It's signed?
13        A.   Lynne.
14        Q.   Lynne.  Who's Lynne?
15        A.   She was our primary contact.
16        Q.   Do you remember her last name?
17        A.   I don't remember off the top of my
18    head.  Martin was her boss.
19        Q.   Martin, okay.  Those are the two
20    people that you say Harland Clarke told that
21    you retired?
22        A.   Yes.
23        Q.   Lynne and Martin?

Page 228

1        A.   Yes.
2        Q.   But you don't know who told Lynne
3    and Martin that you received?
4        A.   Probably Barbara Murnane.
5        Q.   How do you know that?
6        A.   I asked Lynne.  I sent Lynne an
7    e-mail and asked her.
8        Q.   You sent Lynne an e-mail?
9        A.   She sent it back and said it was
10    Barbara Murnane.
11        Q.   Okay.
12        MS. HAYNES:  We produced the e-mail
13    too.
14        MS. HAYNES:  All right.
15        MS. WILKES:  We can go off the
16    record while I find it.
17        (Discussion off the record.)
18    (Whereupon, Defendant's Exhibit No. 65 was
19    marked for identification and is attached to
20    the original transcript.)
21        Q.   (By Mr. Wilkes)  Okay.  Back on the
22    record.  Let me mark this Defendant's Exhibit
23    65.  Is Defendant's Exhibit 65 the e-mail you

15 (Pages 225 to 228)

Page 229

1    were referring to that you exchanged with
2    Lynne McMichael at SunTrust?
3       A.  Yes.
4       Q.  Okay.  Looks like there's two
5    e-mails on this.  Looks like there is one
6    that you sent Thursday June 4th, 2015,
7    thanking Lynne for the card?
8       A.  Yes.
9       Q.  Okay.  Looks like you asked her how
10   she heard the news about your retirement?
11      A.  Yes.
12      Q.  Okay.  And she said -- she responded
13   to you, "I can't remember if Barbara or Jeff
14   told me."
15      A.  Yes.
16      Q.  Okay.  Who's Jeff?
17      A.  Jeff Foley.
18      Q.  Jeff?
19      A.  Foley, F-o-l-e-y.
20      Q.  He was one of your account
21   executives?
22      A.  Yes, he was.
23      Q.  Okay.  She said, "I think it may

Page 230

1    have been Barbara," right?
2       A.  Yes.
3       Q.  Okay.  Is June around the time that
4    you received the card, June of '15?
5       A.  Probably have been May sometime.
6       Q.  May sometime --
7       A.  Yes.
8       Q.  -- when you received the card?
9       A.  Yes.
10      Q.  Okay.  Other than the comment that
11   you retired to SunTrust, are there any other
12   false comments that you say that Harland
13   Clarke communicated about you?
14      A.  Not that I'm aware of.
15      Q.  Nothing else?
16      A.  Not that I'm aware of.
17      Q.  Not that you're aware of.
18          Your complaint also has a claim for
19   interference with contractual or business
20   relations?
21      A.  Yes.
22      Q.  What business relationship are you
23   claiming Harland Clarke interfered with?

Page 231

1       A.  Just in general.  In general trying
2    to find a job and non-compete.  I couldn't --
3    there's several people I couldn't go to work
4    for.
5       Q.  Non-compete.
6       A.  And announced my retirement.
7       Q.  I'm sorry?
8       A.  And announced my retirement.
9       Q.  And announcing your retirement?
10      A.  Took me out of the market.
11      Q.  How did announcing your retirement
12   take you out of the market?
13      A.  Well, you know, it's -- they -- like
14   SunTrust for instance, thought I was retired,
15   so they wouldn't find me any leads on job or
16   anything like that.
17      Q.  SunTrust thought you retired so
18   SunTrust wouldn't find you any new leads on
19   jobs?
20      A.  Yes.
21      Q.  Were you seeking work at SunTrust?
22      A.  No.  I'm talking about word-of-mouth
23   jobs.

Page 232

1       Q.  So you're saying because SunTrust
2    thought you were retired, they wouldn't say,
3    "Hey, Bob, we heard about this sales job" --
4       A.  Yeah.
5       Q.  -- "for XYZ for other companies"?
6       A.  Yes, yes.
7       Q.  Okay.  Well, could you not have told
8    SunTrust, I decided not to retire?
9       A.  I could have.
10      Q.  Did you ever do that?
11      A.  No.
12      Q.  Okay.  You said Harland Clarke
13   announced your retirement, but you're just
14   referring to telling SunTrust, correct?
15      A.  SunTrust, yes.
16      Q.  They never announced it publically
17   that you're aware of, right?
18      A.  Not that I'm aware of.
19      Q.  Okay.
20          MS. WILKES:  Alicia, have you
21   produced a copy of the non-compete?
22          MS. HAYNES:  His non-compete with --
23   I don't know.

16 (Pages 229 to 232)

1    MS. WILKES:  You don't know.
2    Q.  (By Mr. Wilkes)  Okay.
3    A.  I think we have.
4    Q.  Was it a non-compete or
5  non-solicitation?
6    A.  Non-compete.
7    Q.  Okay.  Did you also have a
8  confidentiality agreement?
9    A.  Yes, I did.
10    Q.  Is that what you're referring to?
11    A.  No.  Non-compete.
12    Q.  Do you remember what the terms of
13  the non-compete was?
14    A.  I can't work for anybody for two to
15  three years.  I can't remember exactly.
16    Q.  Two to three years?
17    A.  And a list of people I couldn't work
18  for.
19    Q.  Did it have a list of specific
20  companies you couldn't work for?
21    A.  Yes, it did.
22    Q.  When did you sign the non-compete?
23    A.  Oh, when I came back the second

1    Q.  Okay.  So the companies you were
2  prohibited from working for, do you remember
3  any of the specific companies?
4    A.  Deluxe Checks.
5    Q.  Deluxe Checks.  That's a competitor
6  of Harland Clarke?
7    A.  Yes.  Main Street Checks, Main
8  Street.
9    Q.  Main Street Checks?
10    A.  Standard Register.
11    Q.  Standard Register?
12    A.  R.R. Donnelley.
13    Q.  R.R. Donnelley?
14    A.  R.R., yes.
15    Q.  Okay.  Who else?
16    A.  That's off the top of my head.
17    Q.  Did you see if there was any open
18  positions at any of those companies that you
19  could work in without violating the
20  non-compete?
21    A.  I couldn't work for them because I
22  signed a non-compete.
23    Q.  My question was, did you look to see

1  time.  Let me see.
2    Q.  That was in 2004?
3    A.  Yeah, I believe four is right.
4    Q.  Did you ever ask anybody at Harland
5  Clarke about the non-compete when you were
6  told your position was being eliminated?
7    A.  No.
8    Q.  Did anyone at Harland Clarke tell
9  you they were going to enforce a non-compete
10  against you when your position was
11  eliminated?
12    A.  No, back when the document was
13  signed.
14    Q.  I understand.  But did anyone say,
15  "Hey, Bob, remember you have the
16  non-compete"?
17    A.  No.
18    Q.  Anything like that?
19    A.  No.
20    Q.  Okay.  So the non-compete was never
21  addressed with you in connection with your
22  job elimination?
23    A.  No.

1  if there were any open jobs they had that you
2  could work in that would not violate the
3  non-compete?
4    A.  Said I couldn't work for the company
5  in the non-compete.
6    Q.  Okay.  You say the non-compete said
7  you couldn't work for them at all in any
8  position?
9    A.  Yes.
10    Q.  Okay.  What other business
11  relationships are you saying that Harland
12  Clarke interfered with?
13    A.  That's all I can think of.
14    Q.  Okay.  I just want to make sure I
15  understand I have your testimony correctly.
16  You're saying that the business relationships
17  that were interfered with were the companies
18  that you were prohibited from working for in
19  the non-compete?
20    A.  Yes.
21    Q.  And also SunTrust because they
22  thought you had retired and would not direct
23  other job opportunities to you; is that

Page 237

1    correct?
2        A.   Yes.
3        Q.   Okay.
4            MS. HAYNES:  Hold on, Amy -- there's
5    -- I'm looking at the -- I don't have it, but
6    what you used as Defendant's Exhibit 36,
7    Bates Number 26, under number 12, it talks
8    about the --
9            MS. WILKES:  The non-compete.
10           MS. HAYNES:  It says copy attached.
11   I don't see it attached to this, but it may
12   be after number 30.
13           MS. WILKES:  I'll look.  I don't
14   have that up here.
15           MS. HAYNES:  Bates number 30 is what
16   I'm saying, and I don't have it my documents
17   with me.
18           MS. WILKES:  Mine are downstairs.
19           MS. HAYNES:  But I can check.
20           MS. WILKES:  We can take another
21   break and I can go grab it.
22           MS. HAYNES:  Pardon?
23           MS. WILKES:  I can go grab it.

Page 238

1            MS. HAYNES:  No, it's not important
2    for me, but I just saw it there and you asked
3    if I produced it, so I was trying to find
4    out.
5            MS. WILKES:  I'm going to -- let's
6    take another short five-minute break, and
7    I'll go grab my documents.
8            (Short recess.)
9    (Whereupon, Defendant's Exhibit No. 66 was
10   marked for identification and is attached to
11   the original transcript.)
12       Q.   (By Mr. Wilkes)  Okay.  Let me show
13   you Defendant's Exhibit 66, I'm going to --
14   these are front and back.  I'm going to tell
15   you the Bates label.  That's defendant's 35
16   through 39.
17           MS. HAYNES:  So it wasn't in those
18   documents we produced?
19           MS. WILKES:  It might have been.  I
20   just knew where it was in mine.
21           MS. HAYNES:  So this is Defendant's
22   Exhibit what now?  66.  Tell me the Bates
23   again.

Page 239

1            MS. WILKES:  35 through 39.
2        Q.   (By Mr. Wilkes)  Have you seen
3    Defendant's Exhibit 66 before?
4        A.   Yes.
5        Q.   Is that the -- it's hard to read,
6    but on page, that is -- the page that is
7    Bates stamped 39, is that your signature at
8    the bottom?
9        A.   Yes, it is.
10       Q.   Is this the non-compete agreement
11   you're referring to?
12       A.   It's confidentiality.
13       Q.   Well, let's look, and this is -- it
14   looks like it's dated July 27, 2004?
15       A.   Yes.
16       Q.   Is that correct?
17       A.   Yes.
18       Q.   I thought it was confidentiality
19   too, but here on the bottom of page two, is
20   there a section that says "covenant not to
21   compete," it carries on to page three?
22       A.   Yes.
23       Q.   Is that the non-compete you're

Page 240

1    referring to?
2        A.   Yes, it is.
3        Q.   Okay.
4        A.   A list of clients and customers I
5    can't work for.
6        Q.   You're pointing to where it lists
7    specific companies that are defined as the
8    designated competitors for the purposes of
9    this agreement, correct?
10       A.   Yes.
11       Q.   Okay.  Your complaint also has a
12   claim for negligent hiring, training,
13   supervision and retention.  How are you
14   claiming that Harland Clarke was negligent?
15           MS. HAYNES:  Object to the form.
16           THE WITNESS:  Say it one more time.
17       Q.   (By Mr. Wilkes)  How are you
18   claiming that Harland Clarke was negligent?
19       A.   I was discharged.
20       Q.   What your claim is for?
21       A.   Count seven of your complaint is for
22   negligent wanton, hiring, training,
23   supervision and training.  So my question is,

Page 241

1  how was Harland Clarke negligent with respect
2  to any of those things?
3       MS. HAYNES:  Object to the form.
4       THE WITNESS:  They terminated my
5  position.
6       Q.  (By Mr. Wilkes)  By terminating your
7  position?
8       A.  Without cause.
9       Q.  By terminating your position without
10 cause.
11      Any other way you're claiming
12 Harland Clarke was negligent?
13      A.  All I can think of right now.
14      Q.  Do you know what training Steve
15 Moyer received on age discrimination?
16      A.  No.
17      Q.  Do you know what training Steve
18 Moyer received on disability discrimination?
19      A.  I don't know.
20      Q.  Do you know what training Steve
21 Moyer received on age-based harassment?
22      A.  I don't know.
23      Q.  Do you know what training Steve

Page 242

1  Moyer received on disability-based
2  harassment?
3       A.  I don't know.
4       Q.  Okay.  Do you know what training
5  Steve Moyer received on retaliation?
6       A.  No.
7       Q.  Okay.  Do you know what training
8  Sonia Ellison received on age discrimination?
9       A.  No.
10      Q.  Do you know what training Sonia
11 Ellison received on disability
12 discrimination?
13      A.  No.
14      Q.  Do you know what training Sonia
15 Ellison received on age harassment?
16      A.  No.
17      Q.  Do you know what training Sonia
18 Ellison received on disability harassment?
19      A.  No.
20      Q.  Do you know what training Sonia
21 Ellison received on retaliation?
22      A.  No.
23      Q.  Do you know what training anyone at

Page 243

1  Harland Clarke received?
2       A.  I know what I received.
3       Q.  Do you know what training any other
4  employee received?
5       A.  No.
6       Q.  Do you know if any other employees
7  have ever complained that any action or
8  inaction by Steve Moyer was discriminatory?
9       A.  I don't know.
10      Q.  Do you know if any other employees
11 have ever complained that any action or
12 inaction by Steve Moyer was retaliatory?
13      A.  I don't know.
14      Q.  Okay.  Do you know if any other
15 employee has ever complained that Steve Moyer
16 harassed them in some way?
17      A.  I don't know.
18      Q.  Do you know if anyone has ever
19 complained -- if any other Harland Clarke
20 employee ever complained that any action or
21 inaction by Sonia Ellison was discriminatory?
22      A.  I don't know.
23      Q.  Do you know if Harland Clarke has

Page 244

1  ever complained that any action or inaction
2  by Sonia Ellison was harassing?
3       A.  I don't know.
4       Q.  Okay.  Do you know if any Harland
5  Clarke employee has ever complained that any
6  action or inaction by Sonia Ellison was
7  retaliatory?
8       A.  I don't know.
9       Q.  Besides everything we just talked
10 about today and earlier in your deposition,
11 other than what you already told me, are
12 there any other ways that you're claiming
13 that Harland Clarke discriminated against
14 you?
15      A.  Not that I'm aware of.
16      Q.  Other than what we've already
17 discussed, are there any other ways that you
18 claim that Harland Clarke harassed you?
19      A.  Not that I'm aware of.
20      Q.  Okay.  And other than what we
21 already discussed, are there any other ways
22 that you're claiming that Harland Clarke
23 retaliated against you?

Page 245

1    A.  Not that I'm aware of.
2  (Whereupon, Defendant's Exhibit No. 58 was
3  marked for identification and is attached to
4  the original transcript.)
5    Q.  (By Ms. Wilkes)  Okay.  Let me show
6  you Defendant's Exhibit 58.  Have you
7  seen Defendant's Exhibit 58 before?
8    A.  Yes.
9    Q.  It's a summary of your monetary
10  damages prepared by your lawyer.
11    A.  Right.
12    Q.  Other than the -- I understand that
13  some of these damages are ongoing, but other
14  than the types of monitory damages that are
15  listed in Defendant's 58, are there any other
16  types of monetary losses you're claiming as
17  damages?
18    MS. HAYNES:  Object to the form.
19    THE WITNESS:  Life insurance policy.
20    Q.  (By Mr. Wilkes)  Okay.
21    A.  500,000.
22    Q.  500,000?
23    A.  Yes.

Page 246

1    Q.  That was a policy you had through
2  Harland Clarke?
3    A.  Yes.
4    Q.  And you no longer have life
5  insurance --
6    A.  I do, but I don't have that in
7  addition.
8    Q.  You don't have that in addition?
9    A.  Yes.
10    Q.  Who's your life insurance policy
11  with?
12    A.  Alfa.
13    Q.  Alfa.  How much is it for?
14    A.  $250.
15    Q.  $250,000?
16    A.  Yes.
17    Q.  How long have you had that policy?
18    A.  Probably 25 years.
19    Q.  25 years, okay.
20    Any other financial losses that
21  you're claiming as damages that we haven't
22  discussed or that aren't on Exhibit 58?
23    A.  That's all I see at the present

Page 247

1  time.
2    MS. HAYNES:  I mean, you're not
3  asking about compensatory, punitive, or --
4    MS. WILKES:  No, no.
5    MS. HAYNES:  Okay.
6    Q.  (By Mr. Wilkes)  I'm asking if there
7  is some other monitory, financial -- you
8  mentioned financial losses.  I'm asking is
9  there some other financial loss that you're
10  claiming other than obviously lost wages
11  benefits, those types of things?  Like the
12  life insurance policy, anything else like
13  that?
14    A.  It's all I can think of right now.
15    Q.  Okay.  Let me show you Defendant's
16  Exhibit No. 59.  It's some supplemental
17  disclosures provided by your attorney in this
18  case, and I want to go through specifically,
19  starting on page two.  It list people who you
20  believe have knowledge of your claims?
21    A.  Yes.
22    MS. HAYNES:  Are you marking that as
23  an exhibit?

Page 248

1    MS. WILKES:  Yeah, I did.  Didn't I?
2  59.
3    THE WITNESS:  Yeah.
4  (Whereupon, Defendant's Exhibit No. 59 was
5  marked for identification and is attached to
6  the original transcript.)
7    Q.  (By Mr. Wilkes)  Okay.
8    MS. WILKES:  I only have two copies.
9    MS. HAYNES:  Okay.  Is that the
10  supplemental or --
11    MS. WILKES:  It's the Fourth
12  Supplemental Rule 26 Disclosures.
13    Q.  (By Mr. Wilkes)  Okay.  When is the
14  last time you talked to Steve Moyer?
15    A.  January 9th.
16    Q.  January 9th of 2015?
17    A.  Yes.
18    Q.  Okay.
19    A.  Spoke to him?
20    Q.  Yeah.
21    A.  The last time.
22    Q.  You have exchanged e-mails with him
23  after that day?

1    A.  Couple days in there.
2    Q.  Have you spoken with Steve Moyer
3  after February 9th, 2015?
4    A.  No.
5    Q.  Okay.  Other than what's -- there's
6  some topics listed that identified not --
7  what you believe Steve Moyer knows about your
8  claims.
9        My question is, other than what's
10  listed, is there any other knowledge that you
11  think that Steve Moyer has related to your
12  claims in this case?
13        MS. HAYNES:  Object to the form.
14        THE WITNESS:  I don't have any idea.
15    Q.  (By Mr. Wilkes)  Okay.  When is the
16  last time you talked to Sony Ellison?
17    A.  Probably 30th of January.
18    Q.  2015?
19    A.  Yes.
20    Q.  Okay.  Other than what's listed
21  below Ms. Ellison's name as the knowledge he
22  may have related to your claims, are you
23  aware of any other things that Ms. Ellison

1  may have knowledge of related to your claims?
2        MS. HAYNES:  Object to the form.
3        THE WITNESS:  That's all I know.
4    Q.  (By Mr. Wilkes)  Okay.  Debra
5  Corwin, when is the last time you talked to
6  her?
7    A.  Porta Rico, December.
8    Q.  December of 2014?
9    A.  Yes.
10    Q.  Okay.  Other than what's listed as
11  Ms. Corwin 's possible knowledge, is there
12  any other knowledge that you believe
13  Ms. Corwin may have about your claims?
14    A.  I don't know.
15    Q.  Tom Jones, when is the last time you
16  talked to him?
17    A.  Last week.
18    Q.  Last week?
19    A.  Yes.
20    Q.  He's a friend of yours?
21        MS. HAYNES:  Object to the form.
22        THE WITNESS:  Yeah, he is.
23    Q.  (By Mr. Wilkes)  Did you talk to him

1  about this case?
2    A.  No.
3    Q.  What kinds of things do you talk
4  about with him?
5    A.  Support, families and stuff.
6    Q.  Personal?
7    A.  Personal things.
8    Q.  Okay.  Other than what's listed for
9  Mr. Jones, is there any other knowledge that
10  you believe that he has related to your
11  claims?
12    A.  Not that I know of.
13    Q.  When is the last time you talked to
14  Tracy Harley?
15    A.  Over two weeks ago.
16    Q.  Two weeks ago.
17        Did you talk to her about this case?
18    A.  No.
19    Q.  What did you talk to Tracy about?
20    A.  Personal things.
21    Q.  Family?
22    A.  Family, I guess.
23    Q.  For the conversations with Tom, were

1  those on the phone?
2    A.  Yes.
3    Q.  Okay.  And with Tracy, were those
4  phone calls as well?
5    A.  Yes.
6    Q.  Okay.
7    A.  Well, I did have lunch with her one
8  day.
9    Q.  You had lunch with her?
10    A.  She was in Birmingham, she called
11  me.
12    Q.  When was that?
13    A.  Probably first of May.
14    Q.  Of 2017?
15    A.  Yes.
16    Q.  Okay.  How often do you talk to Tom?
17    A.  About once every two or three
18  months.
19    Q.  How often do you talk to Tracy?
20    A.  About the same.
21    Q.  Are you friends?
22    A.  Yes, we are.
23    Q.  Okay.  Other than what's listed for

21 (Pages 249 to 252)

Page 253

1  Tracy, is there anything else that you
2  believe Tracy has knowledge of related to
3  your claims?
4      A.  I don't know.
5      Q.  You don't know?
6      A.  I don't know.
7      Q.  When is the last time you talked to
8  Mandy Bennett?
9      A.  First of May.
10     Q.  First of May.  Of 2017?
11     A.  Yes.
12     Q.  Was that on the phone?
13     A.  In person.
14     Q.  In person.  Was that here in
15  Birmingham?
16     A.  It was in Louisville.
17     Q.  In Louisville?  What was the purpose
18  of meeting her in person?
19     A.  Had lunch.
20     Q.  Had lunch.  Is that something you
21  set up?
22     A.  I set it up, yes.
23     Q.  How often do you talk to Mandy?

Page 254

1      A.  About once every two months.
2      Q.  Once every two or three months?
3      A.  Yes.
4      Q.  Are you friends?
5      A.  Friends, yes.
6      Q.  Do you talk about this case?
7      A.  No, not at all.
8      Q.  What do you talk about?  Personal
9  things?
10     A.  Personal things.
11     Q.  Other than what's listed for
12  Ms. Bennett, is there any other knowledge
13  that you believe she has about your claims?
14     A.  Not that I know of.
15     Q.  Okay.  When is the last time you
16  talked to Maria Robinson?
17     A.  Probably six months ago.
18     Q.  Is that on the phone?
19     A.  On the phone, yes.
20     Q.  Okay.  How often do you talk to her?
21     A.  Once every six months or so.
22     Q.  Once every six months or so.
23         Are you friends with her?

Page 255

1      A.  Somewhat.
2      Q.  Somewhat.  Not as close as the
3  others?
4      A.  Not as close as the others.
5      Q.  Do you talk to her about this case?
6      A.  No.
7      Q.  Just talk about personal things?
8      A.  Yes.
9      Q.  Other than what's listed for
10  Ms. Robinson, is there any other knowledge
11  that you believe she had about your claims?
12     A.  Not that I know of.
13     Q.  When is the last time you talked to
14  Brett Cox?
15     A.  Probably December of '14.
16     Q.  December of '14?  He didn't work --
17  he didn't work directly with him, did you?
18         MS. HAYNES:  Object to the form.
19         THE WITNESS:  In the same division.
20     Q.  (By Mr. Wilkes)  He was in your
21  division?
22     A.  (Witness nods head.)
23     Q.  I see you have listed that Mr. Cox

Page 256

1  assumed many of your job duties?
2      A.  Yes.  Larry Feinberg and Greg Gould.
3      Q.  Larry Feinberg and Greg Gould.
4  Okay.  I think we talked about that in your
5  first deposition, so we won't go through
6  that.
7         Other than what is listed for
8  Mr. Cox, is there any other knowledge that
9  you believe he has related to your claims?
10     A.  Not that I know of.
11     Q.  Okay.  When is the last time you
12  talked to Larry Feinberg?
13     A.  December '14.
14     Q.  Okay.  Other than what's listed for
15  Feinberg, is there any other knowledge you
16  believe he has --
17     A.  No.
18     Q.  -- related to your claims?
19     A.  No.
20     Q.  When is the last time you talked to
21  Greg Gould?
22     A.  December '14.
23     Q.  Okay.  Other than what's listed for

22 (Pages 253 to 256)

Page 257

1    Mr. Gould, is there any other knowledge that
2    you believe that he has related to your
3    claims?
4        A.  Not that I know of.
5        Q.  All right.  I see you have
6    Dr. Nichols, Dr. Pearson, Dr. Atchison, and
7    Dr. Farley listed, are there any other
8    doctors from who you received treatment since
9    2012 that aren't listed?
10       A.  No.
11       Q.  Okay.  Is there anyone else that you
12   believe has knowledge of your claims that is
13   not listed in these disclosures?
14       A.  I don't know.
15       Q.  Not that you know of?
16       A.  Not that I know of.
17       Q.  Okay.  Other than the people we
18   discussed, are there any other current or
19   former Harland Clarke employees that you've
20   talked to since your termination?
21       A.  No.
22       Q.  What did you do to get ready for
23   this deposition?

Page 258

1        A.  Just went back read over this book.
2        Q.  Okay.  You reviewed some documents?
3        A.  This book.
4        Q.  Okay.
5        MS. WILKES:  Are those the documents
6    you produced, Alicia?
7        MS. HAYNES:  Yes.
8        MS. WILKES:  Okay.
9        Q.  (By Mr. Wilkes)  Did you meet with
10   Ms. Haynes?  I don't want you to tell me what
11   you talked about.
12       A.  Yes.
13       Q.  Do you have any documents that
14   support your claims against Harland Clarke
15   that you have not given to Ms. Haynes?
16       A.  No, not that I'm aware of.
17       MS. WILKES:  And Alicia, that time
18   -- we talked about it at the last deposition,
19   the timeline he was using to refresh his
20   recollection?
21       MS. HAYNES:  Did you bring that?
22       THE WITNESS:  I did.
23       Q.  (By Mr. Wilkes)  I probably won't

Page 259

1    ask you any questions about it.
2        MS. WILKES:  Do you want to mark
3    this as an exhibit or just produce it to me
4    later?
5        MS. HAYNES:  Doesn't matter.  I can
6    produce it to you later.
7        MS. WILKES:  Okay.  We'll get it
8    later.
9        Q.  (By Mr. Wilkes)  All right.  Have
10   you told me every fact that you're aware of
11   supporting your claim that you were
12   discriminated against on the basis of your
13   age?
14       A.  Yes.
15       Q.  Have you told me every fact that
16   you're aware of that supports your claim that
17   you were harassed on the basis of your age?
18       A.  Yes.
19       Q.  Have you told me every fact you're
20   aware of that supports your claim you were
21   discriminated against on the basis of a
22   disability?
23       A.  Yes.

Page 260

1        Q.  Have you told me every fact that
2    you're aware of supporting your claim that
3    you were harassed on the basis of a
4    disability?
5        A.  Yes.
6        Q.  Okay.  Have you told me every fact
7    that you're aware of supporting your claim
8    you were discriminated against on the basis
9    of a perceived disability?
10       A.  Yes.
11       Q.  Have you told me every fact that
12   you're aware of supporting your claim you
13   were harassed on the basis of a perceived
14   disability?
15       A.  Yes.
16       Q.  Have you told me every fact you're
17   aware of supporting your claim you were
18   retaliated against?
19       A.  Yes.
20       Q.  Have you told me every fact that
21   you're aware of supporting your claim that
22   Harland Clarke intentionally inflicted
23   emotional distress on you?

Page 261

1      A.  Yes.
2      Q.  Have you told me every fact that
3  you're aware of supporting your claim that
4  Harland Clarke invaded your privacy?
5      A.  Yes.
6      Q.  Have you told me every fact that
7  you're aware of supporting your claim that
8  Harland Clarke placed you in a false light?
9      A.  Yes.
10     Q.  Okay.  Have you told me every fact
11  you're aware that supports your claim that
12  Harland Clarke interfered with your
13  contractual or business relations?
14     A.  Yes.
15     Q.  Last one.  Do you need a break?
16     A.  Let me get a little water.
17     Q.  Okay.
18     A.  Okay, go.
19     Q.  Last question, have you told me
20  every fact that you're aware of supporting
21  your claim that Harland Clarke was negligent?
22     A.  Yes.
23     Q.  Okay.

CERTIFICATE

STATE OF ALABAMA        )
                        ) ss:
COUNTY OF MARSHALL       )

        I hereby certify that the above and
foregoing proceeding was taken down by me by
stenographic means, and that the content
herein was produced in transcript form by
computer aid under my supervision, and that
the foregoing represents, to the best of my
ability, a true and correct transcript of the
proceedings occurring on said date at said
time.
        I further certify that I am neither
of counsel nor of kin to the parties to the
action, nor am I in anywise interested in the
result of said cause.

        /s/Mallory B. Gray
        Mallory B. Gray, CCR
        CCR #558, Expires 9/30/2017
        Commissioner for the
        State of Alabama at Large
        Notary Public, Expires 02/19

Page 262

1      MS. WILKES:  That's all I have.
2
3      FURTHER DEPONENT SAITH NOT

Sincerely,
Freedom Court Reporting

# FREEDOM
# COURT REPORTING

2031 Shady Crest Drive
Hoover, AL 35216
205.397.2397   877.373.3660
readandsign@freedomreporting.com

## WITNESS CERTIFICATION

I, *Robert B. Collier, Jr.*, said witness, do hereby acknowledge that I have read the foregoing transcript of my testimony and that it is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the attached errata sheet.

*Robert B. Collier J.*
Witness Signature above:

Printed name: *Robert B. Collier, Jr.*

Sworn to and subscribed before me, this
the *7th* day of *June*, 2017.

*Kristi Maria Scoggins*
Notary Public
My Commission expires: *8/3/2020*

Deposition of:        **Robert Birchfield Collier Jr.-212645**
Taken:               **5/15/2017**
Court Reporter:     **Donna Winters**

**TRANSCRIPT ERRATA SHEET**
Deposition of:        **Robert Birchfield Collier Jr.-212645**
Taken:               **5/15/2017**
Court Reporter:     **Donna Winters**

| Page #: | Line #: | Correction/Reason for change: |
|---|---|---|
| 20 | 2 | change "and I had" to "I didn't have"/misunderstood answer |
| 36 | 23 | change "Randy" to "Mandy"/misunderstood answer |
| 59 | 6 | add "computer checks to answer"/omitted from answer |
| 62 | 16 | change "write" to "right "/grammatical error |
| 63 | 2 | change "write" to "right"/grammatical error |
| 67 | 12 | change "We" to "They"/misunderstood answer |
| 87 | 2 | change "called back in" to "call lasted"/misunderstood answer |
| 93 | 1 | change "be there" to "have a job there"/misunderstood answer |
| 95 | 7 | change "revenge" to "crisis"/misunderstood answer |
| 110 | 17&18 | change "You" to "We"/misunderstood answer |
| 157 | 18 | change "Yes" to "No, December" /misunderstood question |

| 159 | 23 | change "Yes" to "No, 3 account executives"/misunderstood question |
| 162 | 5 | change "John" to "Jon"/  misspell |
| 163 | 5 | change "John" to "Jon"/ misspell |
| 164 | 11 | change "Perrino" to "Paraino"/misspell |