# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ROBERT COLLIER, JR.,** | } | |
| | } | |
| **Plaintiff** | } | |
| | } | |
| **v.** | } | **Case No.: 2:15-cv-01006-MHH** |
| | } | |
| **HARLAND CLARKE CORP.,** | } | |
| | } | |
| **Defendants.** | } | |
| | } | |

## <u>MEMORANDUM OPINION</u>

In this employment action, plaintiff Robert Collier, Jr. contends that his former employer, Harland Clarke Corp., terminated his employment and retaliated against him because of his age and disability in violation of the Age Discrimination in Employment Act, 29 U.S.C.§ 621 *et seq.*; the Alabama Age Discrimination in Employment Act, Ala. Code § 25-1-20; and the Americans With Disabilities Act, 42 U.S.C. § 12102. (Doc. 1, pp. 1, 8–13, ¶¶ 33–58). Mr. Collier also asserts a state law claim for invasion of privacy. (Doc. 1, pp. 15–19, ¶¶ 67–70).[1] Pursuant

---

[1] In his complaint, Mr. Collier asserted additional state law claims for intentional infliction of emotional distress; interference with business or contractual relations; and negligent or wanton hiring, training, supervision, and retention. (Doc. 1, pp. 13-15, ¶¶ 59-66; Doc. 1, pp. 16-19, ¶¶ 71-83). In his response in opposition to Harland Clarke's summary judgment motion, Mr. Collier has indicated that he wishes to voluntarily dismiss these claims. (Doc. 54, p. 37). The Court will dismiss the claims. Harland Clarke believes that Mr. Collier has asserted claims for "discrimination and harassment" under the ADEA, AADEA (Count One) and "discrimination

to Rule 56 of the Federal Rules of Civil Procedure, Harland Clarke argues that Mr. Collier has identified no genuine issue of material fact and that the company is entitled to judgment as a matter of law as to all of Mr. Collier's claims. (Doc. 47). Also before the Court is Mr. Collier's motion to compel or, in the alternative, for *in camera* review of documents that Harland Clarke declined to produce in discovery based on the company's assertion of attorney-client privilege and/or the attorney work-product doctrine. (*See* Doc. 37; Doc. 38). Harland Clarke has filed a motion to quash with respect to subpoenas that Mr. Collier issued to Wells Fargo, SunTrust Bank, Berkshire Bank, and David Newton. (Doc. 39). The Court addresses all of these motions in this opinion.

## I. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the

---

and harassment" under the ADA (Count Two). Harland Clarke moved for summary judgment on these claims. (Doc. 48, pp. 25-27). In his summary judgment brief, Mr. Collier states that he did not intend to assert stand-alone harassment or hostile work environment claims and that he "wishes to correct the record." (*See* Doc. 54, pp. 28–29). Any such claims are dismissed.

motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "'Genuine disputes [of material fact] are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record.'" *Evans v. Books-A-Million*, 762 F.3d 1288, 1294 (11th Cir. 2014) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)).

"A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if a court doubts the veracity of the evidence, a court cannot make credibility determinations; that is the work of jurors. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). Accordingly, the Court presents the summary judgment evidence in the light most favorable to Mr. Collier and draws all inferences in his favor.

## II.    Factual Background

Harland Clarke provides products and services to financial institutions.  The company has gone through a number of changes in ownership over the years.  In 1982, Interchecks, a predecessor company of Harland Clarke, hired Mr. Collier.  (Doc. 46-1, p. 6, tpp. 17–18).  Clarke American acquired Interchecks and later merged with Harland Clarke.  (Doc. 46-1, pp. 6, 8, tpp. 17–18, 26).  Mr. Collier remained with the company through these transitions.  In 2003, Mr. Collier left Harland Clarke to work for a competitor.  (Doc. 46-1, p. 6, tp. 19).

In July of 2004, Harland Clarke rehired Mr. Collier as the Director of Partnership Development II—MICR (magnetic ink character recognition) Express, in Harland Clarke's Forms Division.  (Doc. 46-1, pp. 8, 10, tpp. 26–28, 33).  "Forms" refers to paper products such as checks, ledgers, bank receipts, and other types of forms used by banks and other businesses.  (Doc. 46-1, p. 10, tpp. 33–34; Doc. 46-11, p. 13, tpp. 47–48).  As Harland Clarke's Forms Director (his job function; not his title (Doc. 46-8, p. 32)), Mr. Collier coordinated and directed all sales activities for his assigned sales region.  (Doc. 46-1, p. 10, tp. 36).

Toward the end of Mr. Collier's career with Harland Clarke, the Forms Division began selling commercial print.  (Doc. 46-1, p. 6, tp. 18).  Commercial print includes high-gloss posters, banners, 3D prints, tri-fold documents, and custom cut paper products with artwork and text supplied by an advertising agency

or created by Harland Clarke's Graphic Design Department. (Doc. 46-11, p. 53, tpp. 205–06). Mr. Collier was part of the team that developed Harland Clarke's commercial print product line called Print Solutions. (Doc. 46-11, p. 53, tpp. 207–08). Six months before Mr. Collier's termination, the Forms Division started offering commercial print products. (Doc. 46-1, p. 6, tpp. 33–34).

For ten years, Mr. Collier worked without incident as Harland Clarke's Forms Director. In 2014, Mr. Collier began reporting to Steve Moyer, Senior Vice President of the Community Markets Division. (Doc. 46-1, p. 12, tp. 43; Doc. 46-11, p. 3, tp. 7; Doc. 46-11, p. 12, tp. 42; Doc. 46-11, p. 45, tp. 175; Doc. 46-21, p. 3, ¶ 4). Mr. Moyer reported to Rick Ebrey, President of Payments Division. (Doc. 46-11, p. 3, tp. 7; Doc. 46-11, p. 7, tp. 21). Mr. Moyer spearheaded a restructuring of the Forms Division.

Under Mr. Moyer's direction, in April of 2014, Harland Clarke formed a new sales group called the Key Markets Group. The group's target clients were large community banks and credit unions. (Doc. 46-11, pp. 15–16, tpp. 56–58). Harland Clarke created two director positions for the Key Markets Group. (Doc. 46-11, p. 17, tp. 62). Harland Clarke hired Brent Cox and Skip Thompson, directors from another Harland Clarke division, to serve as the directors for the Key Markets Group. (Doc. 46-11, pp. 16–17, tpp. 57–62). Mr. Collier did not

apply for either director position.[2]

Mr. Moyer testified that his business strategy for growing commercial print is captured in a PowerPoint. (Doc. 46-11, p. 57, tpp. 223–24; Doc. 46-11, p. 58, tpp. 228). The PowerPoint is not in the record. Mr. Collier worked with Mr. Moyer and Greg Gould to create the PowerPoint that described Print Solutions, the name given to Harland Clarke's venture into commercial print. (Doc. 46-11, p. 53, tp. 208). As Mr. Moyer testified:

> [The PowerPoint] would have been in collaboration with Marketing, myself, Bob was in -- involved for sure. We had some experience with commercial print as we looked at an acquisition a few years prior. We used industry data research through marketing, and of course Greg Gould would have been a part of that.

(Doc. 46-11, p. 53, tp. 208). David Newton, an outside print broker, assisted in "understanding how to bridge the gap between the market and getting print to a vendor." (Doc. 46-11, p. 54, tpp. 209–10). Other participants included a man from American Litho and possibly Deborah Corwin from Harland Clarke's Marketing Department. (Doc. 46-11, p. 73, tp. 287).

Neither Mr. Cox nor Mr. Thompson who Harland Clarke hired to lead the Key Markets Group was part of the Print Solutions team. The record does not indicate whether either director had prior experience with commercial print

---

[2] One of the Key Markets Group directors was responsible for Texas and surrounding states, and the other director was based in Washington D.C. and was responsible for states along the East Coast. (Doc. 46-11, p. 20, tpp. 75–76).

products.

The Key Markets Group rolled out Print Solutions as a new product for Harland Clarke in May or June of 2014. (Doc. 46-11, p. 29, tpp. 110-11). The Forms Division also began selling commercial print that year. (Doc. 46-1, p. 6, tpp. 33–34). Mr. Collier, as part of the Print Solutions team, had no objection to offering commercial print products to customers from the Forms Division. But Mr. Collier did raise questions about his team's ability to use marketing credits when selling commercial print. (Doc. 46-12, pp. 16-17).[3] Mr. Collier developed a two-year plan which incorporated commercial print into the overall goals for the Forms Division.

The Print Solutions team had a meeting in Birmingham in the fall of 2014. (Doc. 46-11, p. 73, tp. 286). The meeting was designed to provide "more education on commercial print" for the members of the Print Solution team. (Doc. 46-11, p. 73, tp. 286). Mr. Moyer recalled that during this meeting Mr. Collier was using a "customized . . . wooden cane[.]" (Doc. 46-11, p. 72, tp. 283).

---

[3] According to Mr. Moyer a marketing credit is "an amount of money set aside . . . [in Harland Clarke's] payment agreements with banks[.]" (Doc. 46-11, p. 31, tp. 118). A bank could "strategically utilize those funds going forward with [Harland Clarke]; and how ever that [agreement] may have been written might allow for [the bank to use the credit on] commercial print." (Doc. 46-11, p. 31, tp. 119). Although Mr. Moyer's deposition testimony is unclear, emails relied upon by Mr. Collier indicate that marketing credits were available for Marketing Services to use, but the Forms Division could not use the credits. (*See* Doc. 46-12, p. 14) ("Bill opted to work with Marketing Services for Berkshire Bank so [Harland Clarke] credits could be utilized."); (Doc. 46-12, p. 15) ("Marketing Services receives opportunities only because [Harland Clarke] credits can be used."); (Doc. 46-12, p. 16) (Mr. Collier asking Mr. Moyer if the 2015 marketing credits policy will "apply to marketing services as well?").

Mr. Moyer decided to eliminate Mr. Collier's position after the Print Solutions team meeting in Birmingham. (Doc. 46-11, p. 73, tpp. 285-86); (Doc. 46-11, p. 54, tp. 211). Mr. Moyer discussed the decision with Mr. Ebrey. (Doc. 46-11, pp. 65-66, tpp. 256-57); (Doc. 46-11, p. 7, tp. 21). In November of 2014, with assistance from Sonia Ellison from Harland Clarke's Human Resources Department, Mr. Moyer completed a RIF Analysis Worksheet concerning Mr. Collier. (Doc. 46-11, pp. 54-55, tpp. 212-13); (Doc. 46-8, p. 32). Mr. Moyer stated that he provided most of the information on the worksheet. (Doc. 46-11, pp. 54-55, tpp. 212-13). Mr. Moyer believed that Ms. Ellison handled the typing. (Doc. 46-11, pp. 54-55, tpp. 212-13).

According to the worksheet, Mr. Collier had no EEOC claims and ten years of service as the Forms Director/Director Sales II-MICR. (Doc. 46-8, p. 32). In the "Special Circumstances" section, Mr. Moyer identified three factors supporting the RIF: Mr. Collier's "skill and expertise is in the area of Forms and not Commercial Print;" (Doc. 46-11; p. 54; tp. 212); (Doc. 46-8, p. 32); Mr. Collier "is the only person in the Director Sales II and Director II-MICR position;" (Doc. 46-11, pp. 54-55, tpp. 212-13); (Doc. 46-8, p. 32); and Mr. Collier "[d]oes not have direct business relationships with large community bank accounts/clients." (Doc. 46-11, p. 55, tpp. 213); (Doc. 46-8, p. 32). Mr. Moyer offered the following ostensible business justification for the reduction:

Harland Clarke's MICR Form business has been on a continuous decline. Unfortunately, it is unlikely MICR Forms will transform in to [sic] a revenue generating line of business in the future for us. As a result of the decline in FORMS' revenue, we have developed a business plan to create a new growth division called Print Solutions. Print Solutions will focus on commercial print which has [a] high probability of creating new business growth and driving revenue for Harland Clarke.

(Doc. 46-8, p. 32).

Harland Clarke does not have a reduction in force policy. (Doc. 46-13, p. 27, tpp. 103-04). Harland Clarke labelled Mr. Collier's termination as a "reduction in force," but it was a RIF of only one person. (Doc. 46-11, p. 18, tpp. 66-67; Doc. 46-11, p. 43, tp. 166).

Mr. Collier attributes the RIF to an event in the fall of 2014 at which Mr. Moyer saw Mr. Collier using a cane. Mr. Collier first used a cane in 2012 after he underwent back surgery. (Doc. 46-1, p. 34, tpp. 129–130; Doc. 46-1, p. 33, tp. 133; Doc. 46-1, p. 36, tp. 139). After the 2012 surgery, Mr. Collier used the cane for a few months from "about August of [20]12 until December of [20]12." (Doc. 46-1, p. 36, tp. 139). After a second surgery in March of 2014, he began using the cane regularly. (Doc. 46-1, p. 36, tpp. 139–40). Mr. Collier also took three months of short-term disability leave under Harland Clarke's disability plan. (Doc. 46-1, p. 24, tp. 92).

In the weeks preceding the "reduction in force," Mr. Moyer and several co-workers made remarks concerning Mr. Collier's health. For example,

• Mr. Moyer occasionally asked Mr. Collier how he was feeling and/or how his back was doing.  (Doc. 46-1, p. 40, tpp. 156–57).

• In late 2014, Debra Corwin, Vice President of Marketing who participated in the development of Print Solutions, told Maria Robinson, an Account Executive, that Harland Clarke needed to "get rid" of Mr. Collier.  (Doc. 46-1, p. 29, tpp. 110–11).  Mr. Collier testified that Tom Jones told him about Ms. Corwin's comments.  (Doc. 46-1, p. 51, tp. 197).  Mr. Jones denies that he heard Ms. Corwin make this comment but states that he learned of Ms. Corwin's comment from two sales team members, Mandy Bennett and Tracy Harley, who overheard the statement.  (Doc. 46-19, p. 17, tp. 63).

• At a December 2014 conference in Puerto Rico, Mr. Ebrey asked Mr. Collier how he was doing and told Mr. Collier that "it looked like he was struggling to get around."  (Doc. 46-1, p. 41, tp. 157).

• At the December 2014 conference, Dan Singleton, Harland Clarke's President, said to Mr. Collier: "Don't get up.  I know you had back surgery."  (Doc. 46-1, p. 41, tp. 158).

• At the December 2014 conference, Ms. Corwin told Mr. Collier "I can barely hear you" and "it looks like you're struggling to get around."  (Doc. 46-1, pp. 29, 41, tpp. 110, 159).

• At the December 2014 conference, Sonia Ellison, Senior Human Resources

Generalist, asked Mr. Collier: "Do you wish you had taken the extra 30 days off?" (Doc. 46-1, p. 41, tp. 160).

•At various times, other coworkers, clients, or third parties asked Mr. Collier how he was feeling or how his back was doing. (*See* Doc. 46-1, pp. 42–43, tpp. 161–166).

Mr. Moyer testified that he made the decision to eliminate Mr. Collier's position because sales in the Forms Division were declining. (Doc. 46-11, p. 13, tp. 47; Doc. 46-11, p. 26, tp. 98; Doc. 46-11, p. 44-45, tpp. 170–73; Doc. 46-11, p. 56, tpp. 219–22). Mr. Moyer attributed the decline to the banking industry's shift from paper products (such as cash tickets, general ledger tickets, deposit slips, and teller receipts) to digital transactions. (Doc. 46-11, p. 26, tpp. 99–100; Doc. 46-1, p. 10, tp. 33). There is data in the record that suggests that the financial outlook for forms was not as dire as Mr. Moyer contends. (Doc. 46-11, p.45, tpp. 173-74); (Doc. 49-23, p. 2 – filed under seal); *see also* (Doc. 49-22, p.11 and Doc. 49-22, p. 15 – filed under seal) (indicating that between 2013 and 2014, total revenue within the Forms Division increased by 37% from $35,433,520 to $57,501,786); (Doc. 49-22, p. 15 – filed under seal).[4]

---

[4] Mr. Moyer's testified that an accounting change skewed Harland Clarke's financial reporting. (Doc. 46-11, p. 47, tpp. 182–83). Johnna Massie, a Financial Control Manager for MICR Express, provided revised reports for the Forms Division for 2013-14 and identified several errors in the reports discussed during Mr. Moyer's deposition. (Doc. 46-22, pp. 2-6, ¶¶ 1–7). The relevant financial information is the information that Mr. Moyer considered when he made the decision to terminate Mr. Collier's employment.

Mr. Moyer originally planned to discuss the RIF with Mr. Collier on December 19, 2014; Mr. Moyer anticipated that Mr. Collier's termination would be effective on December 31, 2014. (Doc. 46-11, p. 75, tp. 296). The termination date was delayed ostensibly because of the holidays but mostly because in December 2014, Harland Clarke suddenly had to terminate one of the two directors in the Key Markets Group, and Mr. Moyer was planning to move the employees who reported to Mr. Moyer to the Key Markets Group. (Doc. 46-11, p. 18, tpp. 65-68; Doc. 46-11, pp. 75-78).

During a conference call on January 9, 2015, Mr. Moyer and Ms. Ellison told Mr. Collier that his position was being eliminated, effective January 30, 2015. (Doc. 46-1, p. 23, tpp. 85-86).[5] It was the same day that Mr. Collier and two other employees with the Forms Division landed a five-year forms contract with SunTrust Bank. (Doc. 46-12, pp. 19-20). At the time, Mr. Collier was 61 years old. (*See* Doc. 1-1, p. 3). Mr. Collier asked Mr. Moyer if he could "drop into a sales position and keep selling forms and commercial print[.]" (Doc. 46-1, p. 23, tp. 88). Mr. Moyer told Mr. Collier that "there wasn't a position available." (Doc.

---

[5] Harland Clarke extended Mr. Collier's effective termination date from January 30, 2015, to February 9, 2015. (Doc. 46-1, p. 26, tp. 98). Ms. Flanders testified that she believed the date was extended so that Mr. Collier could pursue a claim for short term disability. (Doc. 46-16, p. 37, tp. 144). Mr. Collier stated that he did not know why Harland Clarke extended the termination date, though he suspected it was extended so that his last day of employment would be at the end of a pay period. (Doc. 46-1, p. 26, tp. 98); (*see also* Doc. 46-10, p. 22) (Mr. Collier's last day worked was January 30, 2015, but last payroll was February 9, 2015).

46-1, p. 23, tp. 88). Ms. Ellison told Mr. Collier that he would be considered for any open position for which he applied. (Doc. 46-1, p. 23, tpp. 87–88).

During the January 9, 2015 call, neither Mr. Moyer nor Ms. Ellison told Mr. Collier that one of the director positions in the Key Markets Group was available. Mr. Moyer testified at one point that Harland Clarke posted the vacancy before he notified Mr. Collier of the reduction in force. (Doc. 46-11, p. 18, tpp. 67–68). Mr. Moyer also testified that when he and Ms. Ellison had their conversation with Mr. Collier, Harland Clarke had not advertised the vacant director position. (Doc. 46-11, p. 70, tp. 273–74).

Mr. Moyer testified that at some point in early January 2015, he approved the job posting for the Key Markets Group director vacancy, and Harland Clarke advertised the vacancy. (Doc. 46-11, p. 70, tp. 274; Doc. 46-11, p. 18, tp. 47). Gregory Gould testified that Harland Clarke posted the open position internally and externally in December 2014. (Doc. 46-23, p. 2, ¶¶ 2, 4). Mr. Gould interviewed the three candidates who applied and recommended to Mr. Moyer that Harland Clarke hire Larry Feinberg. (Doc. 46-23, p. 3, ¶ 5). Mr. Feinberg filled the vacancy, but his hire date does not appear in the record. (Doc. 46-11, p. 21, tp. 80; Doc. 46-11, p. 24, tp. 90; Doc. 46-13, p. 58, tp. 227).

Regardless of when Harland Clarke hired Mr. Feinberg, the company had a vacant director position available in the Key Markets Group when Mr. Moyer

notified Mr. Collier of the reduction in force. (Doc. 46-11, p. 18, tpp. 67–68). Mr. Moyer testified that he "had no reason not to tell [] or tell" Mr. Collier about the vacant director position because "[w]e use the posting system as the communication channel for those positions." (Doc. 46-11, p. 70, tp. 275). Although Harland Clarke contends that it posted the director vacancy, the company has not been able to provide evidence of the posting or the starting date for Mr. Feinberg. (Doc. 54, pp. 9–10, ¶ 13). Harland Clarke also has not identified a witness who did the posting. Witnesses who testified about the posting have indicated that someone else was responsible or that they do not know if the posting occurred. (*See* Doc. 46-11, p. 18, tp. 68; Doc. 46-13, p. 58, tpp. 226–27; Doc. 46-7, pp. 35–36, tpp. 136–37).

After receiving notice of his termination, Mr. Collier contacted Unum, Harland Clarke's disability plan administrator, to pursue a claim for short-term disability benefits. (*See* Doc. 46-10, p. 5). Mr. Collier asked Ms. Ellison whether he qualified for short or long term disability through Harland Clarke's disability plan. (Doc. 46-1, pp. 24–25, tpp. 91–93). Initially, Ms. Ellison told Mr. Collier that he would not be eligible for disability benefits because his position was being eliminated, and he would not have a job to return to following disability leave. (Doc. 46-1, p. 25, tp. 94). Ms. Ellison testified that she later discussed the issue with Ms. Flanders and learned that Mr. Collier was in fact eligible to apply for

disability benefits.  Ms. Ellison relayed this information to Mr. Collier in a January 30, 2015 email.  (Doc. 46-7, pp. 40, 66, tpp. 153–55, 259; Doc. 46-4, pp. 79–80).

Ms. Ellison also mailed a Benefits Summary Sheet to Mr. Collier.  (Doc. 46-8, p. 45; Doc. 46-1, p. 24, tp. 89).  Ms. Ellison generated the sheet on January 10, 2015.  (Doc. 46-8, p. 45).  Ms. Ellison understood that the severance calculation on the summary sheet came from a spreadsheet generated by the Human Resources Department.  (Doc. 46-7, p. 53, tp. 207).  Part of the sheet states:

**You will receive the following compensation and benefits on your final paycheck regardless of whether you sign the Company's standard separation agreement:**

- You will receive **26** weeks of your severance pay ($60,823.18) less governmental withholdings and authorized deductions[] will be paid on the Company's next regular pay date after you have returned your signed separation agreement.

- Payout for any accrued, unused 2015 PTO hours in accordance with company policy.

- Any unemployment compensation is determined through the State Workforce Commission.

(Doc. 46-8, p. 45) (emphasis in original).  The sheet also states:

*This sheet is confidential and prepared for you.  Please note that the information contained in this document is effective as of the date printed (1.10.15) and is subject to change at any time based upon policy changes related to administration of severance benefits. Information contained on this sheet is provided solely as a summary. The separation document is the governing instrument and should be reviewed for specific information. Should you have any questions regarding this summary or feel that the information is not accurate, please contact Sonia Ellison.*

(Doc. 46-8, p. 45) (emphasis in original).

Ms. Flanders testified that the severance information in the benefits sheet is incorrect because Mr. Collier received more than two weeks' notice of his termination. (Doc. 46-13, p. 52, tp. 202). Ms. Flanders explained:

> [I]f we had not given two weeks['] notice to Mr. Collier, we would have given him two weeks of his severance up front and his final pay. If we give him two weeks or more notice of -- of his job elimination, he would not have received any of his severance in his final pay, and he would have received the full severance payment after we received his Separation Agreement, signed Separation Agreement.

(Doc. 46-13, p. 52, tpp. 203–04).

After learning about his termination, on January 25, 2015, Mr. Collier filed a charge of discrimination with the Equal Employment Opportunity Commission, checking the boxes for age and disability discrimination. (Doc. 1-1, pp. 1, 3–5). Mr. Collier did not make an internal complaint about disability or age discrimination before filing his charge. With respect to disability discrimination, Mr. Collier asserted that Harland Clarke was aware of his back surgeries in 2012 and 2014 and the complications that he experienced, including using a walking stick and walking with a limp. (Doc. 1-1, pp. 3–4). With respect to age discrimination, Mr. Collier asserted that he was 61 years old when he filed the charge, and he had worked for Harland Clarke for 28 years. (Doc. 1-1, p. 3). Mr. Collier indicated that Harland Clarke had never disciplined him. (Doc. 1-1, p. 3). Mr. Collier represented that he always received good evaluations and raises. (Doc. 1-1, p. 3). Mr. Collier did not check the box for retaliation on the face of the

charge or mention retaliation in his factual summary, but he did make factual assertions about disability benefits and severance pay:

> I asked about applying for short term disability or long term disability since that is a benefit within the company for which I would qualify. Ms. Ellison refused my request, stating that I did not qualify because I did not have a job after the 90-day period to return to. I also asked to extend the time of my termination so I could find other employment and not lose my health insurance, but my request was also refused. I have been told that I would be entitled to a six (6) month severance, but only if I signed a release that would waive all rights to file a charge with the EEOC for age and disability discrimination.

(Doc. 1-1, p. 4).

While Mr. Collier's EEOC charge was pending, Ms. Ellison and Harland Clarke's senior benefits analyst, Melissa Sandoval, communicated with Unum concerning Mr. Collier's claim for disability benefits. (*See* Doc. 46-10, pp. 7–21). Ms. Ellison testified that she became involved "[t]o make sure the process [was] going through, and I was asked by Legal to find out the status of whether or not it was approved or whether or not it was denied." (Doc. 46-7, p. 66, tp. 260). In one message, Ms. Ellison stated, "Sorry to be so pushy on this one. We have an EEOC claim and we need to reply quickly. If possible, can Unum review this claim as soon as possible. Please let me know if this claim has been approved or denied." (Doc. 46-10, p. 8); (*see also* Doc. 46-9, p. 50) ("ER said that EE has gotten a lawyer for EEOC and would like to move as fast as possible").

On February 12, 2015, Harland Clarke's corporate counsel, Danielle

Hargrove, participated in a conference call with Ms. Ellison and Unum representative Chris Gillogly concerning Mr. Collier's claim for benefits. (*See* Doc. 46-10, pp. 22–23). Mr. Gillogly noted that during this call, Ms. Ellison apologized for "blowing up" voicemail but indicated that Harland Clarke wanted a resolution of Mr. Collier's claim "as quickly as possible." (Doc. 46-10, p. 22). Ms. Hargrove asked Mr. Gillogly when Harland Clarke could expect a decision, what was causing the delay, and why Unum needed additional medical information, given that Mr. Collier's treating physician had indicated that Mr. Collier was unable to work. (Doc. 46-10, p. 22).[6]

Mr. Gillogly explained that if the evidence supported Mr. Collier's restrictions and limitations, then Unum would grant the claim. (*See* Doc. 46-10, p. 23). If the evidence did not support the restrictions and limitations, then Unum would "propose an adverse [decision] but HC [Harland Clarke] could advise us to proceed [with] approval regardless." (Doc. 46-10, p. 23). Because the short-term disability plan was self-insured, Harland Clarke had the option to "approve benefits outside the plan . . . without evaluating disability" for Mr. Collier. (Doc.

---

[6] Mr. Collier's physician stated on January 20, 2015, "I do not feel that [Mr. Collier] is able to return to work. . . . I would recommend that he retire at this time on disability." (*See* Doc. 49-12, p. 2 – filed under seal). On April 23, 2015 and on May 13, 2015, Mr. Collier's physician again stated "I would not recommend [that Mr. Collier] return[] to his previous job." (*See* Doc. 49-14, p. 2; Doc. 49-14, p. 2 – filed under seal). In July of 2015, Mr. Collier was diagnosed with Parkinson's Disease. (Doc. 46-1, p. 30–31, tpp. 116–17). Mr. Collier testified that Parkinson's Disease was a misdiagnosis and that his diagnosis was later changed to progressive supranuclear palsy. (Doc. 46-1, p. 30, p. 116).

46-10, p. 22).  But Mr. Gillogly recommended against exercising that option "as it might have a great impact to the EE [employee] should the claim transition to LTD [long term disability]."  (Doc. 46-10, p. 22).  Unum denied Mr. Collier's claim for short-term disability benefits.  (*See* Doc. 46-1, p. 26, tpp. 97–98).  Harland Clarke did not override that decision.  (*See* Doc. 46-16, p. 35, tp. 135).[7]

On February 17, 2015, Mr. Collier filed a claim for social security disability benefits.  (Doc. 46-1, pp. 37–38, tpp. 144–145); (Doc. 49-15, p. 2 – filed under seal); (Doc. 53-1).  Mr. Collier subsequently withdrew his claim because he planned to return to work, but he filed a second claim on or about March 1, 2015.  (Doc. 46-1, pp. 38–39, tpp. 147–49).  The Social Security Administration awarded Mr. Collier benefits on March 23, 2015, with a disability onset date of February 9, 2015, later amended to an onset date of April 7, 2015 (due to Mr. Collier's withdrawal of the first disability claim).  (Doc. 46-1, pp. 39–40, tpp. 152–154; Doc. 49-19, p. 26 – filed under seal).

After terminating Mr. Collier, no one filled the Forms Director position.

---

[7] Arlene Gaitan, Harland Clarke's Director of Health and Wellness and Executive Director of Employee Benefits, testified that she was aware that Harland Clarke could override Unum's denial of short-term disability, but that Unum advised against it.  (Doc. 46-16, pp 34–35, tpp. 129–133).  Ms. Gaitan stated:  "[w]e wanted [Mr. Collier] to get the short-term disability[]" . . . [because we wanted to help him[] . . . he's been a good employee, he's been with the company a long time, and we generally like to help our employees."  (Doc. 46-16, p. 35, tpp. 133-34).  She stated that ultimately, Unum was in the best position to make medical decisions and disability determinations, and that is why Harland Clarke elected not to override the decision.  (Doc. 46-16, p. 35, tpp. 135-36).  Ms. Gaitan testified that to her knowledge Harland Clarke had not overturned Unum's decisions with respect to other employees.  (Doc. 46-16, p. 42, tp. 164).

(Doc. 46-11, p, 24, tpp. 90–91).   Mr. Collier's responsibilities were divided between the directors of the Key Markets Group.   (Doc. 46-11, p. 24, tp. 91). Harland Clarke moved the employees who reported to Mr. Collier to the Key Markets Group, and those employees began reporting to the directors of the Key Markets Group.  (Doc. 46-11, p. 24, tpp. 91–92; Doc. 46-21, pp. 5–6, ¶ 6).

Mr. Collier did not reapply to Harland Clarke.   (Doc. 46-1, p. 24, tp. 90). Mr. Collier testified that he went online to look for open positions, but he did not feel that the available positions fit his skill set or matched his preferred geographical location of Birmingham, Alabama.   (Doc. 46-1, p. 24, tpp. 90–91). Mr. Collier had difficulty finding a job because he had a non-compete agreement with Harland Clarke which limited his employment options.  (Doc. 46-1, p. 59, tp. 231).   Harland Clarke reported to Mr. Collier's customers that he had retired. (Doc. 46-1, p. 59, tp. 231).   Consequently, some of Mr. Collier's contacts considered him to be "out of the market" and had no reason to give him information on job leads.  (Doc. 46-1, p. 59, tpp. 231–32).

## III. Discussion

### A. ADA, ADEA, and AADEA Discrimination Claims[8]

Mr. Collier contends that Harland Clarke discriminated against him on the basis of his age and disability by terminating his employment, falsely labeling his termination a "reduction in force," and by failing to reinstate him or place him in another position with Harland Clarke. Mr. Collier relies on the same evidence to support both his age and disability discrimination claims. The Court addresses Mr. Collier's claims under each statute.

#### 1. ADA Discrimination Claim

Under the ADA, it is unlawful for an employer to discriminate "against a qualified individual on the basis of disability" in any of the "terms, conditions, and

---

[8] The AADEA is an Alabama statute that protects individuals over the age of 40 against age discrimination in the workplace. Ala. Code § 25-1-21. The AADEA is modeled after the ADEA, and claims arising under the AADEA are analyzed using the same framework as the ADEA. *Robinson v. Alabama Cent. Credit Union*, 964 So. 2d 1225, 1228 (Ala. 2007). In this circuit, it is not clear whether a plaintiff may simultaneously pursue claims under the AADEA and ADEA. *Compare Collins v. Compass Group, Inc.*, 965 F. Supp. 2d 1321, 1331–32 (N.D. Ala. 2013) (plaintiff's AADEA claims were duplicative of claims under the ADEA and due to be dismissed on summary judgment); *Henry v. Jefferson County Personnel Bd.*, 519 F. Supp. 2d 1171, 1185, 1185-86 (N.D. Ala. 2007), *aff'd on other grounds*, 252 Fed. Appx. 308 (11th Cir. 2007) ("As a threshold matter, the court notes that Plaintiff cannot pursue both of her claims under the Alabama Age Act and the ADEA in this case. . . . Because the plain language of the Alabama Age Act forces a plaintiff to choose *either* suit under the ADEA *or, in the alternative*, suit under the Alabama Age Act, and because Plaintiff in this case has filed suit under the ADEA, the court finds that Plaintiff's claim under the Alabama Age Act is duplicative.") (emphasis in original), *with Wallace v. Jim Walter Homes, Inc.*, 68 F. Supp. 2d 1303, 1304 (M.D. Ala. 1999) (The AADEA does not preclude "simultaneous pursuit" of AADEA and ADEA claims "in a single forum."). The Court will not decide whether Mr. Collier may pursue his age discrimination claims under both the ADEA and AADEA because under either theory, his claim of age discrimination fails.

privileges of employment." 42 U.S.C. § 12112(a). In the Eleventh Circuit, the *McDonnell Douglas* burden shifting framework applied in Title VII cases also applies to the analysis of circumstantial evidence in ADA discrimination cases. *Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007); *see also Durley v. APAC, Inc.*, 236 F.3d 651, 655–57 (11th Cir. 2000).[9] Under this framework, the plaintiff initially must establish a prima facie case. *Durley*, 236 F.3d at 656. If the plaintiff establishes a prima facie case, then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action. *Id.* "The burden then returns to the plaintiff 'to show that [the proffered reason is] unworthy of credence and a pretext for discrimination.'" *Center v. Sec'y, Dep't of Homeland Sec., Customs & Border Prot. Agency*, 895 F.3d 1295, 1303 (11th Cir. 2018) (alterations in original) (quoting *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004)).

As the Eleventh Circuit has explained, the *McDonnell Douglas* framework is not "the only way to use circumstantial evidence to survive a motion for summary judgment." *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012). "If a plaintiff 'presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent,' she 'will always survive summary judgment.'" *Id.* (quoting *Smith v. Lockheed–Martin*, 644 F.3d 1321,

---

[9] Discrimination claims may be based on direct, circumstantial, or statistical evidence.

1328 (11th Cir. 2011)). A convincing mosaic of circumstantial evidence may be sufficient to allow a jury to infer that discriminatory intent motivated an employment decision. *Lockheed–Martin Corp.*, 644 F.3d at 1328; *see Lewis v. City of Union City, Georgia*, ---- F.3d ----, 2019 WL 1285058, *3 n.6 (11th Cir. Mar. 21, 2019).

To establish a prima facie case under the ADA, a plaintiff must show that at the time of the adverse employment action, (1) he had a disability, (2) he was a qualified individual, and (3) he was subjected to unlawful discrimination because of his disability. *United States Equal Employment Opportunity Comm'n v. St. Joseph's Hospital, Inc.*, 842 F.3d 1333, 1343 (11th Cir. 2016) (citing *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007)). "Disability is defined as a physical or mental impairment that substantially limits one or more major life activities of an individual; a record of such an impairment; or being regarded as having such an impairment." *St. Joseph's Hospital*, 842 F.3d at 1343–44 (quoting 42 U.S.C. § 12101(1) (internal quotations omitted)).

"To prove a 'regarded as' disabled claim, [a plaintiff] must 'establish[] that he has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment . . . .'" *Snider v. U.S. Steel-Fairfield Works Med. Dep't*, 25 F. Supp. 3d 1361, 1366 (N.D. Ala. 2014), *aff'd*, 591 Fed. Appx. 908 (11th Cir. 2015) (quoting 42 U.S.C. § 12102(3)(A)) (internal ellipsis

omitted).   In the ADA Amendments Act of 2008, Congress expanded the "regarded as" prong of the definition of disability so that a person now may be regarded as having an impairment "whether or not the impairment limits or is perceived to limit a major life activity."   42 U.S.C. § 12102(3).   The Eleventh Circuit has held that under the ADA Amendments Act of 2008, "an extensive analysis is not required to determine whether an individual's impairment is a disability under the ADA."   *St. Joseph's Hospital*, 842 F.3d at 1343 (citing *Mazzeo v. Color Resolutions Intern., LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014)).

### a.    *"Regarded As" Disabled*

Mr. Collier argues that Harland Clarke regarded him as disabled after Mr. Moyer observed him walking with a cane.   Mr. Collier draws an analogy between himself and the plaintiff in the *St. Joseph's* case.   In *St. Joseph's*, the plaintiff had a diagnosis of spinal stenosis and gait dysfunction, which the district court found "substantially limited . . . her ability to walk."   The Eleventh Circuit acknowledged the broader "regarded as" definition under the ADA amendments while emphasizing that the plaintiff was diagnosed with an impairment (spinal stenosis and gait dysfunction) that substantially limited the major life activity of walking.   The Eleventh Circuit Court of Appeals noted:

> The evidence shows that Bryk was substantially limited in her ability
> to walk. . . .   The Hospital argues that Bryk's pain, without more, is
> insufficient to establish an ADA disability.   Bryk suffered pain and
> more.   Her spinal stenosis and hip replacement impaired her ability to

walk—without a question a major life activity under the ADA. The evidence showed that without her cane, Bryk would limp and could only walk short distances. She suffered from gait dysfunction. Given that the threshold issue should not require extensive analysis, the court affirms the district court's decision finding that Bryk was disabled as a matter of law and that the first element of the prima facie case was met.

*Id*. at 1344.

Mr. Collier asserts that "[he] is, essentially, that person"—the same as the *St. Joseph's* plaintiff who was perceived as disabled after her supervisor observed her walking with a cane. (Doc. 54, p. 24). By several accounts, Mr. Collier was moving slowly following his second back surgery in 2014. (*See* Doc. 46-19, p. 17, tp. 62). Mr. Moyer asked Mr. Collier on several occasions how his back was feeling, and others remarked to Mr. Collier that it appeared that he was "struggling to get around."

The Court is not convinced that an employer merely seeing an employee with a cane, or other assistive device, brace, splint, or the like, is sufficient, standing alone, to meet the "regarded as" definition under the ADA or the amended ADA. But the combination of facts here—that Mr. Moyer observed Mr. Collier walking with a cane, that Mr. Moyer and others inquired about his back condition, and that Mr. Collier was substantially limited in his ability to walk—could lead a juror to conclude that Harland Clarke regarded Mr. Collier as disabled. In light of the Eleventh Circuit's admonition against extensive analysis

of disability in "regarded as" claims, *St. Joseph's Hospital*, 842 F.3d at 1343, the Court finds that Mr. Collier has satisfied the first prong of his prima facie case.

### b.    *Otherwise Qualified*

Harland Clarke acknowledges that when it terminated Mr. Collier's position, Mr. Collier was otherwise qualified within the meaning of the ADA. A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Harland Clarke argues that as of February 2015, Mr. Collier no longer was able to perform the essential functions of his job because the Social Security Administration determined that he was disabled. (Doc. 48, n.79). Mr. Collier admits that he now is unable to perform his job duties due to supranuclear palsy, but he argues that "his current inability to work does not prove, as a matter of law, that he was never able to work after February 11, 2015[,]" his last day of employment with Harland Clarke. (Doc. 54, p. 32). This factual dispute does not impact the Court's analysis of Mr. Collier's ADA discrimination claims because the parties agree that Mr. Collier still was able to perform the essential functions of his position in January of 2015 when Harland Clarke terminated his position.[10]

---

[10] Mr. Moyer would have terminated Mr. Collier effective December 31, 2014, had it not been for the upheaval in the Key Markets Group in December 2014.

### c.    Discriminatory Intent

Turning to the third prong of Mr. Collier's prima facie case, Mr. Collier must provide evidence that Harland Clarke discriminated against him "because of his disability." *See Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017). Mr. Collier concedes that he has no direct evidence of discriminatory intent; he relies instead on circumstantial evidence. (*See* Doc. 54, p. 12, ¶ 19).

Mr. Collier asserts that Mr. Moyer decided to terminate him after observing him with a cane during a meeting in Birmingham in the fall of 2014. He also argues that Mr. Moyer and various coworkers made remarks about his back condition which he believes either contributed to or were related to Mr. Moyer's decision to terminate his employment. These statements include Mr. Moyer asking Mr. Collier how he was doing or how his back was feeling; a remark by Rick Ebrey that it looked like Mr. Collier was struggling to get around; a remark by Dan Singleton to Mr. Collier, "don't get up, I know you had back surgery"; a remark by Debra Corwin to Mr. Collier that "it looked like he was struggling to get around"; a question by Sonia Ellison asking Mr. Collier if he wished he had taken an extra 30 days off; and a remark by Debra Corwin to Maria Robinson (which was overheard by Mandy Bennett and Tracy Harley, who in turn told Tom Jones), that Harland Clarke needed to "get rid" of Mr. Collier.

Mr. Moyer testified that he made the decision to eliminate Mr. Collier's

position.  (Doc. 46-11, p. 56, tp. 220).  He stated that he talked with Rick Ebrey about the decision, and Ms. Ellison helped prepare a RIF worksheet, but he (Mr. Moyer) was responsible for making the decision.  (Doc. 46-11, p. 56, tp. 220).  There is no evidence in the record that Dan Singleton, Tom Jones, or Maria Robinson was involved in any way in the decision to eliminate Mr. Collier's position.  Therefore, the statements of these individuals may, at best, be minimally probative of discriminatory intent.  *See Ritchie v. Industrial Steel, Inc.*, 426 Fed. Appx. 867, 873 (11th Cir. 2011) ("[S]tray remarks that are isolated and unrelated to the challenged employment action" are insufficient to prove discriminatory intent.).  The statements at issue here—including general questions about how Mr. Collier was feeling or remarks that he was struggling to get around—do not tend to show a discriminatory attitude.  *See Bass v. Lockheed Martin Corp.*, 287 Fed. Appx. 808, 811 (11th Cir. 2008) (vague statements by plaintiff's former supervisor that employer would no longer accommodate leave did not tend to show discriminatory animus).  Ms. Corwin's comment that the company should "get rid" of Mr. Collier is less innocuous and more troubling, but Ms. Corwin's remark is not tethered in any way to Mr. Collier's back surgery or use of a cane, so the statement is not circumstantial evidence of discriminatory intent for purposes of an ADA claim.

Because Mr. Collier has not offered evidence from which a reasonable jury could conclude that he was terminated because of a disability, his ADA claim fails as a matter of law. Although the Court accepts for purposes of this opinion that an ADA plaintiff may satisfy the "regarded as" disability standard with proof that his employer saw him walking with a cane, the Court cannot make the leap that Mr. Collier's argument requires—a finding that the mere coincidence of an employer seeing an employee walking with a cane and shortly thereafter making an adverse employment decision is sufficient to ask a jury to determine whether the employment action was because of the perceived disability. There must be evidence beyond stray remarks of co-workers and a passing encounter with a decision-maker to create a jury question.

To be sure, the circumstances surrounding Mr. Collier's termination would enable a jury to conclude that Harland Clarke not only wanted to eliminate Mr. Collier's position but also wanted to terminate him. A jury also could find that Harland Clarke was less than forthright in its handling of or explanations for the job action. A RIF of one employee is very unusual. Neither Mr. Moyer nor anyone else at Harland Clarke tried to help Mr. Collier, a long-term employee, find another position in the company when Harland Clarke eliminated the Forms Director position (which technically was not a position title within the company in the first place). A fact question exists as to whether Harland Clarke posted the

vacant director position in the Key Markets Group and whether the position had been filled when Mr. Moyer notified Mr. Collier of the RIF. Although Mr. Collier did not apply for the director position when it was created, Mr. Collier may have been willing to apply as an alternative to termination.[11] There are inconsistencies in the explanations that Mr. Moyer offered for the timing of the termination notification, and there seems to be evidence that contradicts Mr. Moyer's assessment of the performance of the Forms Division, but there is no evidence that ties these inconsistencies and incoherencies to Mr. Collier's back surgery or his use of a cane, such that Mr. Collier may identify a triable issue of fact concerning discriminatory intent.

The record before the Court, viewed in the light most favorable to Mr. Collier, reveals a harsh and heartless business decision, but there is no evidence that the decision was motivated by an intent to discriminate against someone who is regarded as having a disability. Therefore, Harland Clarke is entitled to judgment on Mr. Collier's ADA claim. *See Howard v. Hyundai Motor Mfg. Alabama*, 754 Fed. Appx. 798, 808 (11th Cir. 2018) (An employer "cannot be held liable for discriminatory conduct . . . [when the plaintiff] fail[s] to point to any evidence that unlawful discriminatory animus actually motivated [the] actions.");

---

[11] Mr. Collier admits that following his termination, he did not apply for a new position with Harland Clarke. He explains that none of the available positions fit his skill set or allowed him to remain in Birmingham, Alabama. (Doc. 46-1, p. 24, tpp. 90–91). Viewing the evidence in the light most favorable to Mr. Collier, the Court assumes for purposes of this discussion that Mr. Collier would have applied for the director position had he known about it.

*see also Williams v. Fla. Atl. Univ.*, 728 Fed. Appx. 996, 999 (11th Cir. 2018) ("In the end, an 'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'") (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984), *abrogated on other grounds by Lewis*, 2019 WL 1285058).

2.    ADEA Discrimination Claim

Mr. Collier's ADEA claim fairs no better. With respect to his discrimination claim under the ADEA, Mr. Collier argues that Mr. Moyer, after seeing him walking with a cane, decided that Mr. Collier was "either too old, too disabled, or a combination of the two, to perform" in commercial print. (Doc. 54, p. 5). But Mr. Collier has offered no evidence that Harland Clarke terminated him or failed to find an alternative position for him because of his age.[12]

Mr. Moyer testified that he made the decision to eliminate the Director of Forms position as part of a business strategy to address declining revenue from forms sales and to move toward a focus on commercial print. Pursuant to this plan, Harland Clarke moved the employees from the Forms Division into the Key Markets Group. Mr. Moyer stated that he did not retain Mr. Collier because Mr. Collier's skill and expertise was in the area of forms, not commercial print.

---

[12] The Court rejects the assertion implicit in Mr. Collier's argument that an individual who uses a cane or another assistive device is "old" or "too old."

Mr. Collier points out that even if forms sales were declining, the product still generated revenue for Harland Clarke. Mr. Collier argues that he helped develop the Print Solutions plan for the Key Markets Group, a plan designed to promote Harland Clarke's sale of commercial print; that he trained the members of the Forms Division on commercial print; and that he developed a two-year plan for merging the sale of commercial print into the Forms Division.[13] But Mr. Collier merely quibbles with the explanation that Mr. Moyer provided for his decision. An employee cannot establish discriminatory intent by "'quarreling with the wisdom of [the employer's] reason'" for an employment decision. *Ritchie*, 426 Fed. Appx. at 872 (quoting *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000)).

Mr. Collier has not offered evidence that Harland Clarke offered different reasons for the 2014 RIF or that Mr. Moyer or others involved in the shift in focus from forms to commercial print made comments about Mr. Collier's age or any other employee's age. There is no evidence that Harland Clarke was purging from

---

[13] It is undisputed that Mr. Collier contributed to the development of the Print Solutions plan. With respect to Mr. Collier's assertion that he "developed a two year plan for merging the sale of commercial print into the forms division," Mr. Collier cites page 18, lines 15–23 of his deposition and Doc. 46-20. (*See* Doc. 54, p. 17, ¶ 2). The cited materials do not contain information concerning a "two-year plan" (or any other plan) devised by Mr. Collier. Concerning Mr. Collier's assertion that he trained his subordinates on commercial print, the record indicates that Mr. Collier, as part of the Print Solutions development team, participated in a Print Solutions meeting in August of 2014. Mr. Moyer testified: "that's when we started more education on commercial print." (Doc. 46-11, p. 73, tp. 286). As for his knowledge of commercial print, Mr. Collier admits that the Forms Division began selling commercial print six months before his termination. (Doc. 46-1, p. 10, tpp. 33–35). Although some of Mr. Collier's arguments about his commercial print experience lack support in the record, for purposes of this decision, the Court accepts the arguments.

its ranks employees who were older than 50 or adding to its ranks employees under the age of 40, particularly in the Forms Division. Thus, Mr. Collier has not "identif[ied] 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence'" and infer from them discriminatory intent. *Ritchie*, 426 Fed. Appx. at 872 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). Consequently, Harland Clarke is entitled to judgment on his ADEA claim.[14]

## B.    ADA and ADEA Retaliation Claims

Mr. Collier contends that Harland Clarke retaliated against him in violation of the ADA and ADEA by denying his claim for short-term disability benefits. Because Mr. Collier relies on the same evidence in support of his age and disability claims, the Court analyzes these claims together. Before reaching the merits of Mr. Collier's arguments, the Court first must determine whether Mr. Collier had to exhaust his retaliation claim administratively.

Before he files a lawsuit under the ADA or ADEA, a plaintiff first must file a charge of discrimination with the Equal Employment Opportunity Commission. *Zillyette v. Capital One Fin. Corp.*, 179 F.3d 1337, 1339 (11th Cir. 1999). This

---

[14] The parties devote considerable argument to whether a plaintiff may pursue an age discrimination claim along with other employment discrimination claims. In light of the foregoing discussion, the Court does not need to reach the issue.

administrative prerequisite triggers the EEOC's investigation and conciliatory procedures and puts the employer on notice of the allegations against it. *Houston v. Army Fleet Services, L.L.C.*, 509 F. Supp. 2d 1033, 1040 (M.D. Ala. 2007) (citing *Gregory v. Ga. Dept. of Human Res.*, 355 F.3d 1277, 1279–80 (11th Cir. 2004), and *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1319 (11th Cir. 2001)).

"[A] plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory*, 355 F.3d at 1280. A plaintiff's failure to check a particular box on an EEOC charge is not fatal to a claim of discrimination if the factual allegations in the EEOC charge are sufficient to identify a claim. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970) ("[W]e decline to hold that the failure to place a check mark in the correct box is a fatal error.").[15] "Courts will allow judicial claims that 'amplify, clarify, or more clearly focus' the EEOC complaint allegations, but 'allegations of new acts of discrimination are inappropriate' for a post-charge judicial complaint. *EEOC v. STME, LLC*, 309 F. Supp. 3d 1207, 1211 (M.D. Fla. 2018) (quoting *Gregory*, 355 F.3d at 1279–80)). An adverse employment action alleged after and as a result of filing an EEOC charge is said to grow out of the original charge of discrimination, such that a new

---

[15] In *Bonner v. City of Prichard*, the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions that the Fifth Circuit Court of Appeals issued before October 1, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

or amended EEOC charge filing is unnecessary. *See, e.g., Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988) (A plaintiff does not have to "exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court.") (citing *Gupta v. East Texas State Univ.*, 654 F.2d 411 (5th Cir. 1981)).

Mr. Collier's EEOC charge does not mention retaliation or check the box for retaliation, but that is not surprising because Mr. Collier's retaliation theory relates to conduct that occurred after he filed his EEOC charge on January 27, 2015. (*See* Doc. 1-1). In his complaint, Mr. Collier alleges that:

> 27. Defendant terminated Plaintiff on or about February 9, 2015, and offered him a six (6) month severance. Defendant mandated that Collier's severance was contingent on him signing a release and waiving all rights to file a charge with the EEOC for age and disability discrimination."

(*See* Doc. 1, p. 7, ¶ 27). Mr. Collier argues that conditioning the severance package on his waiver of all claims was in retaliation for his filing of an EEOC charge. (*See* Doc. 54, p. 31) ("The facts, set forth above, demonstrate that HC [Harland Clarke] not only changed its position with regard to [Mr.] Collier's severance pay after he filed his charge of discrimination, but that [Harland Clarke's] legal department became involved in the determination on [Mr.] Collier's application for short term disability."). Because Mr. Collier filed his EEOC charge

on January 27, 2015, and because the conduct that Mr. Collier characterizes as retaliatory allegedly occurred in February 2015, consistent with *Baker*, Mr. Collier did not have to exhaust the claim administratively.

More problematic is Mr. Collier's failure to include in the retaliation count of his June 15, 2015 complaint his theory concerning his right to a severance package or to short-term disability benefits. In Count Three of his complaint, entitled "Retaliation Claims Pursuant to the ADEA, AADEA, and the ADA," Mr. Collier alleges that he:

> complained of discrimination that violated the ADEA, AADEA, and ADA. [Mr.] Collier also filed a charge of discrimination with the EEOC alleging discrimination in violation of the ADEA and ADA. [Mr.] Collier was terminated and has been refused transfer, rehire, interview, and all consideration for open and available jobs.

(Doc. 1, p. 12, ¶ 54). As the Eleventh Circuit Court of Appeals consistently has held, "a plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Dukes v. Deaton*, 852 F.3d 1035, 1046 (11th Cir. 2017) (internal quotations and citations omitted) (explaining that in her amended complaint, the plaintiff "alleged one theory of supervisory liability" and then in her brief in opposition to summary judgment "asserted an alternative theory of supervisory liability" that was a "distinct ground for supervisory liability" such that the plaintiff could not raise the new theory in a brief in opposition to a motion for summary judgment without first moving to amend the complaint). Because Mr.

Collier did not request permission to amend his complaint before he filed his summary judgment brief, his retaliation arguments are procedurally barred.

Even if Mr. Collier's retaliation theories were properly before the court, his retaliation arguments would not be persuasive. With respect to his argument concerning short-term disability, Mr. Collier asserts that Harland Clarke retaliated against him because the company's "legal counsel got involved in the processing of Collier's application for short-term disability benefits, which benefits were subsequently denied." (Doc. 54, p. 31). The evidence confirms that Harland Clarke's attorney took part in discussions concerning Mr. Collier's claim for short-term disability, but there is no evidence that the attorney encouraged or otherwise influenced the outcome of the benefit determination. During a conference call, Harland Clarke's corporate counsel (Ms. Hargrove), Ms. Ellison, and Unum representative Chris Gillogly discussed Mr. Collier's disability claim. (*See* Doc. 46-10, pp. 22–23). Unum administers disability benefits for Harland Clarke. The Court has reviewed the transcript of the call and finds nothing in it that suggests that Ms. Ellison or Ms. Hargrove urged Unum to deny Mr. Collier's request for short-term disability benefits. During the call, Ms. Hargrove asked Mr. Gillogly why Unum had not yet reached a decision. Ms. Hargrove expressed frustration and stated that the claim should not be delayed, given the fact that Mr. Collier's physician had indicated that Mr. Collier was unable to work. Mr. Gillogly

explained that because the short-term disability plan was self-insured, Harland Clarke could "approve benefits outside the plan . . . without evaluating disability" (Doc. 46-10, p. 22), but Mr. Gillogly recommended against exercising the option because it could harm Mr. Collier if his claim for short-term disability benefits transitioned to a claim for long term disability benefits.

Ultimately, Unum recommended that Harland Clarke deny Mr. Collier's claim for benefits. Harland Clarke could have overturned Unum's determination and awarded Mr. Collier benefits, but Mr. Collier has not demonstrated that Harland Clarke deviated from its normal course of business by accepting Unum's recommendation. Harland Clarke's Director of Employee Benefits, Ms. Gaitan, acknowledged that Harland Clarke could override Unum's decision and award benefits regardless of Unum's findings but stated that the company had not, to her knowledge, done so in any other case. (Doc. 46-16, p. 42, tp. 164). Ms. Gaitan testified that Harland Clarke did not override Unum's decision in Mr. Collier's case because Unum was in the best position to make disability determinations, and Unum recommended against an award of benefits. (Doc. 46-16, p. 35, tpp. 135–36).

With respect to Mr. Collier's allegations concerning severance pay, the evidence indicates that Harland Clarke included inaccurate severance language in an information sheet that the company sent to Mr. Collier. But the sheet also

states, with emphasis:

> *This sheet is confidential and prepared for you. Please note that the information contained in this document is effective as of the date printed (1.10.15) and is subject to change at any time based upon policy changes related to administration of severance benefits. Information contained on this sheet is provided solely as a summary. The separation document is the governing instrument and should be reviewed for specific information. Should you have any questions regarding this summary or feel that the information is not accurate, please contact Sonia Ellison.*

(Doc. 46-8, p. 45) (emphasis in original). There is no evidence that Harland Clarke provided inaccurate severance information in the summary sheet in an effort to retaliate against Mr. Collier for filing an EEOC charge, and the disclaimer language that appears conspicuously on the summary sheet makes clear that Mr. Collier should not rely solely on the summary sheet.

For these reasons, Harland Clarke is entitled to judgment in its favor on Mr. Collier's retaliation claim.

## C.     State Law Claim for Invasion of Privacy

To establish a claim for invasion of privacy under Alabama law, Mr. Collier must demonstrate that Harland Clarke (1) intruded into his physical solitude or seclusion; (2) disclosed private information about him that violates ordinary decency; (3) put him in a false position in the public eye; or (4) appropriated some element of his personality for public use. *Butler v. Town of Argo*, 871 So. 2d 1, 12 (Ala. 2003). Under Alabama law, invasion of privacy is "the intentional wrongful intrusion into one's private activities in such a manner as to outrage or cause

mental suffering, shame or humiliation to a person of ordinary sensibilities." *Ex parte Bole*, 103 So. 3d 40, 51–52 (Ala. 2012).

Relying on an intrusion upon seclusion theory (Doc. 54, p. 35), Mr. Collier argues that Harland Clarke invaded his privacy by communicating with Unum about his claim for short-term disability benefits. Mr. Collier contends that Harland Clarke's attorney "quizzed Unum for medical and claims information," and then shared this information with the EEOC in Harland Clarke's EEOC position statement.

The Court has reviewed the record, focusing on the documents that Mr. Collier cites in support of his invasion of privacy claim. The documents consist of email and phone communications with Unum and the transcript of the telephone call involving Ms. Ellison, Ms. Hargrove, and Mr. Gillogly. (Doc. 46-9, pp. 47–50; Doc. 46-10, pp. 7–11, 22–23). The evidence does not indicate that Harland Clarke attempted to "discredit [Mr.] Collier by publishing to Unum [Mr.] Collier's personal affairs." (Doc. 54, p. 37). Instead, the communications reflect Harland Clarke's efforts to prompt Unum to resolve Mr. Collier's application for disability benefits. The substance of the communications do not constitute "prying or intrusion . . . which would be offensive or objectionable to a reasonable person." *Hogin v. Cottingham*, 533 So. 2d 525, 531 (Ala. 1988).

Mr. Collier also argues that Harland Clarke told his former customers that he

had retired, and that in doing so, the company placed him in a false light. (Doc. 54, p. 37). Mr. Collier asserts that he "received emails and cards congratulating him on his retirement." (Doc. 54, p. 37).[16] The Alabama Supreme Court has explained that "false light" invasion of privacy occurs when:

> one gives publicity to a matter concerning another that places the other before the public in a false light, [and] (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Ex parte Bole*, 103 So. 3d at 51–52. Giving publicity to a matter means making the information available "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Ex parte Birmingham News*, 778 So. 2d 814, 818 (Ala. 2000).

Mr. Collier has not produced evidence that Harland Clarke provided misinformation concerning his separation from Harland Clarke. Mr. Collier cites the deposition transcript of Tom Jones. (*See* Doc. 54, p. 19, ¶ 17). The cited portions of Mr. Jones's deposition do not relate to Mr. Collier's assertion. Mr. Jones indicated that he could not remember how he learned that Mr. Collier no longer was with the company; Mr. Jones does not mention retirement. (*See* Doc. 46-19, p. 8, tp. 28). Even if the evidence indicated that Harland Clarke had told

---

[16] Although Mr. Collier's brief states that he received multiple "emails and cards congratulating him on his retirement," the evidentiary record contains one email and one card from the same client. (*See* Doc. 46-6, pp. 7–9).

some of Mr. Collier's former clients that he had retired, Mr. Collier has not demonstrated that the information was published to the public at large or that the information could be deemed highly offensive to a reasonable person. Therefore, Harland Clarke is entitled to summary judgment on Mr. Collier's invasion of privacy claim.

## IV.    Mr. Collier's Motion to Compel

Shortly before the discovery deadline in this case expired, Mr. Collier filed a motion to compel with respect to one of his document requests. (Doc. 37).[17] Mr. Collier requested "[d]ocuments which evidence and/or support Defendant's decision to eliminate the Sales Director position previously held by Plaintiff and the condensing of all or part of the job into the other positions, including, all plans, notifications, the identity by name and position of all decision-makers, email communications, and organizational charts related thereto." (Doc. 37-3, p. 13, ¶ 24). Harland Clarke asserted attorney-client privilege and/or the attorney work product doctrine objections to the request. (Doc. 37-4, p. 22).

Eventually, Harland Clarke produced documents to Mr. Collier which Harland Clarke did not consider privileged, including a chart concerning the reduction in force. Mr. Collier asserts that Harland Clarke waived its claims of privilege by producing the RIF chart, such that Harland Clarke must produce all

---

[17] After a number of extensions, the discovery deadline became November 14, 2017. (Doc. 33).

emails surrounding the RIF chart and the RIF decision. (Doc. 37, p. 6, ¶ 17).

The Court has reviewed the documents in question *in camera*. Most of the documents are privileged communications between corporate counsel and human resources personnel. None of the information contained in the documents would change the Court's substantive analysis of Mr. Collier's claims. Therefore, the Court denies the motion to compel as moot.

## V.     Harland Clarke's Motion to Quash

Harland Clarke moved to quash non-party subpoenas. On November 6, 2017, within two weeks of the November 14, 2017 discovery deadline in this case, Mr. Collier issued four non-party subpoenas to Wells Fargo, SunTrust Bank, Berkshire Bank, and David Newton. (Doc. 39-1, pp. 2–5; Doc. 39-2, pp. 2–5; Doc. 39-3, pp. 2–5; Doc. 39-5, pp. 2–5). A subpoena may be quashed when it "fails to allow a reasonable time to comply." Fed. R. Civ. P. 45(d)(3)(A). Even though Mr. Collier issued the subpoenas before the expiration of the final discovery deadline, the timing of service did not allow for compliance within the deadline. Mr. Collier has offered no response to Harland Clarke's motion to quash and has not otherwise offered a reasonable explanation for delaying service of the subpoenas until eight days before the discovery deadline. Therefore, the Court will grant Harland Clarke's motion to quash.

## VI.    Conclusion

For the foregoing reasons, the Court will enter judgment in favor of Harland Clarke with respect to Mr. Collier's discrimination and retaliation claims under the ADA, ADEA, and AADEA.  Harland Clarke is also entitled to judgment on Mr. Collier's state law claim for invasion of privacy.

The Court grants Harland Clarke's motion to quash and denies Mr. Collier's motion to compel as moot.  The Court grants Mr. Collier's motion to voluntarily dismiss his state law claims for intentional infliction of emotional distress, interference with business and contractual relations, and negligent and wanton hiring, training, and supervision.  Any harassment or hostile work environment claims contained in Counts One and Two of Mr. Collier's complaint are dismissed. *See* note 1, *supra*.  The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** this 31st day of March, 2019.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE